**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| FRESH ACQUISITIONS, LLC, *et al.*,[1] | § | Case No. 21-30721 (SGJ) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |

**DECLARATION OF MARK SHAPIRO, CHIEF RESTRUCTURING
OFFICER, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Mark Shapiro declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Chief Restructuring Officer of Fresh Acquisitions, LLC ("Fresh" and each of the other above-captioned affiliated debtors and debtors in possession, collectively the "Debtors" or the "Company").  I have held this position since February 2, 2021.

2.      As Chief Restructuring Officer, I am responsible for overseeing the operations and financial activities of the Debtors, including, but not limited to, monitoring cash flow, business relationships, workforce issues, and financial planning.  As a result of my tenure with the Debtors and my turnaround experience, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I am generally familiar with the Debtors' businesses, financial condition, policies and procedures, day-to-day operations, and books and records.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Alamo Fresh Payroll, LLC (1590); Fresh Acquisitions, LLC (2795); Alamo Ovation, LLC (9002); Buffets LLC (2294); Hometown Buffet, Inc. (3002); Tahoe Joe's Inc. (7129); OCB Restaurant Company, LLC (7607); OCB Purchasing, Co. (7610); Ryan's Restaurant Group, LLC (7895); Fire Mountain Restaurants, LLC (8003); Food Management Partners, Inc. (7374); FMP SA Management Group, LLC (3031); FMP-Fresh Payroll, LLC (8962); FMP-Ovation Payroll, LLC (1728); and Alamo Buffets Payroll, LLC (0998). The Debtors' principal offices are located at 2338 N. Loop 1604 W., Suite 350, San Antonio TX, 78248, United States.

4826-7091-0436

3.      Except as otherwise noted, I have personal knowledge of the matters set forth herein, or I have gained knowledge of such matters from my tenure with the Debtors and their advisors.

4.      I am over the age of 18, and I am authorized to submit this declaration on behalf of the Debtors.  References to the Bankruptcy Code (as defined herein), the chapter 11 process, and related legal matters are based on my understanding of such as explained to me by counsel.  If called upon to testify, I would testify competently to the facts set forth in this declaration.

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Northern District of Texas (the "Court").  To minimize the adverse effects on the business and contemporaneously herewith, the Company has filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions").  I submit this declaration to assist the Court and parties in interest in understanding the circumstances resulting in the commencement of these chapter 11 cases, and in support of the Debtors' chapter 11 petitions and First Day Motions.

### Qualifications

6.      I am a Senior Managing Director of GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services ("B. Riley Advisory"), where I have been employed since 2016. Prior to that time I managed Challenger Advisors LLC, a Dallas-based turnaround financial advisory firm and before that served as Chief Financial Officer for a number of public companies, including Big Lots Inc. and Central Parking Corp, as well-as private equity-owned portfolio businesses.  I received my Bachelor of Science degree in accounting from The Ohio State University and began my career with Ernst & Young in New York. I am a Certified Public Accountant (inactive).

4826-7091-0436

7.      I have over twenty-five years' experience as a turnaround advisor and corporate financial executive and have advised debtors, secured lenders, trade creditors and equity holders in both out of court and in court proceedings.  I have extensive experience in U.S. Bankruptcy Courts and have been involved in numerous chapter 11 cases and court-appointed receiverships.

8.      In addition to working with the Debtors, I have played various roles with respect to both company-side and creditor/committee-side engagements.   Representative experience includes, but is not limited to, the following:  PBS Brands Inc./Punch Bowl Social (CRO), Loves Furniture, Inc. (Debtor's FA), GGI Holdings LLC/Gold's Gym (Debtor's FA and Liquidating Trustee), Pine Creek Medical Center (CRO), Lockwood Holdings LLC (CRO), Uplift Rx LLC/Alliance Health (Debtors' FA and Liquidating Trustee), Neighbors Legacy Holdings Inc. (Unsecured Creditors' Committee FA and Creditor Trustee), Eagle Pipe, LLC (Debtor's FA) and Bristow Group Inc. (Equity Committee FA).

## Preliminary Statement

9.      Prior to the COVID-19 pandemic, the Debtors were a significant operator of buffet-style restaurants in the United States with approximately 90 stores operating in 27 states.  The Debtors' concepts include six buffet restaurant chains and a full service steakhouse. The Debtors' buffet restaurants principally operated under the names Furr's Fresh Buffet®, Old Country Buffet®, Country Buffet®, HomeTown® Buffet, Ryan's®, and Fire Mountain®. These locations primarily offer self-service buffets with entrees, sides, and desserts for an all-inclusive price. In addition, the Debtors own and operate a full service, casual dining chain under the name Tahoe Joe's Famous Steakhouse®.

10.      Much like its competitors in the all-you-can-eat (AYCE) and dine-in restaurant businesses, the Debtors' recent history has been impacted by the uncertainty, unexpected challenges, and ever-changing landscape resulting from the COVID-19 pandemic. Despite the

3

4826-7091-0436

Debtors' efforts to right-size their operations in the wake of a prior 2016 bankruptcy filing, the unpredictable and unprecedented scale of the COVID-19 pandemic significantly disrupted the Debtors' restaurant operations and severely limited customer demand. As various federal, state, and local governments instituted shelter-in-place orders and restricted restaurant operations to delivery and takeout services, the Debtors (like many other restaurant operators) experienced a significant decline in customer spending and foot traffic. The shutdowns delivered a sudden and significant blow to the business and the Debtors' overall liquidity position. As such, the Debtors have been forced to close all of their remaining AYCE restaurants; the only locations currently open for business are six Tahoe Joe's restaurants in California.

11. To familiarize the Court with the Debtors, their businesses, the circumstances leading up to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, this Declaration is organized into four sections. **Part I** provides background information on the Debtors' corporate and capital structures. **Part II** offers detailed information on the Debtors' prepetition operations, prior bankruptcy filings and the subsequent events leading to the present need for further restructuring. **Part III** briefly describes the proposed sale process to be conducted during the course of these cases. **Part IV** summarizes the relief requested in and the legal and factual basis that support the First Day Motions.

### Background

I. **Corporate Structure and Summary of Prepetition Debt.**

    A. **Corporate Structure.**

12. The Company and its brands are all privately owned. The Debtors own and operate their brands through a number of direct and indirect subsidiaries.

13. The Furr's Fresh Buffet® brand is owned by Fresh, which has the following corporate structure:

4



14. The Debtors' remaining brands (Tahoe Joe's®, Old Country Buffet®, Country Buffet®, HomeTown® Buffet, Ryan's® and Fire Mountain®) are owned directly or indirectly by Debtor Buffets, LLC ("Buffets"), a Minnesota limited liability company, which in turn is owned by non-debtor Alamo Buffets, LLC, a Texas limited liability company. The corporate structure for Buffets is set forth below:



15. The remaining Debtors—Alamo Ovation, LLC ("Alamo Ovation"); Food Management Partners, Inc. ("FMP"); FMP SA Management Group, LLC ("FMP Management"); FMP-Fresh Payroll, LLC ("Fresh Payroll"); and FMP-Ovation Payroll, LLC ("Ovation Payroll") are non-operating entities. In light of the cessation of the Debtors' restaurant operations in 2020, and a new management agreement with VitaNova Brands ("VitaNova") (discussed below) that

5

became effective on January 1, 2021, these Debtor entities no longer have operations, but have sought chapter 11 protection due to their co-liability for certain of the other Debtors' liabilities.

16.     Alamo Buffets Payroll, LLC employs the personnel that operate Tahoe Joe's® restaurants.  Prior to that, Ovation Payroll employed the personnel that operated the locations owned by Buffets, including the Tahoe Joe's personnel.  Although all Furr's locations are closed as of the Petition Date, Alamo Fresh Payroll, LLC is responsible for employing all Furr's restaurant personnel.  From 2014 through 2018, Fresh Payroll employed the personnel that operated the Furr's locations owned by Fresh.

**B.**     **The Debtors' Prepetition Debt Structure**

17.     As noted above by the two different organizational charts, there are two "parts" or "sides" of the Debtors' businesses—the "Furr's" side,[2] and the "Buffets" side (which includes all brands other than Furr's Fresh Buffet®).  The Furr's side of the business is subject to prior secured obligations to Arizona Bank & Trust ("AB&T").  The Buffets side of the business has no prior secured obligations, except as discussed below.

18.     On or about January 2, 2015, Fresh and non-Debtor Alamo Dynamics, LLC ("Alamo") entered into a Commercial Loan Agreement ("CLA") with AB&T in the original principal amount of $8,707,500.  The CLA was guaranteed by, among others, FMP Management. On or around June 29, 2015, the CLA was modified to incorporate, among other things, a short term bridge loan of $14,500,000.  The CLA was further modified from time to time thereafter, including on or about May 30, 2017, when Debtor FMP Management was added as a co-borrower. The CLA is guaranteed by a variety of non-Debtor entities and individuals (the "Guarantors").

---

[2] The Furr's Fresh Buffet® restaurants are under the Fresh umbrella.

4826-7091-0436

19. On or about February 18, 2021, AB&T entered into a forbearance agreement with Fresh, Alamo, FMP Management, and the Guarantors (the "Forbearance Agreement"), as a result of certain alleged defaults under the CLA which, among other things, extended the maturity date for the CLA to July 30, 2021.

20. As of the Petition Date, Fresh and FMP Management are indebted to AB&T in the approximate amount of $13,466,151.50 in principal and accrued interest, plus additional costs and fees. All amounts owing to AB&T are secured by substantially all assets of each of Fresh and FMP Management, and certain assets of non-debtor Alamo.

21. As noted above, the Buffets Debtors had no prior secured obligations. They do have unsecured liabilities, including approximately $3.9 million in sales taxes, $900,000 in payroll tax obligations and accrued PTO to certain employees in the amount of approximately $507,763.30.

21. Effective as of April 16, 2021, each of the Debtors as a borrower entered into that certain Prepetition and Debtor in Possession Credit Agreement dated as of April 16, 2021 with VitaNova as lender (the "DIP Credit Agreement"), for a prepetition advance of $500,000. That advance is secured by a first lien on substantially all assets of the Buffets Debtors, and only a second lien on the Furr's Debtors' intellectual property (which is subject to and will remain subject to AB&T's first priority lien).

## II. Circumstances Leading Up to the Restructuring and Prepetition Restructuring Efforts.

### A. The Debtors' History

22. Buffets, Inc. was founded in 1983 to develop buffet-style restaurants under the name Old Country Buffet®. In October 1985, Buffets, Inc. successfully completed an initial public offering with seven restaurants, and by 1988 had 47 company-owned units and nine franchised

4826-7091-0436

units.  In September 1996, Buffets, Inc. merged with HomeTown Buffet, a similar publicly-held, buffet-style restaurant company established and developed by one of Buffets, Inc.'s co-founders. The merger of Buffets, Inc. and HomeTown Buffet added 80 company-owned restaurants in 11 states and 19 franchised restaurants in eight states, bringing the total number of restaurants to 346 company-owned restaurants and 24 franchised restaurants in 36 states as of December 31, 1996.

23.     On October 2, 2000, Buffets Holdings, Inc. acquired Buffets in a buyout from its public shareholders.  On November 1, 2006, Buffets, through a wholly-owned subsidiary, merged with Ryan's Restaurant Group, Inc., a similar restaurant concept to Buffets with more than 300 steak-buffet restaurants operating primarily in the Southeastern United States.  Under the merger, Buffets' wholly-owned subsidiary merged with and into Ryan's with Ryan's remaining as the surviving corporation. As a result of the Merger, Ryan's became a wholly-owned subsidiary of Buffets.

24.     Due to a variety of external economic factors that adversely affected the companies' operating performance during 2007, Buffets Holdings, Inc. and its direct and indirect subsidiaries filed for chapter 11 relief in January of 2008 (the "2008 Debtors"). The 2008 Debtors successfully reorganized and confirmed their Chapter 11 plan on April 17, 2009. The 2008 Debtors' chapter 11 plan became effective on April 28, 2009, and their chapter 11 cases have been closed.

25.     The Buffets companies were again impacted by external economic factors of a sluggish U.S. economy including a marked increase in unemployment, higher gasoline and energy costs, lower consumer confidence and associated decline in discretionary spending among the companies' core customers as well as an increase in the minimum wage.  These factors together with above-market rent obligations led to Buffets, its direct parent, the ultimate parent and all

4826-7091-0436

direct and indirect subsidiaries filing for chapter 11 relief in January of 2012 (the "2012 Debtors").

After approximately 5 months in chapter 11, the 2012 Debtors successfully reorganized and

confirmed their chapter 11 plan on June 27, 2012. The 2012 Debtors' chapter 11 plan went

effective on July 18, 2012.

26. Three years later, on August 19, 2015, Alamo Ovation, LLC acquired Buffets

Restaurants Holdings, Inc. (the "Merger"). Under the Merger, Alamo Ovation Acquisition, Inc., an

acquisition subsidiary of Alamo Ovation, LLC, merged with and into Buffets Restaurants

Holdings, Inc. with Buffets Restaurants Holdings, Inc. remaining as the surviving corporation. As

a result of the Merger, Buffets Restaurants Holdings, Inc. became a wholly owned subsidiary of

Alamo Ovation, LLC, a Texas limited liability company.

27. Immediately following the Merger, the Debtors operated over 300 restaurants in 35

states which included five buffet brands: Ryan's®, HomeTown® Buffet, Old Country Buffet®,

Country Buffet®, and Fire® Mountain and the one full service, casual dining brand, Tahoe Joe's®

Famous Steakhouse. At that point, the Debtors' business operations were managed by FMP

Management pursuant to a management agreement. FMP Management, a privately held company

based in Hollywood Park, Texas, was a multi-concept developer and operator of independent

restaurant chains. FMP Management provided operational oversight and all professional and

administrative services for the Debtors. In return for the services provided, FMP Management

received reimbursement of allocated costs and expenses and a management fee. A separate entity,

Ovation Payroll, provided employment and wage related services for the Debtors.

28. Due to the need for further reorganization and protection following a state court

judgment entered in late 2015, the Debtors filed a third group of bankruptcy cases in March of

4826-7091-0436

2016 (the "2016 Debtors").[3]  The 2016 Debtors' chapter 11 plan became effective on May 18, 2017, and their chapter 11 cases are now closed.

29.    Debtor Fresh acquired the Furr's Fresh Buffet® brand assets, indirectly, following a section 363 sale approved by the U.S. Bankruptcy Court for the Northern District of Texas (Dallas Division) in the prior brand owner's 2014 bankruptcy cases.[4]  Consequently, Fresh and its Furr's Fresh Buffet® brand assets were not included in the 2016 bankruptcy filings.

30.    FMP Management and Ovation Payroll previously provided management services to Buffets and its subsidiaries pursuant to management service agreements.  FMP Management ceased operations in June 2020.  The management and service agreements were terminated on December 31, 2020.  Beginning January 1, 2021, non-Debtor entity VitaNova started providing management services to Buffets and its subsidiaries.

**B.    The COVID-19 Pandemic and Operational Response.**

31.    Despite the Debtors' efforts to right-size their operations following the 2016 bankruptcy, the unpredictable and unprecedented scale of the COVID-19 pandemic significantly disrupted the Debtors' restaurant operations and severely limited customer demand.  As various federal, state, and local governments instituted shelter-in-place orders and restricted restaurant operations to delivery and takeout services, the Debtors (like many other restaurant operators) experienced a significant decline in customer spending and foot traffic.  The shutdowns delivered a sudden and significant blow to the business's liquidity position.  The Company's projections demonstrated that, to weather this environment, it needed to take immediate action to preserve liquidity and weather the worsening storm. As such, the Debtors decided to close the vast majority

---

[3] *See In re Buffets, LLC,* Case No. 16-50557-11-rbk (Bankr. W.D. Tex.).

[4] *See In re Buffet Partners, L.P.,* Case No. 14-30699-11-hdh (Bankr. N.D. Tex.).

4826-7091-0436

of their restaurant locations.  The only restaurants that remain open currently are six Tahoe Joe's®

restaurants, which had revenue of approximately $21 million per year before the pandemic.

32.     In short, the Debtors have responded to the pandemic by conserving financial

resources in the face of the pandemic with the goal of maximizing value of the Debtors' restaurant

brand assets.

C.      **Restructuring Negotiations and Path Forward.**

33.     Despite the Debtors' prepetition cost savings initiatives through store closings, the

Debtors cannot sustain their remaining operations with their dwindling liquidity.  As discussed in

the other first day motions and accompanying declarations filed contemporaneously with this

Declaration, the Debtors reached agreements with VitaNova, their proposed DIP Lender, to borrow

needed capital on a pre- and postpetition basis.  These funds are necessary to manage these

bankruptcy cases, including the ability to run a sale process.

34.     A sale and auction process will ensure that the greatest value is realized for Tahoe

Joe's and the Furr's intellectual property.  Although Furr's locations are closed, selling its

intellectual property under this process provides flexibility to the buyer and allows the brand to be

reopened in the future, if desired.  It also allows for the possibility of monetizing or transferring

leases for certain closed stores that a buyer could use for future operations, either for the Furr's

brand or otherwise.

35.     Other than the revenue generated by Tahoe Joe's, which itself has been insufficient

to sustain operations entirely, equity has had to infuse capital over time to maintain the overall

corporate family.  Such capital infusions have little, if any, chance of being repaid under the current

circumstances.

36.     In furtherance of orchestrating an orderly chapter 11 filing, and to avoid conflicts

(given the multiple hats worn by the VitaNova management team), Vineet ("Vin") Batra was

4826-7091-0436

appointed as Independent Director for the governing bodies of all of the Debtors in January 2021, and I was appointed Chief Restructuring Officer in February, 2021.

### III.   Proposed Sale Process

37.   While the Debtors are not seeking emergency approval of bid procedures, the proposed DIP financing arrangements contemplate an expedited sale process to begin in the first few weeks of these bankruptcy cases.  Specifically, the proposed DIP financing agreement and interim order, if approved, will require the Debtors to file a bidding procedures motion within 21 days of the Petition Date, with such motion to include the proposed bidding procedures and process for approving a stalking horse asset purchase agreement and corresponding bid protections for any proposed stalking horse bidder.  The proposed DIP financing agreement and interim and final orders, if approved, will also require approval of a section 363 sale transaction within 75 days of the Petition Date.  As will be discussed in more detail in the forthcoming bidding procedures motion, the Debtors believe an expedited sale process is necessary to preserve cash and maximize value of the Debtors' brands, while ensuring a timely and efficient exit from bankruptcy to expedite creditor recoveries.

### IV.   Evidentiary Support for First Day Motions.

38.   Contemporaneously herewith, the Debtors have filed a number of First Day Motions and other pleadings seeking various forms of relief intended to stabilize their business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring.  The First Day Motions include the following:

a.   *Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases and Granting Related Relief*;

b.   *Notice of Designation as Complex Chapter 11 Bankruptcy Case*;

c.   *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable*

12

4826-7091-0436

*Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief;*

d.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (B) Granting Related Relief* (the "Customer Programs Motion");

e.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue to Operate Their Cash Management System and Perform Intercompany Transactions, and (II) Granting Related Relief;*

f.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) 503(b)(9) Claimants and (B) PACA/PASA Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief;*

g.  *Debtors' Expedited Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief;*

h.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief;*

i.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Insurance Policies and Honor all Obligations in Respect Thereof, (B) Renew, Supplement, and Enter into New Insurance Policies, and (C) Honor the Terms of Related Payment Plans and Pay Premiums Thereunder, and (Ii) Granting Related Relief;*

j.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Serve a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases and Bar Dates, and (IV) Granting Related Relief;*

k.  *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief;*

l.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Rejection of Certain Leases, and (II) Authorizing the Abandonment of Certain Property and (III) Granting Related Relief* (the "Lease Rejection Motion");

13

4826-7091-0436

m. *Debtors' Emergency Application for Entry of an Order (I) Authorizing the Employment and Retention of BMC Group, Inc. as Claims, Noticing, and Solicitation Agent and (II) Appointing BMC Group, Inc. as Administrative Agent* (the "BMC Application");

n. *Debtors' Emergency Motion for Entry of an Order Authorizing Performance Under Insurance Premium Finance Agreement*; and

o. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief.*

39.   By the First Day Motions, the Debtors seek authority to, among other things, use the DIP Lender's and AB&T's cash collateral and borrow additional amounts from the DIP Lender to fund operations and administrative expenses during these chapter 11 cases, honor employee-related wages and benefits obligations, pay claims of vendors and suppliers to ensure that their business operations are not disrupted by these chapter 11 cases, honor customer programs (including gift cards), and continue the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible.

40.   I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element in the Debtors achieving a successful reorganization through a sale or plan, and (c) best serves the estates and creditors' interests.  I have reviewed each of the First Day Motions and the facts set forth therein are true and correct are true and correct to the best of my knowledge, and are incorporated herein in their entirety by reference.  If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions.

41.   I would additionally testify as follows in relation to the following First Day Motions:

14

4826-7091-0436

### A.     The BMC Application

42.     The Debtors seek entry of an order authorizing the employment of BMC Group, Inc. ("BMC") as claims, noticing, and solicitation agent and appointing BMC as this Court's outside agent.  I understand that BMC is one of the country's leading chapter 11 administrators with vast experience in noticing, claims processing, administration and reconciliation, balloting, tabulation, and distributions, and I believe that BMC is well qualified to serve as the Noticing, Solicitation, and Tabulation Agent in these chapter 11 cases.  The retention of BMC will provide the Clerk of Court and the Debtors with efficient management of the noticing and solicitation processes in these chapter 11 cases, which will allow the Debtors' professionals to focus their attention more closely on the Debtors' overall chapter 11 efforts.

### B.     The Customer Programs Motion

43.     The Debtors have developed a variety of incentives, discounts, promotions, and related programs to attract customers and maintain positive customer relationships. These Customer Programs (as defined in the Customer Programs Motion) include gift cards, promotions, discounts, or other similar programs, many of which may periodically change on a seasonal or annual basis, and third party delivery services.  I understand that the Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  Customer programs, like those administered by the Debtors, are standard in the restaurant industry.

44.     I believe it is critical that we maintain each of these programs and honor obligations related thereto.  The Debtors operate in a highly competitive market and must regularly provide both existing and potential customers with programs similar to (or better than) those offered by their competitors.  This is particularly important with regard to discounts, third party delivery services, and credit card processing capabilities. The Debtors have implemented each of the

4826-7091-0436

Customer Programs in the ordinary course of their businesses as a means to maintain positive, productive, and profitable relationships with their customers that ultimately promote customer satisfaction, encourage new purchases, and ensure that the Debtors remain competitive.

45.    Honoring these Customer Programs is crucial to keep the reputation of the Debtors intact, meet competitive market pressures, ensure customer satisfaction, and, ultimately, maximize value for the Debtors' estates and their stakeholders.  There is no alternative by which the Debtors can avoid the loss of goodwill, the loss of customers and, as a direct result, a loss of potential growth.  I believe that the relief requested in the Customer Programs Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

### C.    Lease Rejection Motion

46.    I am familiar with the Debtors' leases and was involved in the decision to reject the leases described in Exhibit 1 to the proposed order submitted with the lease rejection motion. While the Debtors operated 90 restaurant locations as of February 2020, the leases corresponding to 19 of those restaurant leases have expired under their own terms prior to the Petition Date.  Thus, as of the Petition Date, the Debtors remained tenants on leases corresponding to 71 locations, including 15 Furr's Fresh Buffets® locations, seven (7) Tahoe Joe's® locations, and 49 of the remaining Buffets brand locations.  As noted above, all restaurant locations remain closed except for six (6) Tahoe Joe's® locations.

47.    Prepetition, the Debtors notified the landlords listed on the proposed rejection schedule by sending each landlord: (i) a notice of surrender of the premises, (ii) the keys to the leased premises (to the extent not previously surrendered) and (iii) a notice of intent to abandon personal property on the premises (if any).

4826-7091-0436

48.    The leases listed in the rejection schedule correspond to 57 of the Debtors' remaining 71 restaurant locations. It is my business judgment that rejection of these leases (corresponding to 57 restaurant locations) is in the best interests of the Debtors because the continued payment of rent of approximately $1 million per month is burdensome on these estates, especially if such expense is entitled to administrative priority under the Bankruptcy Code.  These rejected locations and any remaining personal property therein will be abandoned.  I believe immediate rejection of the Leases, for which possession has already been surrendered, and the further surrender of any personal property remaining on the premises, is a reasonable exercise of business judgment, because it will allow the estates to conserve approximately $1 million per month in administrative rents on lease locations that are no longer in use by the Debtors. The remaining 14 leases are subject to ongoing discussions with the applicable landlords and, thus, will remain subject to assumption or rejection by separate motion or pursuant to the proposed bidding procedures motion to be filed in these cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  April 20, 2021

*/s/ Mark Shapiro*
Mark Shapiro
Chief Restructuring Officer

17

4826-7091-0436