# Exhibit A

Carolyn J. Johnsen
Texas Bar No. 19844600
William L. Novotny (admitted pro hac vice)
Arizona Bar. No. 4239
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, Arizona  85004
Telephone:  (602) 285-5000
Facsimile:    (844) 670-6009
cjjohnsen@dickinsonwright.com
wnovotny@dickinsonwright.com

*Counsel for the Official Committee*
*of Unsecured Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

In re:

| | | |
|---|---|---|
| FRESH ACQUISITIONS, LLC, *et al.*,[1] | § | Case No. 21-30721 (SGJ) |
| | § | Chapter 11 |
| Debtors. | § | (Jointly Administered) |

---

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION**

---

[1] The Debtors in these Chapter 11 cases ("Debtors") and the last four digits of each Debtor's Taxpayer Identification Number are as follows: Alamo Fresh Payroll, LLC (1590); Fresh Acquisitions, LLC (2795); Alamo Ovation, LLC (9002); Buffets LLC (2294); Hometown Buffet, Inc. (3002); Tahoe Joe's Inc. (7129); OCB Restaurant Company, LLC (7607); OCB Purchasing, Co. (7610); Ryan's Restaurant Group, LLC (7895); Fire Mountain Restaurants, LLC (8003); Food Management Partners, Inc. (7374); FMP SA Management Group, LLC (3031); FMP-Fresh Payroll, LLC (8962); FMP-Ovation Payroll, LLC (1728); and Alamo Buffets Payroll, LLC (0998). The Debtors' principal offices are located at: 2338 N. Loop 1604 W., Suite 350, San Antonio TX, 78248, United States.

# ARTICLE I

## INTRODUCTION

The Official Committee of Unsecured Creditors (the "**Committee**") submits this *Joint Chapter 11 Plan of Liquidation* (the "**Plan**") that will govern the distribution of the assets of the 15 Debtor entities identified above (the "**Debtors**"). The Committee is the "**Plan Proponent**" of the Plan within the meaning Section 1129 of the Bankruptcy Code. Reference is made to the *Disclosure Statement in Support of the Official Committee of Unsecured Creditor's Joint Chapter 11 Plan of Liquidation* (the "**Disclosure Statement**") filed contemporaneously with the Plan, for among other things, a discussion of Debtors' history, the recent sale of their operating assets, and a summary and analysis of the Committee's Plan.  All Holders of Claims or Interests entitled to vote to accept or reject the Plan are encouraged to review in detail the Disclosure Statement and the Plan before voting to accept or reject the Plan.  To the extent that the Plan is inconsistent with the Disclosure Statement, the Plan will govern.

## OVERVIEW

The Plan proposes a liquidation through the creation of a Liquidating Trust to which all of Estates' assets will be transferred on the Effective Date of the Plan.  A Liquidating Trustee will be appointed to evaluate and liquidate the assets for the benefit of Creditors, to prosecute and litigate Causes of Action and Claim objections, and ultimately to distribute all proceeds to Creditors and Interest Holders in accordance with the priorities established by the Bankruptcy Code.

# ARTICLE II

## DEFINITIONS, RULES OF INTERPRETATION,

## AND COMPUTATION OF TIME

### A.    Scope of Definitions; Rules of Construction

For purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the

meanings hereinafter stated, or if not stated, then as commonly used.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules (hereinafter defined), shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.  Whenever the context requires, such terms shall include the plural as well as the singular number.  The masculine gender shall include the feminine, and the feminine gender shall include the masculine.  Moreover, for purposes of the Plan, the singular and plural uses of such defined terms and the conjunctive and disjunctive uses thereof will be fungible and interchangeable, unless the context otherwise requires.

The defined terms stated in this Article II also are substantive terms of the Plan; and Article II will be deemed incorporated throughout the rest of the Plan to convey the substantive provisions included in the defined terms.

## B. <u>Definitions</u>

1. <u>Administrative Claims</u> means claims and expenses which are allowed pursuant to Bankruptcy Code § 503(b) and which are entitled to priority pursuant to Bankruptcy Code § 507(a)(1).

2. <u>Affiliate</u> shall have the same meaning as defined by the Bankruptcy Code § 101(2).

3. <u>Allowed Claim</u> means a Claim: (i) with respect to which a Proof of Claim has been filed with the Bankruptcy Court within the applicable period of limitation fixed by the Fed. R. Bankr. P. 3003 or otherwise established by the Bankruptcy Court; or (ii) Scheduled in the list of Creditors prepared and filed with the Bankruptcy Court pursuant to Fed. R. Bankr. P. 1007(b) and not listed as disputed, contingent, or unliquidated as to amount, and in either case, as to which no objection to the allowance thereof has been filed within any applicable period of limitation fixed by Fed. R. Bankr. P. 3007, the Plan, an order of the Bankruptcy Court, or as to which any such objection has been determined by an order or judgment which is no longer

subject to appeal and as to which no appeal is pending.  An Allowed Claim shall not include non-matured or post-petition interest, unless otherwise provided in the Plan.

4. <u>Allowed Interest</u> means an Interest as to which no objection to the allowance thereof has been filed within any applicable period of limitation fixed under the Bankruptcy Code or Bankruptcy Rules or by the Court.

5. <u>Allowed Unsecured Claim</u> means a Claim that is both an Allowed Claim and an Unsecured Claim.

6. <u>Allowed Secured Claim</u> means a Claim that is both an Allowed Claim and a Secured Claim.

7. <u>Asset(s)</u> means any asset, property or interest therein of the Estates as provided for under Section 541 of the Bankruptcy Code and that which has been acquired after the Petition Date including, without limitation, all assets disclosed and undisclosed, known or unknown, or that may be discovered; Cash on hand and all deposits; any subsidiaries or affiliated entities; any insurance policies; and all existing or potential claims and Causes of Action, whether previously identified, noticed, brought/filed or otherwise,  including without limitation all rights and entitlements to the return of previously transferred or sold assets without authority.

8. <u>Avoidance Action</u> means a lawsuit commenced pursuant to Bankruptcy Code §§ 510, 542, 543, 544, 547, 548, 549, 550 and 553 to recover for the benefit of the Estates, a transfer of property to a third party.

9. <u>Ballot</u> means the ballot for accepting or rejecting the Plan that will be distributed to holders of Claims in Classes that are Impaired under this Plan and are entitled to vote on this Plan.

10. <u>Bankruptcy Code</u> means the Bankruptcy Reform Act of 1978, sometimes referred to as the Bankruptcy Code of 1978, as contained in Title 11 U.S.C.A. § 101, et seq., and all amendments thereto.

11. <u>Bankruptcy Court or Court</u> means the United States Bankruptcy Court for the Northern District of Texas, Dallas division, or any other court that exercises

jurisdiction over all or part of the Chapter 11 Cases, including the United States District Court for the Northern District of Texas to the extent that the reference of all or part of the Chapter 11 Cases is withdrawn.

12.     Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure promulgated under 28 U.S.C. § 2075 and the Local Rules of the Bankruptcy Court, as applicable during the term of the Chapter 11 Case.

13.     Business Day means every day except Saturdays, Sundays, and holidays observed by the Bankruptcy Court.

14.     Cash means any legal tender of the United States.

15.     Case or Case means the above-captioned Chapter 11 cases of Fresh Acquisitions, LLC, et.al., lead Case No. 21-30721 (SGJ).

16.     Causes of Action means any and all actions, proceedings, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims (as defined in Bankruptcy Code § 101(5)), whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, non-matured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise. The term Causes of Action includes all cross-claims, counter claims and set-off or recoupments. The term Causes of Action includes Avoidance Actions and Litigation Claims.

17.     Chapter 11 means chapter 11 of the Bankruptcy Code.

18.     Claim means a right to (i) payment from the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, non-matured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, non-matured, disputed, undisputed, secured or unsecured.

**Plan of Liquidation**                                                                                                pg. 5

19.　Claimant means a holder of a Claim.

20.　Class means one or more Creditors or Interest Holders grouped together as defined herein.  The Plan is intended to deal with all Claims against and Interests in the Debtors of whatever character, whether or not contingent or liquidated, and whether or not allowed by the Bankruptcy Court pursuant to Bankruptcy Code § 502(a).  Only those Allowed Claims and Allowed Interests, however, will receive payment under the Plan.

21.　Collateral means Property that is pledged as security for the satisfaction of a debt.

22.　Committee means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case.  Members include Tim Chung of Westwood Financial for WFC Wyoming NM, LLC; Larry G. Lee of LEECO Energy and Investments, Inc.; Sara Lamb of Upper Lakes Food, Inc.; and Tyerell Mack, an individual.

23.　Confirmation means the formal approval of the Bankruptcy Court of the Plan pursuant to Bankruptcy Code § 1129.

24.　Confirmation Date means the date upon which the Confirmation Order is entered by the Bankruptcy Court.

25.　Confirmation Hearing means the hearing regarding confirmation of the Plan conducted by the Bankruptcy Court pursuant to Bankruptcy Code § 1128, including any adjournment or continuation of that hearing from time to time.

26.　Confirmation Order means the Order entered by the Bankruptcy Court determining that the Plan meets the requirements of Chapter 11 of the Bankruptcy Code and is entitled to Confirmation.

27.　Creditor means a Person or entity holding a Claim against the Debtors for the debts, liabilities, demands, or Claims of any character whatsoever, as defined in Bankruptcy Code § 101(4).

28.    <u>Cure</u> means the distribution of Cash, or such other Property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption of an executory contract or unexpired lease, pursuant to Bankruptcy Code § 365(b), in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

29.    <u>Debtors</u> means the 15 debtors identified in the caption of this Case.

30.    <u>Disallowed</u> means, when used with respect to a Claim or Interest, or any portion thereof, a Claim or Interest that: (a) is not listed on the Schedules, or is listed therein as contingent, unliquidated, disputed, or in an amount equal to zero, and whose Holder has failed to timely file a proof of Claim or proof of Interest; (b) the Bankruptcy Court has disallowed pursuant to an order entered on the Bankruptcy Court docket; or (c) is disallowed under any provision of Bankruptcy Code, including, without limitation, Bankruptcy Code § 502, and/or the Federal Rules of Bankruptcy Procedure.

31.    <u>Disclosure Statement</u> means the *Disclosure Statement in Support of the Official Committee of Unsecured Creditors' Joint Chapter 11 Plan of Liquidation*, as it may be amended or supplemented.

32.    <u>Disputed Claim</u> means a Claim against the Debtors that is not Allowed, including: (a) if no proof of Claim has been filed by the applicable bar date or has otherwise been deemed timely filed under applicable law: (i) a Claim that is listed on the Schedules as disputed, contingent or unliquidated; or (ii) a Claim that is listed on the Schedules as other than disputed, contingent or unliquidated, but as to which the the Liquidating Trustee, or any other party in interest with standing to object to Claims under the Plan or applicable law, has filed an objection by the applicable Claims objection deadline under the Plan, unless such objection has been withdrawn or denied by a Final Order; or (b) if a proof of Claim or request for payment of an

Administrative Claim has been filed by the applicable bar date or has otherwise been deemed timely filed under applicable law: (i) a Claim for which a corresponding Claim is listed on the Schedules as disputed, contingent or unliquidated; or (ii) a Claim for which an objection has been filed by the Liquidating Trustee to which the Claim relates, or any other party in interest with standing to object to Claims under the Plan or applicable law, by the applicable Claims objection bar date, unless such objection has been withdrawn or denied by a Final Order.

33.    Disputed Claims Reserve means the reserve of Cash established and maintained by the Liquidating Trustee to pay Disputed Claims upon allowance by the Bankruptcy Court.

34.    Distribution means any payment of Cash or property required under the Plan.

35.    Effective Date means the date that is fourteen (14) days following the entry of the Confirmation Date.

36.    Equity Interest means all membership units or issued, unissued, authorized or outstanding shares of common stock or preferred stock of any corporate Debtor, together with any warrants, options or contractual rights to purchase or acquire any such securities at any time, and all rights arising with respect thereto.

37.    Estates means the bankruptcy estates of the Debtors created under Section 541 of the Bankruptcy Code.

38.    Executory Contract means every unexpired lease and executory contract which is subject to being assumed or rejected under Bankruptcy Code § 365.

39.    Exhibit means any document attached to either the Plan or Disclosure Statement.

40.    Final Order means an order of the Bankruptcy Court that not having been reversed, modified, or amended and not being stayed, and the time to appeal from which or to seek review or rehearing of which having expired, and no such appeal,

review, certiorari or rehearing is pending, has become conclusive of all matters adjudicated thereby and in full force and effect.

41. <u>Government Entity</u> means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local.

42. <u>Guarantors</u> means Alan Jones, Larry Harris, Jason Kemp, and Brian Padilla.

43. <u>Holder</u> means the beneficial holder of any Claim or Interest.

44. <u>Impaired/Impaired Class</u> means, under Bankruptcy Code § 1124, a Class of Claims is impaired under a Plan, unless with respect to each Claim of such Class: (i) it is paid in full on the Effective Date of the Plan; (ii) the Plan leaves unaltered the legal, equitable and contractual rights to which such Claim entitles the holder to such Claim; or (iii) all defaults are cured, the original maturity of the Claim is reinstated, and the Claim is otherwise treated as provided in clause (ii) above.

45. <u>Insider</u> has the meaning ascribed to such term in Section 101(31) of the Bankruptcy Code.

46. <u>Interest Holders</u> means the holders of Interests in the Debtors.

47. <u>Interest</u> means any Equity Interest.

48. <u>Lien</u> means a lien as described in Bankruptcy Code § 101(37), except for a lien that has been avoided in accordance with Bankruptcy Code §§ 544, 545, 546, 547, 548, or 549.

49. <u>Litigation Claims</u> means all of the Debtors' and the Estates' rights, claims, torts, liens, liabilities, obligations, actions, Causes of Action, Avoidance Actions, avoiding powers, proceedings, debts, contracts, judgments, offsets, damages, and demands whatsoever in law or in equity whether known or unknown, contingent, or otherwise that the Debtor may have against any Person. This includes, but is not limited to, the claims discussed in the Disclosure Statement.

50.     <u>Liquidating Trust</u> means the trust established on the Effective Date pursuant to Article IV of the Plan.

51.     <u>Liquidating Trust Agreement</u> means the agreement attached as Exhibit C to the Disclosure Statement pursuant to which the Liquidating Trust shall be operated.

52.     <u>Liquidating Trust Assets</u> means all of the Debtors' Assets transferred to the Liquidating Trust.

53.     <u>Liquidating Trust Fund</u> means the Debtor's Cash transferred to the Liquidating Trust on the Effective Date and all proceeds derived from the liquidation of the Liquidating Trust Assets.

54.     <u>Liquidating Trustee</u> means David Gonzales or such other Person appointed to administer and act as trustee of the Liquidating Trust.

55.     <u>Litigation Recovery</u> means proceeds derived from the Causes of Action.

56.     <u>Other Priority Claim</u> means any Claim against the Debtors that is entitled to priority under Section 507(a) of the Bankruptcy Code, other than Administrative Expense Claims or Priority Tax Claims.

57.     <u>Person</u> means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in Bankruptcy Code § 101(27)), or other entity (including, without limitation, the Committee).

58.     <u>Petition Date</u> means April 20, 2021, the date on which the Debtors filed their voluntary Chapter 11 bankruptcy petitions.

59.     <u>Plan</u> means the *Official Committee of Unsecured Creditors' Joint Chapter 11 Plan of Liquidation* filed by the Committee and every modification thereof.

60.     <u>Plan Confirmation</u> means the entry by the Bankruptcy Court of an order confirming the Plan.

61.     Plan Supplement means one or more documents filed as an additional Exhibit to the Plan or Disclosure Statement.

62.     Priority Tax Claim means any Claim against the Debtors of a governmental unit of the kind specified in Bankruptcy Code § § 502(i) or 507(a)(8).

63.     Pro Rata means proportionally, so that the ratio of the consideration distributed on account of an Allowed Claim or Allowed Interest in the Class (or sub-class) and consideration distributed on account of all Allowed Claims or Allowed Interests in the Class (or sub-class) is the same as the ratio of the Allowed Claims or Allowed Interests in the Class (or sub-class).

64.     Professional means a Person: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

65.     Professional Fee Claims means Claims of any professional employed in the Chapter 11 Case pursuant to Bankruptcy Code §§ 327 or 1103, or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Bankruptcy Code §§ 503(b)(3)(F) and (b)(4).

66.     Proof of Claim shall have the same meaning as defined by Fed. R. Bankr. P. 3001(a).

67.     Property means all rights, title, privileges, and interests of the Estates in any and all real and personal property (individually or as a whole) as previously or hereafter determined by Final Order of a court of competent jurisdiction and/or as defined in § 541 of the Bankruptcy Code.

68.     Proponent means the Committee who is proposing the Plan.

69.    <u>Scheduled</u> means any Claim or Interest, the status, priority and amount, if any, of such Claim or Interest as set forth in the Schedules.

70.    <u>Schedules</u> means the schedules of assets and liabilities and the statement of affairs filed in the Chapter 11 Case by each of the Debtors, as such schedules or statements have been or may be amended or supplemented from time to time in accordance with Fed. R. Bankr. P. 1009 or orders of the Bankruptcy Court.

71.    <u>Secured Claim</u> means the portion of any Claim against any of the Debtors, (a) determined in accordance with the Bankruptcy Code § 506(a), as of the Confirmation Date, secured by a valid, perfected and unavoidable Lien, to the extent of the value of the holder's interest in a Debtor's interest in the subject Collateral; or (b) subject to offset under the Bankruptcy Code § 553, to the extent of the amount subject to offset.

72.    <u>Unsecured Claim(s)</u> means any Claims not secured by Collateral of the Estates.

73.    <u>Unsecured Creditor(s)</u> means any Creditor(s) of the Debtors holding Unsecured Claims of any character whatsoever, except Claims entitled to priority pursuant to Bankruptcy Code § 507.

74.    <u>UST</u> means the Office of the United States Trustee.

<u>Rules of Interpretation</u>.  For purposes of this Plan: (i) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (ii) the headings and captions used in this Plan are for convenience and reference only and are not intended to be a part of or affect the interpretation of the Plan and shall not limit or otherwise affect the provisions hereof; (iii) the word "including" shall mean "including without limitation"; and (iv) the rules of construction set forth in Bankruptcy Code § 102 and in the Bankruptcy Rules shall apply.

<u>Computation of Time</u>.   In computing any period of time prescribed by or allowed by the Plan, the provisions of Fed. R. Bankr. P. 9006(a) shall apply.

**ARTICLE III**

**<u>CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS</u>**

Creditors and Interest Holders are grouped in Classes depending on the type of Claim or Interest they have.   The following section describes how they will be treated in the Plan.   Payments and distributions will be made by the Liquidating Trustee.

**A.      <u>No Classification of Administrative Claims</u>**

As provided in Section 1123(a)(1) of the Bankruptcy Code, Certain Claims shall not be classified for purposes of voting on or receiving distributions under the Plan. All such Claims shall be treated separately as unclassified Claims on the terms set forth herein.

1.      <u>Administrative Expenses</u>

Unless previously approved and paid, Allowed Administrative Claims will be paid, in full satisfaction of the Claim: (a) one cash payment in the Allowed amount of the Claim on the Effective Date or as soon thereafter as possible or after the Claim is Allowed if subject to Court approval; (b) in the ordinary course of business as the Claim matures; or (c) upon other less favorable terms as may be agreed upon by the Holder of the Claim, or as ordered by the Bankruptcy Court.

2.      <u>Priority Tax Claims</u>

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or alternative treatment is ordered by the Bankruptcy Court, in full and final satisfaction, each such Holder shall be treated in accordance with the terms set forth in Bankruptcy Code section 1129(a)(9)(C).   Specifically, each Holder of an Allowed Priority Tax Claim will be paid in equal annual installments for four years

with a balloon payment on or before the fifth anniversary of the Petition Date. Interest will accrue on each Allowed Priority Tax Claim at the statutory rate applicable in the Holder's jurisdiction. If there is no applicable statutory rate, then the rate will be established at six percent (6%) per annum.

The annual payment to each Holder of an Allowed Priority Tax Claim will consist of its Pro-Rata share of $500,000 to be paid on December 1, 2022, December 1, 2023, December 1, 2024, and December 1, 2025.  All remaining principal and accrued interest for each Tax Claimant will be paid on or before April 20, 2026. In his sole discretion, the Liquidating Trustee may pay Holders of Allowed Priority Tax Claims in a shorter period of time as funds become available.

**B.** **Classification and Treatment of Claims and Interests That Are Classified**

For purposes of voting, distributions, and all confirmation matters, except as otherwise provided herein all Allowed Claims and Interests shall be classified and treated as follows.

1.    Class 1 – Priority Wage Claims

Class 1 consists of the Allowed Claims for wages, salaries, or commissions earned within 180 days prior to the Petition Date or the date that the respective Debtors' business closed, whichever occurred first, and capped at $13,650 per Claimant pursuant to Section 507(a)(4) of the Bankruptcy Code. To the extent that a Claim in this Class exceeds the capped amount, the excess amount of the Claim will be treated in Class 2. Each Holder of an Allowed Claim in this Class will be paid the foregoing capped amount in full on the Effective Date.  Class 1 is not impaired and is not entitled to vote on the Plan although a Holder of an Allowed Claim in excess of the foregoing capped amount may vote that portion of its Allowed Claim in Class 2.

2.    Class 2 – General Unsecured Creditors

Class 2 consists of the Allowed Claims of general unsecured creditors, except those classified in Class 3. On the Effective Date, in full and final satisfaction of any

Claims against the Debtors, the Holder of an Allowed Claim in this Class shall receive a Pro-Rata beneficial interest in the Liquidating Trust and shall be paid its Pro-Rata share of the Liquidating Trust Fund in accordance with the Liquidating Trust Agreement and the Plan after full payment of Allowed Administrative Claims, Allowed Priority Tax Claims and the Holders of Claims in Class 1.  Class 2 is Impaired and is entitled to vote on the Plan.

3.      Class 3 – Unsecured Insider and Affiliate Claims.

Class 3 consists of the Allowed Unsecured Claims of Insiders and Affiliates of the Debtors. The Claims in this Class shall be deemed disallowed pending the resolution of any Cause of Action or Claim Objection filed against a Holder of a Claim in this Class. If such Claim is Allowed, in full and final satisfaction of such Claim, the Holder shall receive a beneficial interest in the Liquidating Trust and shall be paid its Pro-Rata share of the Liquidating Trust Fund in accordance with the Liquidating Trust Agreement and the Final Order allowing such Claim (that may provide for the subordination of such Claim), after full payment of Allowed Administrative Claims and Priority Claims. Class 3 is Impaired and is entitled to vote on the Plan.

4.      Class 4 – Equity Interests in the Debtors

Class 4 consists of the Equity Interests in each of the Debtors.  Such Interests shall be cancelled on the Effective Date. Class 4 is Impaired, is not entitled to vote on the Plan, and is deemed to have rejected the Plan.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.      Creation of Liquidating Trust and Plan Funding

On the Effective Date, a Liquidating Trust will be created pursuant to the Liquidating Trust Agreement (attached in substantially final form as Exhibit C to the Disclosure Statement or filed separately in the Plan Supplement, the terms of which are incorporated by reference) to liquidate all Liquidating Trust Assets, to pursue all

Causes of Action, and to make all Distributions to Holders of Allowed Claims and Interests as required by the Plan.

On the Effective Date, the Liquidating Trust Assets will be transferred to the Liquidating Trust.  The Plan will be funded by the Cash on hand on the Effective Date and by the proceeds of the Litigation Recovery.

**B.      Appointment of Liquidating Trustee**

The initial Liquidating Trustee will be David Gonzales, who is the principal of Caliber Advisors that has served as financial advisor to the Committee during the Case.  Mr. Gonzales will be deemed appointed on the Effective Date, without further motion, application, notice, hearing or other order of the Court.  Any and all authority, power, and standing shall be transferred to and assumed by the Liquidating Trustee.  Mr. Gonzales will be compensated as set forth in the Liquidating Trust Agreement.

**C.      Duties and Powers of Liquidating Trustee**

As more fully described in the Liquidating Trust Agreement, the Liquidating Trustee shall be appointed by the Court on the Effective Date and shall have the rights and powers of a debtor in possession under Bankruptcy Code section 1107, and such other rights, powers, and duties necessary, appropriate, prudent or advisable to effectuate the provisions of the Plan and the Liquidating Trust, including but not limited to, objecting to and resolving Claims; investigating, pursuing and resolving Causes of Action; and making Distributions to Creditors and Interest Holders.  The Liquidating Trustee shall not be required to obtain any approvals from the Court, any court or governmental body and/or provide any notices under any applicable laws to implement the terms of the Plan in accordance with the Plan and the Liquidating Trust Agreement except as expressly set forth in the Plan and the Liquidating Trust Agreement.

**D.      Compensation of the Plan Trustee and Professionals**

The Liquidating Trustee may employ, without order of the Court such counsel (which may be the same counsel employed by the Committee), financial advisors

(which may be Caliber which is presently employed by the  Committee) and other professionals, agents and advisors selected by the Liquidating Trustee that are reasonably required to perform the Liquidating Trustee's responsibilities under the Plan. The Liquidating Trust's professionals shall be compensated at their respective standard hourly rates or on a contingency fee basis as agreed to by the Liquidating Trustee, without further motion, application notice, or other order of the Court. The fees and expenses of the Liquidating Trust's professionals shall be satisfied from the Liquidating Trust Assets.

### E.    Expenses of the Liquidating Trust

The expenses of the Liquidating Trust will consist of attorneys' fees, accounting fees and costs, other fees and costs of other professionals, consultants, agent, and advisors employed by the Liquidating Trustee and all fees and expenses related to the distribution of funds to creditors and the pursuit of claims objections and litigation.

### F.    Debtors' Corporate Existence and Governance

On the Effective Date, all instruments evidencing or creating any indebtedness or obligation of the Debtors, except such instruments that are authorized or issued under this Plan, shall be canceled and extinguished. Additionally, as of the Effective Date, all Equity Interests shall be deemed cancelled and extinguished without any further action of any party. The holders of, or parties to, the cancelled notes, membership interests, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to this Plan.

### G.    Transfer of All Books, Files and Records

Immediately after the Effective Date, the Debtors and their past and present management companies shall transfer all of their books, files, and records to the Liquidating Trustee and shall cause all of their Insiders, Affiliates, and their agents and representatives to transfer all of their books, files and records related to the

Debtors to the Liquidating Trustee including in all instances any and all attorney-client privileged and work product documents, correspondence, and communications whether electronic or hard copy form.

### H.      Transfer of Rights, Privileges and Authority

On the Effective Date, the Liquidating Trustee on behalf of the Liquidating Trust shall succeed to and have all power, authority, rights, privileges and immunities previously held or asserted by the Debtors and their officers, managers, directors, members and shareholders.

### I.      Effectuating Documents and Further Transactions

On the Effective Date, the Liquidating Trustee is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors are authorized and shall be required to promptly execute and deliver the documents necessary to effectuate the terms of the Plan. Upon transfer of the Liquidating Trust Assets, the Liquidating Trust shall succeed to all of the Debtors' right, title and interest in the Liquidating Trust Assets and the Debtors will have no further rights or interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

### J.      Exemption from Transfer Taxes

Pursuant to Section 1146(a) of the Bankruptcy Code, the creation or transfer of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, and executed in connection with the liquidation of assets shall not be subject to any stamp tax, real estate tax or similar tax.

### K.      Exemption from Securities Laws

The creation of the Liquidating Trust and the issuance of beneficial interests in accordance thereto, and all other instruments, certificates, and other documents

required to be issued or distributed pursuant to the Plan, (a) shall be authorized under Bankruptcy Code § 1145 as of the Effective Date without further motion, application, notice, hearing, or other order of the Court, and (b) shall be exempt pursuant to Bankruptcy Code § 1145 from registration under the Securities Act of 1933, as amended (and all rules and regulations promulgated thereunder), and under any state or local law (and all rules and regulations promulgated thereunder) requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.

## ARTICLE V

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

In this case, all executory contracts and leases not previously assumed or rejected shall be deemed rejected on the Confirmation Date.  Each counter party to a rejected lease or contract not previously rejected during the Case shall file on or before thirty (30) days after the Confirmation Date a proof of claim for any rejection damages.  Otherwise, all proofs of claim for rejection damages are governed by the proof of claim deadline previously established in this Case.

## ARTICLE VI

## SUBSTANTIVE CONSOLIDATION

In connection with Distributions to be made to the Holders of Allowed Claims, the Plan is predicated on the substantive consolidation of the Estates of the Debtors into a single Estate for purposes of the Plan and the Distributions thereunder. On the Effective Date, (a) all assets and liabilities of the substantively consolidated Debtors will be deemed to be merged for purposes of the Plan and Distributions to be made thereunder, (b) the obligations of each of the Debtors will be deemed to be the obligation of the substantively consolidated Debtors for purposes of the Plan and Distributions thereunder, (c) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the substantively consolidated Debtors, (d) each Claim filed in the Chapter 11 Case of any of the Debtors will be deemed filed

against the Debtors in the consolidated Chapter 11 Cases in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (e) all Claims between and among the respective Debtors will be extinguished, (f) all transfers, disbursements and distributions made by any of the Debtors will be deemed to be made by the substantively consolidated Debtors, and (g) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any of the Debtors and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the substantively consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of assets available for distribution to such Class without regard to which of the Debtors was originally liable for such Claim.

**ARTICLE VII**

**CLAIMS, DISTRIBUTIONS AND CLAIMS OBJECTIONS**

**A.      Deadline for Applications for Administrative Expenses**

Applications for Administrative Claims, including Professional Fee Claims shall be filed no later than 30 days after the Confirmation Date.  If such application is not timely filed, such Claim will be forever barred and may not be asserted in any manner.

**B.      Objections, Complaints and Settlements**

The Liquidating Trustee shall have the exclusive right to file, litigate and resolve Causes of Action and objections to Claims and Interests other than Administrative Claims.  All rights and standing to initiate, prosecute, or dismiss any Cause of Action or to file and prosecute objections to Claims and Interests shall be transferred to the Liquidating Trust and the Liquidating Trustee.  The Liquidating Trustee shall have the exclusive right to settle an objection or Cause of Action for which recovery is sought for $100,000 or less.  Settlements for which recovery is sought in an amount in excess of $100,000 must be presented to the Court for approval.

All Claims Objections must be filed no later than 180 days after the Effective Date or such other time as may be extended upon Order of the Bankruptcy Court.  All

Causes of Action must be commenced within one year (1) after the Effective Date or such other time as may be extended upon Order of the Bankruptcy Court.

### C.   Plan Distributions and Disbursing Agent

Distributions to Creditors and Interest Holders will be made in accordance with the Plan and the Liquidating Trust Agreement.  No Distributions will be made to any claimant unless that Claimant has an Allowed Claim or Allowed Interest.   No interest shall accrue or be paid unless specifically provided in the Plan. The Liquidating Trustee will serve as the disbursing agent for all Allowed Claims and Allowed Interests. Any Distributions shall be made in the prudent and sole discretion of the Liquidating Trustee as Liquidating Assets are liquidated all in accordance with the Liquidating Trust Agreement.

### D.   Amendment of Claims

After the Effective Date, a Claim may be amended to decrease, but not to increase, the amount thereof.

### E.   Full and Final Satisfaction

All final Distributions under the Plan shall be in full and final satisfaction, settlement, release, and discharge of all Claims and Interests.

**ARTICLE VIII**

**RETENTION OF JURISDICTION**

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, over all matters arising out of and related to the Chapter 11 Case for, among other things, the following purposes:

(a)   To hear and determine all matters with respect to the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b)   To hear and determine any motion, adversary proceeding, application, contested matter or other litigated matter pending on or commenced after the Confirmation Date;

(c)      To hear and determine all matters with respect to the allowance, disallowance, liquidation, classification, priority or estimation of any Claim;

(d)      To ensure that Distributions to holders of Allowed Claims and Interests are accomplished as provided in the Plan;

(e)      To hear and determine all applications for compensation and reimbursement of professional claims;

(f)      To hear and determine any application to modify the Plan in accordance with Section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(g)      To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated by the Plan or any agreement, instrument or other document governing or relating to any of the foregoing;

(h)      To issue injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(i)      To issue orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan;

(j)      To enter, implement or enforce orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(k)      To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(l)   To hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code;

(m)   To determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, any of the Plan documents or any other contract, instrument, release or other agreement or document related to the Plan and the Disclosure Statement;

(n)   To hear matters to recover all Property of the Debtors' Estates, wherever located including without limitation all entities or assets improperly transferred or sold;

(o)   To hear and determine any rights, Claims or Causes of Action held by or accruing to the Liquidating Trust  pursuant to the Plan, Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(p)   To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Debtors' Chapter 11 Case with respect to any Person;

(q)   To hear and determine any disputes arising in connection with the interpretation, implementation or enforcement of any post-petition agreements;

(r)   To hear any other matter not inconsistent with the Bankruptcy Code; and

(s)   To enter a final decree closing the Chapter 11 Case.

The Liquidating Trust and the Liquidating Trustee shall be deemed to have and be vested with the full authority and standing to continue, institute, prosecute, and defend such objections, matters, claims, actions, or Causes of Action which may or could have been commenced prior to the Effective Date or identified or brought subsequent thereto.

**The Liquidating Trust and the Liquidating Trustee shall be deemed to have and be vested with the full authority and standing to continue, institute, prosecute, and defend such objections, matters, claims, actions, or Causes of Action which may or could have been commenced prior to the Effective Date or identified or brought subsequent thereto.**

# ARTICLE IX

## EFFECT OF CONFIRMATION

### A.      Vesting of Assets

Upon the Effective Date, pursuant to Sections 1141(b) and (c) of the Bankruptcy Code, the Liquidating Trust Assets shall vest in the Liquidating Trust, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise expressly provided in the Plan.

### B.      Preservation and Pursuit of Causes of Action

All Causes of Action shall vest in the Liquidating Trust and are specifically preserved. The Liquidating Trust through its Liquidating Trustee shall have standing to bring and maintain any and all Causes of Action and to hire other professionals for same as deemed necessary and appropriate. At the present time, the potential defendants have been identified on **Exhibit F** to the Disclosure Statement and incorporated herein. This list is not meant to be exclusive and additional defendants may be added.

Causes of Action may include but are not limited to actions for breach of fiduciary duty, fraud, gross mismanagement, self-dealing, breaches and violations related to corporate governance and securities laws, and the Avoidance Actions. Investigations of the Causes of Action are ongoing.  Accordingly, no Person may rely on the fact that the Plan and Disclosure Statement do not identify a particular Person or Cause of Action.

Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Liquidating Trust may have or choose to assert under any provision of the Bankruptcy Code or any applicable non-bankruptcy law.

The descriptions of potential Causes of Action in this Section and Section XIII of the Disclosure Statement are not exclusive.  Further, such descriptions are not intended to be a demand on any of the potential defendants in such Causes of Action

and are not an indication of whether a meritorious Cause of Action exists. The descriptions are also not intended to limit claims or Causes of Action which may be asserted against any potential defendant.

The Committee expressly, specifically and unequivocally reserves all rights in all Causes of Action. Any potential defendant who is also a Creditor in this Case Should assume that a Cause of Action may be pursued against them by the Liquidating Trustee.

## C.     Pending Litigation

The Committee also reserves any and all claims, defenses or counterclaims that have been asserted in any lawsuit pending as of the Confirmation Hearing, including any lawsuits or proceedings in which any of the Debtors assert affirmative claims against any Creditor or other third party, with all such claims, defenses or counterclaims assigned to the Liquidating Trustee.

## D.     Binding Effect

The rights, benefits and obligations of any Person named or referred to in this Plan will be binding upon, and will inure to the benefit of, the heir, executor, administrator, successor or assign of such Person.

## E.     Discharge and Injunction

Except as otherwise specifically provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the payments and Distributions to be made under the Plan shall discharge all existing debts and Claims, and shall terminate all interests of any kind, nature, or description whatsoever against the Debtors or the Liquidating Trust or any of their assets or properties to the fullest extent permitted by Section 1141 of the Bankruptcy Code. Except as otherwise specifically provided in the Plan or in the Confirmation Order, upon the Effective Date, all existing Claims against the Debtors shall be precluded and enjoined from asserting against the Debtors, the Liquidating Trust, the Liquidating Trustee, their respective successors or assignees, or any of their assets or properties, any other or further Claim or Interest

**Plan of Liquidation**                                                                pg. 25

based on any act or omission, transaction, or other activity of any kind or nature that occurred before the Effective Date, whether or not the holder has filed a Proof of Claim and whether or not the facts or legal bases therefor were known or existed before the Effective Date.

On the Effective Date and in consideration of the Distributions to be made under the Plan, and except as otherwise provided in the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any Affiliate of the Holder shall be deemed to have forever waived, released, and discharged the Debtors and the Liquidating Trust, to the fullest extent permitted by Section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose before the Effective Date.  Upon the Effective Date, all those Persons shall be forever precluded and enjoined, pursuant to Section 524 of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against or in the Debtors or the Liquidating Trust.

Except as otherwise expressly provided in the Plan, all persons or entities who have held, hold, or may hold Claims or Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, managers, members, principals, representatives, and Affiliates, are permanently enjoined, from and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors, the Liquidating Trust or Trustee or Property of the Debtors; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against the Debtors, the Liquidating Trust and the Liquidating Trustee, or against the Property or interests in Property of the Debtors; or (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors, the Liquidating Trust, and the Liquidating Trustee, or against the Property or interests in Property of the Debtors, with respect to any such

Claim or Interest.  This injunction shall extend to any successors or assignees of the Debtors, the Liquidating Trust, and the Liquidating Trustee, and their respective Properties and interests in Properties.

### F.   Dissolution of Committee

On the Effective Date, (a) the Committee shall dissolve and its members shall be released of their respective duties, responsibilities and obligations in connection with the Chapter 11 Case or the Plan; and (b) the retention or employment of the Committee's respective professionals and agents shall be terminated, other than with respect to filing and prosecution of the Committee's and Caliber's final fee applications.

### G.   Setoff and Recoupment

The Liquidating Trustee may, but shall not be required to, set off or recoup against any Claim and any distribution to be made on account of that Claim, any and all claims, rights, and Causes of Action of any nature that the Liquidating Trust may have against the holder of that Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, however, that neither the failure to effect a set off or recoupment nor the allowance of any Claim under the Plan shall constitute a waiver, abandonment, or release by the Liquidating Trustee of any of those claims, rights, and Causes of Action that the Trust may have against the Holder of the Claim.  To the extent the Liquidating Trustee fails to setoff or recoup against a Holder and seek to collect a claim from that Holder after a Distribution to the holder pursuant to the Plan, the Liquidating Trustee shall be entitled to full recovery on its claim against that holder of a Claim.

**ARTICLE X**

**MISCELLANEOUS PROVISIONS**

### A.   Binding Effect of Plan

The provisions of this Plan shall bind the Debtor, Creditors, and any Interest Holders, and shall bind any Person asserting a Claim against the Debtors or an

Interest in the Debtors, whether or not the Claim or Interest arose before or after the Petition Date or the Effective Date, whether or not the Claim or Interest is impaired, and whether or not the Person has accepted the Plan.

### B.   Appeals

In the event of an appeal of the Confirmation Order or any other kind of review or challenge to the Confirmation Order, and provided that no stay of the effectiveness of the Confirmation Order has been entered, the Bankruptcy Court will retain jurisdiction to implement and enforce the Confirmation Order and the Plan according to their terms, including, but not limited to, jurisdiction to enter such orders regarding the Plan or the performance thereof to implement the Plan.  During the pendency of an appeal, any applicable statute of limitations for any Cause of Action shall be tolled.

### C.   Modification and Amendment of Exhibits, Schedules, and Appendices

The Committee may modify or amend the terms of any document or agreement that is an Exhibit, schedule or appendix to the Plan without the need for re-solicitation of votes with respect to the Plan; provided, however, that the modification or amendment does not materially adversely affect the rights of any Person provided in the Plan.

### D.   Headings

The headings of the Articles, Sections and Subsections of the Plan are inserted for convenience only and shall not limit the interpretation of the Plan.

### E.   Amendment and Modification of the Plan

The Committee may propose amendments to or modifications of the Plan at any time prior to confirmation of the Plan without the leave of the Bankruptcy Court or as permitted by the Bankruptcy Code or Bankruptcy Rules.  After confirmation of the Plan, the Liquidating Trustee may seek to amend or modify the Plan with the approval of the Bankruptcy Court, so long as it does not materially or adversely affect the interests of Creditors or other parties in interest as set forth herein, to remedy any

defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, in a manner as may be necessary to carry out the purposes and intent of the Plan.

### F.     **Effect of Confirmation Order**

The Confirmation Order will include a provision that the Confirmation Order shall be immediately effective and enforceable upon its entry and shall not be subject to any stay under Bankruptcy Rule 3020(e) or otherwise.

### G.     **Quarterly Fees**

The quarterly fees required by 28 U.S.C. § 1930(a)(6) will be paid by the Liquidating Trust.   The Liquidating Trustee will file all necessary reports until application is made for entry of a final decree.   Application for a final decree can be made by the Liquidating Trustee when the Plan has been fully administered, which for purposes of the Plan shall mean when the Plan has been substantially consummated, as that term is defined in Section 1101(2) of the Bankruptcy Code

### H.     **Notices**

Any notice required or permitted to be provided under the Plan will be in writing and served by regular postage-prepaid, first-class mail, hand-delivery, facsimile, or email.

### I.     **Conflicts between Plan and Confirmation Order**

In the event the terms of the Plan and the Confirmation Order conflict, the terms of the Confirmation Order shall govern.

### J.     **Withdrawal of Plan**

The Plan may be withdrawn prior to the entry of the Confirmation Order at the sole discretion of the Committee.

**K.      Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

DATED this 18th day of October, 2021

                                              THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS
By:   /s/ Tim Chung
            Committee Chair

Respectively submitted:        /s/ Carolyn J. Johnsen
                                        Carolyn J. Johnsen
                                        Texas Bar No. 1984460
                                        DICKINSON WRIGHT PLLC
                                        1850 North Central Avenue, Suite 1400
                                        Phoenix, Arizona 85004
                                        Telephone:  (602) 285-5040
                                        Facsimile: (844) 670-6009
                                        cjjohnsen@dickinsonwright.com
                                        Attorneys for the Committee

4847-1269-4527 v2 [97257-1]

# Exhibit B

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| FRESH ACQUISITIONS, LLC, *et al.*,[1] | § § | Case No. 21-30721 (SGJ) |
| Debtors. | § § | (Joint Administration Requested) |

**DECLARATION OF MARK SHAPIRO, CHIEF RESTRUCTURING
OFFICER, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Mark Shapiro declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Chief Restructuring Officer of Fresh Acquisitions, LLC ("Fresh" and each of the other above-captioned affiliated debtors and debtors in possession, collectively the "Debtors" or the "Company"). I have held this position since February 2, 2021.

2.      As Chief Restructuring Officer, I am responsible for overseeing the operations and financial activities of the Debtors, including, but not limited to, monitoring cash flow, business relationships, workforce issues, and financial planning. As a result of my tenure with the Debtors and my turnaround experience, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I am generally familiar with the Debtors' businesses, financial condition, policies and procedures, day-to-day operations, and books and records.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Alamo Fresh Payroll, LLC (1590); Fresh Acquisitions, LLC (2795); Alamo Ovation, LLC (9002); Buffets LLC (2294); Hometown Buffet, Inc. (3002); Tahoe Joe's Inc. (7129); OCB Restaurant Company, LLC (7607); OCB Purchasing, Co. (7610); Ryan's Restaurant Group, LLC (7895); Fire Mountain Restaurants, LLC (8003); Food Management Partners, Inc. (7374); FMP SA Management Group, LLC (3031); FMP-Fresh Payroll, LLC (8962); FMP-Ovation Payroll, LLC (1728); and Alamo Buffets Payroll, LLC (0998). The Debtors' principal offices are located at 2338 N. Loop 1604 W., Suite 350, San Antonio TX, 78248, United States.

3. Except as otherwise noted, I have personal knowledge of the matters set forth herein, or I have gained knowledge of such matters from my tenure with the Debtors and their advisors.

4. I am over the age of 18, and I am authorized to submit this declaration on behalf of the Debtors. References to the Bankruptcy Code (as defined herein), the chapter 11 process, and related legal matters are based on my understanding of such as explained to me by counsel. If called upon to testify, I would testify competently to the facts set forth in this declaration.

5. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Northern District of Texas (the "Court"). To minimize the adverse effects on the business and contemporaneously herewith, the Company has filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions"). I submit this declaration to assist the Court and parties in interest in understanding the circumstances resulting in the commencement of these chapter 11 cases, and in support of the Debtors' chapter 11 petitions and First Day Motions.

**Qualifications**

6. I am a Senior Managing Director of GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services ("B. Riley Advisory"), where I have been employed since 2016. Prior to that time I managed Challenger Advisors LLC, a Dallas-based turnaround financial advisory firm and before that served as Chief Financial Officer for a number of public companies, including Big Lots Inc. and Central Parking Corp, as well-as private equity-owned portfolio businesses. I received my Bachelor of Science degree in accounting from The Ohio State University and began my career with Ernst & Young in New York. I am a Certified Public Accountant (inactive).

2

4826-7091-0436

7.      I have over twenty-five years' experience as a turnaround advisor and corporate financial executive and have advised debtors, secured lenders, trade creditors and equity holders in both out of court and in court proceedings.  I have extensive experience in U.S. Bankruptcy Courts and have been involved in numerous chapter 11 cases and court-appointed receiverships.

8.      In addition to working with the Debtors, I have played various roles with respect to both company-side and creditor/committee-side engagements.   Representative experience includes, but is not limited to, the following:  PBS Brands Inc./Punch Bowl Social (CRO), Loves Furniture, Inc. (Debtor's FA), GGI Holdings LLC/Gold's Gym (Debtor's FA and Liquidating Trustee), Pine Creek Medical Center (CRO), Lockwood Holdings LLC (CRO), Uplift Rx LLC/Alliance Health (Debtors' FA and Liquidating Trustee), Neighbors Legacy Holdings Inc. (Unsecured Creditors' Committee FA and Creditor Trustee), Eagle Pipe, LLC (Debtor's FA) and Bristow Group Inc. (Equity Committee FA).

### Preliminary Statement

9.      Prior to the COVID-19 pandemic, the Debtors were a significant operator of buffet-style restaurants in the United States with approximately 90 stores operating in 27 states.  The Debtors' concepts include six buffet restaurant chains and a full service steakhouse. The Debtors' buffet restaurants principally operated under the names Furr's Fresh Buffet®, Old Country Buffet®, Country Buffet®, HomeTown® Buffet, Ryan's®, and Fire Mountain®. These locations primarily offer self-service buffets with entrees, sides, and desserts for an all-inclusive price. In addition, the Debtors own and operate a full service, casual dining chain under the name Tahoe Joe's Famous Steakhouse®.

10.     Much like its competitors in the all-you-can-eat (AYCE) and dine-in restaurant businesses, the Debtors' recent history has been impacted by the uncertainty, unexpected challenges, and ever-changing landscape resulting from the COVID-19 pandemic. Despite the

Debtors' efforts to right-size their operations in the wake of a prior 2016 bankruptcy filing, the unpredictable and unprecedented scale of the COVID-19 pandemic significantly disrupted the Debtors' restaurant operations and severely limited customer demand. As various federal, state, and local governments instituted shelter-in-place orders and restricted restaurant operations to delivery and takeout services, the Debtors (like many other restaurant operators) experienced a significant decline in customer spending and foot traffic. The shutdowns delivered a sudden and significant blow to the business and the Debtors' overall liquidity position. As such, the Debtors have been forced to close all of their remaining AYCE restaurants; the only locations currently open for business are six Tahoe Joe's restaurants in California.

11. To familiarize the Court with the Debtors, their businesses, the circumstances leading up to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, this Declaration is organized into four sections. **Part I** provides background information on the Debtors' corporate and capital structures. **Part II** offers detailed information on the Debtors' prepetition operations, prior bankruptcy filings and the subsequent events leading to the present need for further restructuring. **Part III** briefly describes the proposed sale process to be conducted during the course of these cases. **Part IV** summarizes the relief requested in and the legal and factual basis that support the First Day Motions.

<u>**Background**</u>

**I.     Corporate Structure and Summary of Prepetition Debt.**

    **A.     Corporate Structure.**

12. The Company and its brands are all privately owned. The Debtors own and operate their brands through a number of direct and indirect subsidiaries.

13. The Furr's Fresh Buffet® brand is owned by Fresh, which has the following corporate structure:

4826-7091-0436



14.     The Debtors' remaining brands (Tahoe Joe's®, Old Country Buffet®, Country Buffet®, HomeTown® Buffet, Ryan's® and Fire Mountain®) are owned directly or indirectly by Debtor Buffets, LLC ("Buffets"), a Minnesota limited liability company, which in turn is owned by non-debtor Alamo Buffets, LLC, a Texas limited liability company. The corporate structure for Buffets is set forth below:



15.     The remaining Debtors—Alamo Ovation, LLC ("Alamo Ovation"); Food Management Partners, Inc. ("FMP"); FMP SA Management Group, LLC ("FMP Management"); FMP-Fresh Payroll, LLC ("Fresh Payroll"); and FMP-Ovation Payroll, LLC ("Ovation Payroll") are non-operating entities. In light of the cessation of the Debtors' restaurant operations in 2020, and a new management agreement with VitaNova Brands ("VitaNova") (discussed below) that

5

became effective on January 1, 2021, these Debtor entities no longer have operations, but have sought chapter 11 protection due to their co-liability for certain of the other Debtors' liabilities.

16.     Alamo Buffets Payroll, LLC employs the personnel that operate Tahoe Joe's® restaurants.  Prior to that, Ovation Payroll employed the personnel that operated the locations owned by Buffets, including the Tahoe Joe's personnel.  Although all Furr's locations are closed as of the Petition Date, Alamo Fresh Payroll, LLC is responsible for employing all Furr's restaurant personnel.  From 2014 through 2018, Fresh Payroll employed the personnel that operated the Furr's locations owned by Fresh.

**B.     The Debtors' Prepetition Debt Structure**

17.     As noted above by the two different organizational charts, there are two "parts" or "sides" of the Debtors' businesses—the "Furr's" side,[2] and the "Buffets" side (which includes all brands other than Furr's Fresh Buffet®).  The Furr's side of the business is subject to prior secured obligations to Arizona Bank & Trust ("AB&T").  The Buffets side of the business has no prior secured obligations, except as discussed below.

18.     On or about January 2, 2015, Fresh and non-Debtor Alamo Dynamics, LLC ("Alamo") entered into a Commercial Loan Agreement ("CLA") with AB&T in the original principal amount of $8,707,500.  The CLA was guaranteed by, among others, FMP Management.  On or around June 29, 2015, the CLA was modified to incorporate, among other things, a short term bridge loan of $14,500,000.  The CLA was further modified from time to time thereafter, including on or about May 30, 2017, when Debtor FMP Management was added as a co-borrower.  The CLA is guaranteed by a variety of non-Debtor entities and individuals (the "Guarantors").

---

[2] The Furr's Fresh Buffet® restaurants are under the Fresh umbrella.

6

19.     On or about February 18, 2021, AB&T entered into a forbearance agreement with Fresh, Alamo, FMP Management, and the Guarantors (the "Forbearance Agreement"), as a result of certain alleged defaults under the CLA which, among other things, extended the maturity date for the CLA to July 30, 2021.

20.     As of the Petition Date, Fresh and FMP Management are indebted to AB&T in the approximate amount of $13,466,151.50 in principal and accrued interest, plus additional costs and fees.  All amounts owing to AB&T are secured by substantially all assets of each of Fresh and FMP Management, and certain assets of non-debtor Alamo.

21.     As noted above, the Buffets Debtors had no prior secured obligations.  They do have unsecured liabilities, including approximately $3.9 million in sales taxes, $900,000 in payroll tax obligations and accrued PTO to certain employees in the amount of approximately $507,763.30.

21.     Effective as of April 16, 2021, each of the Debtors as a borrower entered into that certain Prepetition and Debtor in Possession Credit Agreement dated as of April 16, 2021 with VitaNova as lender (the "DIP Credit Agreement"), for a prepetition advance of $500,000.  That advance is secured by a first lien on substantially all assets of the Buffets Debtors, and only a second lien on the Furr's Debtors' intellectual property (which is subject to and will remain subject to AB&T's first priority lien).

**II.     Circumstances Leading Up to the Restructuring and Prepetition Restructuring Efforts.**

**A.     The Debtors' History**

22.     Buffets, Inc. was founded in 1983 to develop buffet-style restaurants under the name Old Country Buffet®. In October 1985, Buffets, Inc. successfully completed an initial public offering with seven restaurants, and by 1988 had 47 company-owned units and nine franchised

7

4826-7091-0436

units. In September 1996, Buffets, Inc. merged with HomeTown Buffet, a similar publicly-held, buffet-style restaurant company established and developed by one of Buffets, Inc.'s co-founders. The merger of Buffets, Inc. and HomeTown Buffet added 80 company-owned restaurants in 11 states and 19 franchised restaurants in eight states, bringing the total number of restaurants to 346 company-owned restaurants and 24 franchised restaurants in 36 states as of December 31, 1996.

23.    On October 2, 2000, Buffets Holdings, Inc. acquired Buffets in a buyout from its public shareholders. On November 1, 2006, Buffets, through a wholly-owned subsidiary, merged with Ryan's Restaurant Group, Inc., a similar restaurant concept to Buffets with more than 300 steak-buffet restaurants operating primarily in the Southeastern United States. Under the merger, Buffets' wholly-owned subsidiary merged with and into Ryan's with Ryan's remaining as the surviving corporation. As a result of the Merger, Ryan's became a wholly-owned subsidiary of Buffets.

24.    Due to a variety of external economic factors that adversely affected the companies' operating performance during 2007, Buffets Holdings, Inc. and its direct and indirect subsidiaries filed for chapter 11 relief in January of 2008 (the "2008 Debtors"). The 2008 Debtors successfully reorganized and confirmed their Chapter 11 plan on April 17, 2009. The 2008 Debtors' chapter 11 plan became effective on April 28, 2009, and their chapter 11 cases have been closed.

25.    The Buffets companies were again impacted by external economic factors of a sluggish U.S. economy including a marked increase in unemployment, higher gasoline and energy costs, lower consumer confidence and associated decline in discretionary spending among the companies' core customers as well as an increase in the minimum wage. These factors together with above-market rent obligations led to Buffets, its direct parent, the ultimate parent and all

8

4826-7091-0436

direct and indirect subsidiaries filing for chapter 11 relief in January of 2012 (the "2012 Debtors").

After approximately 5 months in chapter 11, the 2012 Debtors successfully reorganized and

confirmed their chapter 11 plan on June 27, 2012. The 2012 Debtors' chapter 11 plan went

effective on July 18, 2012.

26.     Three years later, on August 19, 2015, Alamo Ovation, LLC acquired Buffets

Restaurants Holdings, Inc. (the "Merger"). Under the Merger, Alamo Ovation Acquisition, Inc., an

acquisition subsidiary of Alamo Ovation, LLC, merged with and into Buffets Restaurants

Holdings, Inc. with Buffets Restaurants Holdings, Inc. remaining as the surviving corporation. As

a result of the Merger, Buffets Restaurants Holdings, Inc. became a wholly owned subsidiary of

Alamo Ovation, LLC, a Texas limited liability company.

27.     Immediately following the Merger, the Debtors operated over 300 restaurants in 35

states which included five buffet brands: Ryan's®, HomeTown® Buffet, Old Country Buffet®,

Country Buffet®, and Fire® Mountain and the one full service, casual dining brand, Tahoe Joe's®

Famous Steakhouse. At that point, the Debtors' business operations were managed by FMP

Management pursuant to a management agreement. FMP Management, a privately held company

based in Hollywood Park, Texas, was a multi-concept developer and operator of independent

restaurant chains. FMP Management provided operational oversight and all professional and

administrative services for the Debtors. In return for the services provided, FMP Management

received reimbursement of allocated costs and expenses and a management fee. A separate entity,

Ovation Payroll, provided employment and wage related services for the Debtors.

28.     Due to the need for further reorganization and protection following a state court

judgment entered in late 2015, the Debtors filed a third group of bankruptcy cases in March of

9

4826-7091-0436

2016 (the "2016 Debtors").[3]  The 2016 Debtors' chapter 11 plan became effective on May 18, 2017, and their chapter 11 cases are now closed.

29.     Debtor Fresh acquired the Furr's Fresh Buffet® brand assets, indirectly, following a section 363 sale approved by the U.S. Bankruptcy Court for the Northern District of Texas (Dallas Division) in the prior brand owner's 2014 bankruptcy cases.[4]  Consequently, Fresh and its Furr's Fresh Buffet® brand assets were not included in the 2016 bankruptcy filings.

30.     FMP Management and Ovation Payroll previously provided management services to Buffets and its subsidiaries pursuant to management service agreements.  FMP Management ceased operations in June 2020.  The management and service agreements were terminated on December 31, 2020.  Beginning January 1, 2021, non-Debtor entity VitaNova started providing management services to Buffets and its subsidiaries.

**B.     The COVID-19 Pandemic and Operational Response.**

31.     Despite the Debtors' efforts to right-size their operations following the 2016 bankruptcy, the unpredictable and unprecedented scale of the COVID-19 pandemic significantly disrupted the Debtors' restaurant operations and severely limited customer demand.  As various federal, state, and local governments instituted shelter-in-place orders and restricted restaurant operations to delivery and takeout services, the Debtors (like many other restaurant operators) experienced a significant decline in customer spending and foot traffic.  The shutdowns delivered a sudden and significant blow to the business's liquidity position.  The Company's projections demonstrated that, to weather this environment, it needed to take immediate action to preserve liquidity and weather the worsening storm. As such, the Debtors decided to close the vast majority

---

[3] *See In re Buffets, LLC,* Case No. 16-50557-11-rbk (Bankr. W.D. Tex.).

[4] *See In re Buffet Partners, L.P.,* Case No. 14-30699-11-hdh (Bankr. N.D. Tex.).

4826-7091-0436

of their restaurant locations. The only restaurants that remain open currently are six Tahoe Joe's®️ restaurants, which had revenue of approximately $21 million per year before the pandemic.

32.    In short, the Debtors have responded to the pandemic by conserving financial resources in the face of the pandemic with the goal of maximizing value of the Debtors' restaurant brand assets.

### C.    Restructuring Negotiations and Path Forward.

33.    Despite the Debtors' prepetition cost savings initiatives through store closings, the Debtors cannot sustain their remaining operations with their dwindling liquidity. As discussed in the other first day motions and accompanying declarations filed contemporaneously with this Declaration, the Debtors reached agreements with VitaNova, their proposed DIP Lender, to borrow needed capital on a pre- and postpetition basis. These funds are necessary to manage these bankruptcy cases, including the ability to run a sale process.

34.    A sale and auction process will ensure that the greatest value is realized for Tahoe Joe's and the Furr's intellectual property. Although Furr's locations are closed, selling its intellectual property under this process provides flexibility to the buyer and allows the brand to be reopened in the future, if desired. It also allows for the possibility of monetizing or transferring leases for certain closed stores that a buyer could use for future operations, either for the Furr's brand or otherwise.

35.    Other than the revenue generated by Tahoe Joe's, which itself has been insufficient to sustain operations entirely, equity has had to infuse capital over time to maintain the overall corporate family. Such capital infusions have little, if any, chance of being repaid under the current circumstances.

36.    In furtherance of orchestrating an orderly chapter 11 filing, and to avoid conflicts (given the multiple hats worn by the VitaNova management team), Vineet ("Vin") Batra was

11

appointed as Independent Director for the governing bodies of all of the Debtors in January 2021, and I was appointed Chief Restructuring Officer in February, 2021.

## III.    Proposed Sale Process

37.     While the Debtors are not seeking emergency approval of bid procedures, the proposed DIP financing arrangements contemplate an expedited sale process to begin in the first few weeks of these bankruptcy cases.  Specifically, the proposed DIP financing agreement and interim order, if approved, will require the Debtors to file a bidding procedures motion within 21 days of the Petition Date, with such motion to include the proposed bidding procedures and process for approving a stalking horse asset purchase agreement and corresponding bid protections for any proposed stalking horse bidder.  The proposed DIP financing agreement and interim and final orders, if approved, will also require approval of a section 363 sale transaction within 75 days of the Petition Date.  As will be discussed in more detail in the forthcoming bidding procedures motion, the Debtors believe an expedited sale process is necessary to preserve cash and maximize value of the Debtors' brands, while ensuring a timely and efficient exit from bankruptcy to expedite creditor recoveries.

## IV.    Evidentiary Support for First Day Motions.

38.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions and other pleadings seeking various forms of relief intended to stabilize their business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring.  The First Day Motions include the following:

   a. *Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases and Granting Related Relief;*

   b. *Notice of Designation as Complex Chapter 11 Bankruptcy Case;*

   c. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable*

12

*Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief;*

d.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (B) Granting Related Relief* (the "Customer Programs Motion");

e.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue to Operate Their Cash Management System and Perform Intercompany Transactions, and (II) Granting Related Relief;*

f.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) 503(b)(9) Claimants and (B) PACA/PASA Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief;*

g.  *Debtors' Expedited Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief;*

h.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief;*

i.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Insurance Policies and Honor all Obligations in Respect Thereof, (B) Renew, Supplement, and Enter into New Insurance Policies, and (C) Honor the Terms of Related Payment Plans and Pay Premiums Thereunder, and (Ii) Granting Related Relief;*

j.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Serve a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases and Bar Dates, and (IV) Granting Related Relief;*

k.  *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief;*

l.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Rejection of Certain Leases, and (II) Authorizing the Abandonment of Certain Property and (III) Granting Related Relief* (the "Lease Rejection Motion");

13

4826-7091-0436

m. *Debtors' Emergency Application for Entry of an Order (I) Authorizing the Employment and Retention of BMC Group, Inc. as Claims, Noticing, and Solicitation Agent and (II) Appointing BMC Group, Inc. as Administrative Agent* (the "BMC Application");

n. *Debtors' Emergency Motion for Entry of an Order Authorizing Performance Under Insurance Premium Finance Agreement*; and

o. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief.*

39. By the First Day Motions, the Debtors seek authority to, among other things, use the DIP Lender's and AB&T's cash collateral and borrow additional amounts from the DIP Lender to fund operations and administrative expenses during these chapter 11 cases, honor employee-related wages and benefits obligations, pay claims of vendors and suppliers to ensure that their business operations are not disrupted by these chapter 11 cases, honor customer programs (including gift cards), and continue the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible.

40. I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element in the Debtors achieving a successful reorganization through a sale or plan, and (c) best serves the estates and creditors' interests. I have reviewed each of the First Day Motions and the facts set forth therein are true and correct are true and correct to the best of my knowledge, and are incorporated herein in their entirety by reference. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions.

41. I would additionally testify as follows in relation to the following First Day Motions:

14

### A.    The BMC Application

42.    The Debtors seek entry of an order authorizing the employment of BMC Group, Inc. ("BMC") as claims, noticing, and solicitation agent and appointing BMC as this Court's outside agent.  I understand that BMC is one of the country's leading chapter 11 administrators with vast experience in noticing, claims processing, administration and reconciliation, balloting, tabulation, and distributions, and I believe that BMC is well qualified to serve as the Noticing, Solicitation, and Tabulation Agent in these chapter 11 cases.  The retention of BMC will provide the Clerk of Court and the Debtors with efficient management of the noticing and solicitation processes in these chapter 11 cases, which will allow the Debtors' professionals to focus their attention more closely on the Debtors' overall chapter 11 efforts.

### B.    The Customer Programs Motion

43.    The Debtors have developed a variety of incentives, discounts, promotions, and related programs to attract customers and maintain positive customer relationships. These Customer Programs (as defined in the Customer Programs Motion) include gift cards, promotions, discounts, or other similar programs, many of which may periodically change on a seasonal or annual basis, and third party delivery services.  I understand that the Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  Customer programs, like those administered by the Debtors, are standard in the restaurant industry.

44.    I believe it is critical that we maintain each of these programs and honor obligations related thereto.  The Debtors operate in a highly competitive market and must regularly provide both existing and potential customers with programs similar to (or better than) those offered by their competitors.  This is particularly important with regard to discounts, third party delivery services, and credit card processing capabilities. The Debtors have implemented each of the

4826-7091-0436

Customer Programs in the ordinary course of their businesses as a means to maintain positive, productive, and profitable relationships with their customers that ultimately promote customer satisfaction, encourage new purchases, and ensure that the Debtors remain competitive.

45.     Honoring these Customer Programs is crucial to keep the reputation of the Debtors intact, meet competitive market pressures, ensure customer satisfaction, and, ultimately, maximize value for the Debtors' estates and their stakeholders. There is no alternative by which the Debtors can avoid the loss of goodwill, the loss of customers and, as a direct result, a loss of potential growth. I believe that the relief requested in the Customer Programs Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

### C.     Lease Rejection Motion

46.     I am familiar with the Debtors' leases and was involved in the decision to reject the leases described in Exhibit 1 to the proposed order submitted with the lease rejection motion. While the Debtors operated 90 restaurant locations as of February 2020, the leases corresponding to 19 of those restaurant leases have expired under their own terms prior to the Petition Date. Thus, as of the Petition Date, the Debtors remained tenants on leases corresponding to 71 locations, including 15 Furr's Fresh Buffets® locations, seven (7) Tahoe Joe's® locations, and 49 of the remaining Buffets brand locations. As noted above, all restaurant locations remain closed except for six (6) Tahoe Joe's® locations.

47.     Prepetition, the Debtors notified the landlords listed on the proposed rejection schedule by sending each landlord: (i) a notice of surrender of the premises, (ii) the keys to the leased premises (to the extent not previously surrendered) and (iii) a notice of intent to abandon personal property on the premises (if any).

48.     The leases listed in the rejection schedule correspond to 57 of the Debtors' remaining 71 restaurant locations. It is my business judgment that rejection of these leases (corresponding to 57 restaurant locations) is in the best interests of the Debtors because the continued payment of rent of approximately $1 million per month is burdensome on these estates, especially if such expense is entitled to administrative priority under the Bankruptcy Code. These rejected locations and any remaining personal property therein will be abandoned. I believe immediate rejection of the Leases, for which possession has already been surrendered, and the further surrender of any personal property remaining on the premises, is a reasonable exercise of business judgment, because it will allow the estates to conserve approximately $1 million per month in administrative rents on lease locations that are no longer in use by the Debtors. The remaining 14 leases are subject to ongoing discussions with the applicable landlords and, thus, will remain subject to assumption or rejection by separate motion or pursuant to the proposed bidding procedures motion to be filed in these cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 20, 2021                         */s/ Mark Shapiro*
                                              Mark Shapiro
                                              Chief Restructuring Officer

4826-7091-0436

# Exhibit C

### FRESH ACQUISITION LIQUIDATING TRUST AGREEMENT

This Fresh Acquisition Liquidating Trust Agreement, dated as of _____2021 (the "**Liquidating Trust Agreement**"), is entered into by and among the parties listed on Exhibit A (collectively, "**Fresh Acquisition**" or the "**Debtors**") and David Gonzales, as Trustee (the "**Liquidating Trustee**") of the Fresh Acquisition Liquidating Trust (the "**Liquidating Trust**").

### RECITALS

A.      On April 20, 2021, (the "**Petition Date**") the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (the "**Court**"), Case No. 21-30721.

B.      On April 30, 2021, the United States Trustee ("**UST**") appointed the Official Committee of Unsecured Creditors ("**Committee**") pursuant to 11 U.S.C. §§ 1102(a) and 1102(b)(2).

C.      On or about October 18, 2021, the Committee ( the "**Plan Proponent**") filed its Joint Chapter 11 Plan of Liquidation (the "**Plan**") and Disclosure Statement in Support of Joint Chapter 11 Plan of Liquidation (the "**Disclosure Statement**").

D.      On or about _____2021, the Court entered it Order Confirming Plan thereby confirming the Plan and authorizing the establishment of the Liquidating Trust pursuant to this Liquidating Trust Agreement and the appointment of the Liquidating Trustee.

E.      This Liquidating Trust Agreement is being executed to establish and provide for the administration of the Liquidating Trust and the liquidation and distribution of the Liquidating Trust Assets as defined in the Plan.

F.      The Liquidating Trust is intended to qualify as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d), to be treated as a "grantor trust" for federal income tax purposes, and to be exempt from the requirements of the Investment Company Act of 1940.

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants contained herein, the parties hereto agree as follows:

### DEFINITIONS

The Definitions attached to this Liquidating Trust Agreement as Exhibit B are those contained in the Plan and referred to in the Disclosure Statement and are incorporated herein. Additional Definitions  used in this Liquidating Trust Agreement are as follows:

"**Cause**" means, with respect to the Liquidating Trustee, conviction of a felony or any other crime involving moral turpitude; any act or failure to act involving actual dishonesty, fraud, misrepresentation, theft or embezzlement with respect to the Liquidating Trust Assets; or willful and repeated failure to substantially perform his/her duties under this Trust Agreement.

"**Liquidating Trust Administrative Reserves**" means Cash that is allocated and retained by the Liquidating Trust, from time to time in an amount necessary to satisfy reasonable costs and expenses of the Liquidating Trust and other obligations and liabilities incurred, assumed or reasonably anticipated by the Liquidating Trust (or to which the Liquidating Trust Assets are otherwise subject), including without limitation (a) fees and costs incurred in connection with the protection, preservation, liquidation and distribution of the Liquidating Trust Assets; (b) the fees and costs incurred in connection with investigating, prosecuting and resolving the Disputed Claims and Causes of Action; and (c) fees and expenses including, without limitation, any taxes imposed on the Liquidating Trust or fees of the UST.

"**Liquidating Trust Beneficial Interest**" means a non-transferable and non-assignable beneficial interest in the Liquidating Trust to be issued to each Liquidating Trust Beneficiary, which entitles its holder to receive distributions from the Liquidating Trust as set forth in this Trust Agreement.

"**Liquidating Trust Beneficiary**" means a holder of an Allowed unpaid Administrative, Priority or Unsecured Claim.

"**Liquidating Trustee Parties**" means the Liquidating Trustee and the Liquidating Trust Professionals as defined herein.

"**Liquidating Trust Professionals**" means counsel, advisors, consultants, and other professionals selected by the Liquidating Trustee reasonably required to perform the responsibilities of the Liquidating Trust.

## ARTICLE I
## CREATION OF LIQUIDATING TRUST

1.  Creation of Trust.  The Liquidating Trust shall be deemed to have been created by Debtors and the Liquidating Trustee effective on the Effective Date.  The Liquidating Trust shall bear the name "Fresh Acquisition Liquidating Trust."

2.  Purpose of Liquidating Trust.

a.  The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets in accordance with the Plan and Treasury Regulations Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

b.  This Liquidating Trust Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust.  The Liquidating Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Liquidating Trustee or the Liquidating Trust Beneficiaries for any purpose be, or be deemed to be treated in any way whatsoever, liable or responsible hereunder as partners or joint venturers. The relationship of the Liquidating Trust Beneficiaries to the Liquidating Trustee shall be solely

2

that of beneficiaries of a trust and shall not be deemed a principal or agency relationship, and their rights shall be limited to those conferred upon them by this Liquidating Trust Agreement.

c.      Under no circumstance shall the Liquidating Trustee be authorized, or contend he/she is authorized, to incur liability on behalf of the Debtors' Estates, and any and all liability incurred by the Liquidating Trustee, whether for expenses of prosecution, payment of sanctions, or otherwise shall be the exclusive liability of the Liquidating Trust and not the liability of the Liquidating Trustee in his/her individual capacity or Debtors' Estates.

3.      <u>Transfer of Liquidating Trust Assets.</u>

On the Effective Date, the Liquidating Trust Assets shall be transferred to the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other persons and entities to the maximum extent contemplated by and permissible under section 1141 of the Bankruptcy Code and the Plan.  Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax pursuant to section 1146 of the Bankruptcy Code. For the avoidance of doubt, the Liquidating Trust Assets shall be deemed to have vested in the Liquidating Trust on the Effective Date.

4.      <u>Transfer of Books and Privileges.</u>

Immediately after Effective Date, the Debtors shall deliver or cause to be delivered to the Liquidating Trustee any and all books and records that relate primarily to or that may be reasonably required in connection with the Liquidating Trust Assets and administration of the Liquidating Trust whether held by the Debtors or their agents, representatives, advisors, attorneys, accountants and any other professional hired by the Debtors. It is understood that any and all privileges, work product and confidentiality agreements held or asserted by the Debtors are hereby waived.

5.      <u>Execution of Instruments.</u>

The Debtors and the Liquidating Trustee (on behalf of the Liquidating Trust), as successor in interest to the Debtors' Estates, may (i) execute and deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed), and (ii) take, or cause to be taken, all such further action in order to evidence, vest, perfect or effectuate the transfer of the Liquidating Trust Assets to the Liquidating Trust and consummate transactions contemplated by and to otherwise carry out the intent of the Liquidating Trust.

6.      <u>Title to Liquidating Trust Assets</u>.

Upon the transfer of the Liquidating Trust Assets, the Liquidating Trust shall succeed to all of the Debtors' right, title and interest in the Liquidating Trust Assets and the Debtors will have no further rights or interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

7.      <u>Agents and Professionals; Employees</u>.

The Liquidating Trust may employ the Liquidating Trust Professionals without further order from the Bankruptcy Court.  The Liquidating Trust Professionals shall be compensated on such basis as agreed to by the Liquidating Trustee without further motion, application, notice or other order of the Bankruptcy Court. The fees and expenses of the Professionals shall be paid from the Liquidating Trust Assets.

8.      <u>Insurance</u>.

The Liquidating Trust may maintain customary insurance coverage for the protection of the Liquidating Trustee as determined by the Liquidating Trustee.

9.      <u>Status of Liquidating Trust and Liquidating Trustee</u>.

The Liquidating Trust will be the successor-in-interest to the Debtors with respect to any Cause of Action that was or could have been commenced by the Debtors prior to the Effective Date and shall be deemed substituted for the same as the party in any such litigation or objection. The Liquidating Trustee (on behalf of the Liquidating Trust) will be the representative of the Estates as that term is used in Section 1123(b)(3)(B) of the Bankruptcy Code and will have the rights and powers provided in the Bankruptcy Code.  All Causes of Action are preserved and retained and may be enforced by the Liquidating Trustee on behalf of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

10.      <u>Distribution of Remaining Assets</u>.

To the extent that after satisfaction in full of all of the costs and expenses of the administration of the Liquidating Trust, after all Claims have been either Allowed or disallowed, after all Allowed Claims have been paid pursuant to the Plan and this Liquidating Trust Agreement, after satisfaction of all other obligations or liabilities of the Liquidating Trust incurred or assumed in accordance with this Liquidating Trust Agreement, and after the affairs of the Liquidating Trust have been finally wound up and concluded, there shall remain any Liquidating Trust Assets, the Liquidating Trustee shall pay any remaining Liquidating Trust Assets to the Equity Interests pursuant to the Plan.

11.      <u>Fiscal Year</u>.

Except for the first and last years of the Liquidating Trust, the Fiscal Year of the Liquidating Trust shall be the calendar year.  For the first and last years of the Liquidating Trust, the Fiscal Year of the Liquidating Trust shall be such portion of the calendar year that the Liquidating Trust is in existence.

12.      <u>Costs and Expenses of the Liquidating Trust</u>.  The Liquidating Trustee and the Liquidating Trust Professionals shall be compensated and expenses paid from the liquidation of the Liquidating Trust Assets.  Such compensation and expenses will be subordinated to the payment of Allowed Administrative Claims.

4

13.      Books and Records.

The Liquidating Trustee shall maintain books and records in respect of the Liquidating Trust for the period commencing on the date hereof through the termination of the Liquidating Trust, containing such information and in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.

The Liquidating Trustee is authorized without further application to the Bankruptcy Court or notice to any party, to destroy books and records (whether in electronic or paper format) in accordance with Section 3 of Article IX.

## ARTICLE II
## DISTRIBUTIONS TO ADMINISTRATIVE CLAIMANTS AND LIQUIDATING TRUST BENEFICIARIES

1.      Receipt of Liquidating Trust Beneficial Interests; Incidents of Ownership.  On the Effective Date, each Liquidating Trust Beneficiary as of the Effective Date shall receive a Liquidating Trust Beneficial Interest in the Liquidating Trust.  The holder of a Disputed Claim or Interest that subsequently becomes Allowed, in whole or in part,  shall receive a Liquidating Trust Beneficial Interest in the Liquidating Trust at such time as, and to the extent, such Disputed Claims become Allowed.  The Liquidating Trust Beneficiaries shall be the sole beneficiaries of the Liquidating Trust and the Liquidating Trust Assets, and the Liquidating Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized in this Liquidating Trust Agreement, including, but not limited to, those powers set forth in Section 4 of Article V. hereof.

2.      Evidence of Liquidating Trust Beneficial Interest.  Ownership of a Liquidating Trust Beneficial Interest shall be evidenced by appropriate notation on the books and records maintained for that purpose by the Liquidating Trustee or an agent of the Liquidating Trustee, but shall otherwise be uncertificated.  Such notation shall be conclusive absent manifest error, and the Liquidating Trust and the Liquidating Trustee shall treat each person whose name is recorded on the books and records of the Liquidating Trust as aforesaid as the owner of the Liquidating Trust Beneficial Interest indicated therein for all purposes of this Liquidating Trust Agreement, notwithstanding assertions to the contrary.  The notation shall be in such form as the Liquidating Trustee shall determine, but shall be commensurate with the amount of the Allowed Claim of the respective Liquidating Trust Beneficiary and shall readily permit calculation of the Pro Rata share of each such Liquidating Trust Beneficiary.  A Liquidating Trust Beneficiary shall be deemed the "holder of record" of such beneficiary's Liquidating Trust Beneficial Interest(s) for purposes of all applicable laws, rules and regulations. The Liquidating Trustee shall, upon the written request of a Liquidating Trust Beneficiary, provide reasonably adequate documentary evidence of such beneficiary's Liquidating Trust Beneficial Interest. The expense of providing such documentation shall be borne by the requesting Liquidating Trust Beneficiary.

3.      Nontransferability of the Liquidating Trust Beneficial Interests.  Liquidating Trust Beneficial Interests shall not be transferable or assignable except by will, intestate succession or

5

operation of law; provided, that any transfer or assignment of a Liquidating Trust Beneficial Interest by will, intestate succession or operation of law shall not be effective unless and until such transfer or assignment is recorded on the books and records of the Liquidating Trust maintained for that purpose, as provided in Section 2 of this Article II.  Notwithstanding any other provision to the contrary, the Liquidating Trustee may disregard any purported transfer or assignment of Liquidating Trust Beneficial Interests by will, intestate succession or operation of law if appropriate information (as reasonably determined by the Liquidating Trustee), including applicable tax-related information, is not provided by such purported transferee or assignee to the Liquidating Trustee. Until such information is provided, any amounts that would have been distributed to the previous Liquidating Trust Beneficiary shall be held pending the Liquidating Trustee's receipt of the requisite information from the transferee; provided that, if the transferee fails to comply with such a request within ninety (90) days, such distribution shall be deemed an undelivered distribution; and provided further that, if the Liquidating Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder-transferee and the Liquidating Trustee is later held liable for the amount of such withholding, such holder-transferee shall reimburse the Liquidating Trustee for such liability.

4.      Liquidating Trust Beneficial Interests Not Securities.  The Liquidating Trust Beneficial Interests shall not constitute "securities" and shall not be registered pursuant to the Securities Act of 1933, as amended, or any state securities law.  However, if it should be determined that the Liquidating Trust Beneficial Interests constitute "securities," the exemption provisions of section 1145 of the Bankruptcy Code shall apply to the Liquidating Trust Beneficial Interests.

5.      Rights of Liquidating Trust Beneficiaries.  Each Liquidating Trust Beneficiary shall be entitled to participate in the rights and benefits due to a Liquidating Trust Beneficiary hereunder on account of its Liquidating Trust Beneficial Interest.  Each Liquidating Trust Beneficiary shall take and hold the same.  The interest of a Liquidating Trust Beneficiary is hereby declared and shall be, in all respects, personal property.

6.      Interest Beneficial Only.  Except as expressly provided hereunder, a Liquidating Trust Beneficiary shall have no title to, right to, possession of, management of or control of the Liquidating Trust or the Liquidating Trust Assets.  The ownership of a Liquidating Trust Beneficial Interest in the Liquidating Trust shall not entitle any Liquidating Trust Beneficiary to any title in or to the Liquidating Trust Assets or to any right to call for a partition or division of such assets or to require an accounting, except as specifically provided herein.

7.      Conflicting Claims.  If any conflicting claims or demands are made or asserted with respect to a Liquidating Trust Beneficial Interest, the Liquidating Trustee shall be entitled, at his/her sole election, to refuse to comply with any such conflicting claims or demands.  In so refusing, the Liquidating Trustee may elect to make no payment or distribution with respect to the Liquidating Trust Beneficial Interest at issue, or any part thereof, until such conflict is resolved in accordance with this Section 7, and the Liquidating Trustee shall refer such conflicting claims or demands to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands or his/her refusal to make a payment or distribution with respect to the Liquidating Trust Beneficial Interest at issue.  The Liquidating Trustee shall not be or become liable for damages of any kind including attorneys' fees and costs

6

to any party for his/her refusal to comply with any of such conflicting claims or demands.  The Liquidating Trustee shall be entitled to refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court or (b) all differences have been resolved by a written agreement among all of such parties and the Liquidating Trustee, which agreement shall include a complete release of the Liquidating Trust and the Liquidating Trustee (the occurrence of either (a) or (b) being referred to as a "Dispute Resolution" in this Section 7).  Until a Dispute Resolution is reached with respect to such conflicting claims or demands, the Liquidating Trustee shall hold any payments or distributions from the Liquidating Trust to be made with respect to the Liquidating Trust Beneficial Interest at issue.  Promptly after a Dispute Resolution is reached, the Liquidating Trustee shall transfer the payments and distributions, if any, together with any interest and income generated thereon, in accordance with the terms of such Dispute Resolution.

8.      Liability to Third Persons.  No Liquidating Trust Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person in connection with the Liquidating Trust Assets or the affairs of the Liquidating Trust.

## ARTICLE III
## DISTRIBUTIONS OF CREDITOR TRUST ASSETS

1.      Distributions.  The Liquidating Trustee shall make distributions to the Liquidating Trust Beneficiaries on account of their Liquidating Trust Beneficial Interests, in his/her sole discretion, in accordance with such holders' Pro Rata share of available Cash, after maintaining the Liquidating Trust Administrative Reserves.

2.      Minimum Cash Distributions.  The Liquidating Trustee shall not be required to make any Distribution (other than the final) of Cash less than $100 to any Liquidating Trust Beneficiary; provided however, that if any distribution is not made pursuant to this Section 2, such Distribution shall be added to any subsequent Distribution to be made on behalf of such Liquidating Trust Beneficial Interest.

3.      Delivery of Distributions.  All Distributions to any Liquidating Trust Beneficiary shall be made at the address of such holder (a) as set forth on the Schedules filed with the Bankruptcy Court, or (b) on the books and records of the Liquidating Trustee unless the Liquidating Trustee has been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules.

4.      Undeliverable and Unclaimed Distributions.  In the event that any distribution to any Liquidating Trust Beneficiary is returned as undeliverable, the Liquidating Trustee shall use commercially reasonable efforts to determine the current address of such Liquidating Trust Beneficiary, but he/she shall not be required to retain an outside investigator to determine the current address of a Liquidating Trust Beneficiary whose Distribution is returned as undeliverable. In any event, any attempted Distribution made pursuant to this Liquidating Trust Agreement that remains unclaimed for a period of thirty (30) days after the last attempted delivery shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Liquidating Trust. The Liquidating Trustee shall have no further obligation to

make any Distribution to such Liquidating Trust Beneficiary and such claim shall be extinguished and forever barred.

5.      Withholding and Reporting Requirements.  The Liquidating Trustee may, but is not directed to, withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to any provision of any foreign, state or local tax law with respect to any payment or distribution to the Liquidating Trust Beneficiaries. All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders for all purposes of this Liquidating Trust Agreement. The Liquidating Trustee shall be authorized to collect such tax information from the Liquidating Trust Beneficiaries (including social security numbers or other tax identification numbers) as required in his/her sole discretion to effectuate this Liquidating Trust Agreement. To receive distributions under this trust, all Liquidating Trust Beneficiaries shall be required to identify themselves to the Liquidating Trustee and provide tax information and the specifics of their holdings, to the extent the Liquidating Trustee deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder).  The Liquidating Trustee may refuse to make a distribution to any Liquidating Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; provided, however, that, upon the delivery of such information by a Liquidating Trust Beneficiary, the Liquidating Trustee shall make such distribution to which the Liquidating Trust Beneficiary is entitled, without interest; and provided further that, if the holder fails to comply with such a request within thirty (30) days, such distribution shall be deemed an undeliverable distribution hereunder; and provided further that, if the Liquidating Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Liquidating Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Liquidating Trustee for such liability.  Notwithstanding the foregoing, each owner of a Liquidating Trust Beneficial Interest and recipient of a Distribution on account of an Allowed Claim shall have the sole and exclusive responsibility for any taxes imposed by any governmental unit, including income, withholding and other taxes, on account of such ownership or distribution.

## ARTICLE IV
## THE LIQUIDATING TRUSTEE

1.      Appointment and Acceptance of Liquidating Trustee.  The Liquidating Trustee is hereby appointed as trustee of the Liquidating Trust under the Trust Act and, as necessary or applicable, shall be deemed appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  The Liquidating Trustee hereby accepts such appointment, including the trusteeship of the Liquidating Trust created by this Liquidating Trust Agreement, and the grant, assignment, transfer, conveyance and delivery to the Liquidating Trustee, on behalf, and for the benefit, of the Liquidating Trust Beneficiaries, by the Debtors of all of their respective right, title and interest in the Liquidating Trust Assets, upon and subject to the terms and conditions set forth herein. The Liquidating Trustee may resign and shall be subject to removal and replacement in accordance with Article VI.

2.      Fiduciary Duty and Standard of Care.

        a.      The Liquidating Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Liquidating Trust, and in accordance with applicable law.  The Liquidating Trustee shall have the authority to bind the Liquidating Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity as Liquidating Trustee, and not individually.

        b.      The Liquidating Trustee shall exercise such rights and powers vested in him/her by this Liquidating Trust Agreement and use the same degree of care and skill in her exercise as a prudent person would exercise or use under the circumstances in the conduct of his/her own affairs, in accordance with applicable law.  No provision of this Liquidating Trust Agreement shall be construed to relieve the Liquidating Trustee from liability for his/her own gross negligence, fraud or reckless or willful misconduct, except that the Liquidating Trustee shall not be liable for any action taken in good faith in reliance upon the advice of Liquidating Trust Professionals retained by the Liquidating Trustee in accordance with this Liquidating Trust Agreement.

3.      Bond.  The Liquidating Trustee shall serve without a bond,

4.      Powers of the Liquidating Trustee.

        a.      As more specifically provided below, the Liquidating Trustee shall have the responsibility for administering the Liquidating Trust, maintaining all appropriate reserves, objecting to, settling or otherwise resolving the Disputed Claims, liquidating the Liquidating Trust Assets, and making distributions under this Liquidating Trust Agreement.

        b.      The Liquidating Trustee shall have the rights and powers of a debtor in possession under Bankruptcy Code section 1107, and such other rights, powers, and duties necessary, appropriate, prudent or advisable to effectuate the provisions of the Plan and the Liquidating Trust, including but not limited to, objecting to and resolving Claims and Interests; subordinating a Claim or Interest within the requirements of the Code; investigating, pursuing and resolving Causes of Action; invoking the provisions of Bankruptcy Code section 108; waiving attorney-client and other privileges as circumstances may warrant; and making Distributions to Creditors and Interest Holders. The Liquidating Trustee shall be expressly authorized and required to undertake the following actions, in the Plan Trustee's good faith judgment, in the best interests of the Liquidating Trust Beneficiaries and to maximize net recoveries therefor:

                i.      To effectuate the provisions of the Plan pertaining to the collection, liquidation, and distribution of the Liquidating Trust Assets;

                ii.      to hold the Liquidating Trust Assets for the benefit of the Liquidating Trust Beneficiaries, whether such beneficiaries' Claims are Allowed on or after the Effective Date;

                iii.      to establish and maintain the Liquidating Trust Administrative Reserves;

9

iv.   to make all distributions and other necessary payments pursuant to this Liquidating Trust Agreement;

v.   to settle or otherwise resolve Disputed Claims in accordance with the terms of this Liquidating Trust Agreement and the Plan;

vi.   in the Liquidating Trustee's reasonable business judgment to investigate, prosecute, settle, liquidate, dispose of, and/or abandon the Liquidating Trust Assets, including the Causes of Action and any objections to Claims or Interests;

vii.   to monitor and enforce the implementation of the Liquidating Trust Agreement;

viii.   to file all tax and regulatory forms, returns, reports and other documents and financial information required with respect to the Liquidating Trust;

ix.   in the Liquidating Trustee's reasonable business judgment, to reconcile, object to, and resolve the Disputed Claims or other Claims against the Liquidating Trust;

x.   to hold, manage, and distribute Cash or non-Cash Liquidating Trust Assets obtained through the exercise of his/her power and authority;

xi.   to maintain and dispose of the books and records transferred to the Liquidating Trustee in a manner deemed appropriate by the Liquidating Trustee, as provided in Section 13 of Article I and Section 3 of Article IX;

xii.   to enter into and exercise rights under contracts that are necessary or desirable to the administration of the Liquidating Trust and execute any documents or pleadings related to the liquidation of the Liquidating Trust Assets or other matters related to the Liquidating Trust;

xiii.   to establish and maintain bank accounts and terminate such accounts for or on behalf of the Liquidating Trust;

xiv.   to obtain and maintain insurance coverage with respect to the liabilities and obligations of the Liquidating Trustee;

xv.   to take all actions necessary and appropriate consistent with the treatment of the Liquidating Trust as a "grantor trust" for United States federal income tax purposes;

xvi.   to bring suits or defend the Liquidating Trust and Liquidating Trustee against such suits, if any, as the Liquidating Trustee determines in connection with any matter solely to the extent arising from the rights, powers or obligations granted to the Liquidating Trust or Liquidating Trustee under this Liquidating Trust Agreement;

xvii.   to take such other and further actions as are not inconsistent with this Liquidating Trust Agreement; and

xviii. to take such other and further actions in furtherance of the purposes of the Plan as are not inconsistent with this Liquidating Trust Agreement.

5.    Investment of Liquidating Trust Assets.    The Liquidating Trustee may invest Liquidating Trust Assets (including any earnings thereon or proceeds therefrom) only in demand and time deposits, including short-term certificates of deposit, in banks or other savings institutions, and in other highly-rated temporary, liquid investments, such as U.S. Treasury Bills, consistent with Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

6.    Limitations on Actions of Liquidating Trustee.    No part of the Liquidating Trust Assets shall be used or disposed of by the Liquidating Trustee in furtherance of any trade or business.  The Liquidating Trustee shall, on behalf of the Liquidating Trust, hold the Liquidating Trust out as a trust in the process of liquidation and not as an investment company.  The Liquidating Trustee shall not engage in any investments or activities inconsistent with the treatment of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d).  The Liquidating Trustee shall be restricted to the liquidation of the Liquidating Trust Assets on behalf, and for the benefit, of the Liquidating Trust Beneficiaries; the distribution and application of Liquidating Trust Assets for the purposes set forth in this Liquidating Trust Agreement; and the conservation and protection of the Liquidating Trust Assets and the administration thereof in accordance with the Plan.

7.    No Further Approvals Required.    In performance of his/her duties hereunder, the Liquidating Trustee shall have the rights and powers of a debtor in possession under section 1107 of the Bankruptcy Code, and such other rights, powers, and duties necessary, appropriate, advisable or convenient to effectuate the provisions of this Liquidating Trust Agreement.  On and after the Effective Date, and except as otherwise provided in the Plan, the Liquidating Trustee shall not be required to obtain any approvals from the Bankruptcy Court, any court or governmental body and/or provide any notices under any applicable laws to implement the terms of this Liquidating Trust Agreement, including, without limitation, the sale, transfer, disposal or contribution of any Liquidating Trust Assets retained by the Liquidating Trust; the prosecution, settlement or abandonment of any Cause of Action; and the negotiation, resolution or settlement of any Disputed Claims, in each case, other than as expressly required under this Liquidating Trust Agreement.

8.    Reliance by Liquidating Trustee.    The Liquidating Trustee may rely, and shall be protected in acting, upon any resolution, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document reasonably believed by the Liquidating Trustee to be genuine and to have been signed or presented by the proper party or parties. The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of Liquidating Trust Professionals regardless of whether such advice is provided in writing.

9.    Liability to Third Persons.    The Liquidating Trustee shall not be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person in connection with the Liquidating Trust Assets or the affairs of the Liquidating Trust, and all persons claiming against the Liquidating Trustee or otherwise asserting claims of any nature in connection with affairs of the Liquidating Trust, shall look solely to the Liquidating Trust Assets for satisfaction of any

11

such claims, except where a Liquidating Trustee Party is found pursuant to a Final Order to have acted with gross negligence, fraud or reckless or willful misconduct.

10.    Compensation and Expenses.  The Liquidating Trustee shall be compensated in $10,000 per month and shall be reimbursed for his/her out-of-pocket expenses incident to the performance of his/her duties under this Liquidating Trust Agreement.  The fees and expenses of the Liquidating Trustee shall be satisfied out of the Liquidating Trust Assets and shall be in accordance with the Liquidating Trust Administrative Reserve.  The Liquidating Trustee shall be compensated under the terms provided herein without further motion, application, notice or other order of the Bankruptcy Court.

## ARTICLE VI
## SUCCESSOR CREDITOR TRUSTEES

1.    Resignation.  The Liquidating Trustee may resign at any time upon not less than thirty (30) days' written notice to the Liquidating Trust Beneficiaries provided that such resignation shall not be effective until such time as a successor Liquidating Trustee has been appointed.

2.    Removal.  The Creditor Trustee may be removed for Cause by a vote of seventy-five percent (75%) of the Liquidating Trust Beneficiaries, voting in accordance with their Pro Rata share of Allowed Claims.  All amounts due and owing to the Liquidating Trustee shall be paid to the Liquidating Trustee from the Liquidating Trust Assets immediately at the time of his or her removal .

3.    Effect of Resignation or Removal.

    a.    The resignation, removal, incompetency, bankruptcy or insolvency of the Liquidating Trustee shall not operate to terminate the Liquidating Trust or to revoke any existing agency created pursuant to the terms of this Liquidating Trust Agreement, or invalidate any action theretofore taken by the Liquidating Trustee.

    b.    In the event of the resignation or removal of the Liquidating Trustee, such Liquidating Trustee shall (i) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Liquidating Trustee or directed by the Bankruptcy Court to effect the termination of such Liquidating Trustee's capacity under this Liquidating Trust Agreement; (ii) promptly deliver to the successor Liquidating Trustee all documents, instruments, records and other writings related to the Liquidating Trust as may be in the possession of such Liquidating Trustee; and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Liquidating Trustee.

    c.    Notice of the resignation or removal of the Liquidating Trustee shall be promptly filed with the Bankruptcy Court.

4.      <u>Replacement</u>.  In the event that the Liquidating Trustee resigns or is duly removed, or in the event of the death of the Liquidating Trustee or other occurrence rendering the Liquidating Trustee incapacitated or unavailable for an extended period of sixty (60) consecutive days, the Liquidating Trust Beneficiaries shall designate a successor trustee by a 75 percent (75%) vote, voting in accordance with their Pro Rata share of Allowed Claims. Notice of the appointment of a successor Liquidating Trustee shall be filed with the Bankruptcy Court promptly following such appointment.

5.      <u>Successor Liquidating Trustee</u>.  Any successor Liquidating Trustee appointed hereunder shall execute an instrument accepting his/her appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and, in the case of the Liquidating Trustee's resignation, to the resigning Liquidating Trustee.  Thereupon, such successor Liquidating Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the Liquidating Trust with like effect as if originally named Liquidating Trustee and shall be deemed appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  The resigning or removed Liquidating Trustee shall duly assign, transfer and deliver to such successor Liquidating Trustee all property and money held by such resigning or removed Liquidating Trustee hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor Liquidating Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Liquidating Trustee upon the trusts herein expressed all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed Liquidating Trustee.

6.      <u>Reliance Upon Representations of Predecessor Liquidating Trustee</u>.  Any successor Liquidating Trustee may accept and rely upon any accounting made by or on behalf of any predecessor Liquidating Trustee hereunder, and any statement or representation made as to the assets comprising the Liquidating Trust Assets or as to any other fact bearing upon the prior administration of the Liquidating Trust, so long as it has a good-faith basis to do so.  The successor Liquidating Trustee shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue.  Any successor Liquidating Trustee shall not be liable for any act or omission of any predecessor Liquidating Trustee, nor have a duty to enforce any claims against any predecessor Liquidating Trustee on account of any such act or omission.

**ARTICLE VII**
**<u>TAX MATTERS</u>**

1.      <u>Tax Treatment</u>.

a.      For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries, followed by the transfer by such Liquidating Trust Beneficiaries to the Liquidating Trust in exchange for the Liquidating Trust Beneficial Interests.  Accordingly, the Liquidating Trust Beneficiaries holding Liquidating Trust Beneficial Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the

Liquidating Trust Assets (other than such Liquidating Trust Assets as may be allocable to the Disputed Claims Reserve). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

b.  The Liquidating Trustee may elect, in his/her sole discretion and to the extent necessary or appropriate to the administration of the Plan, to allocate amounts and Cash, if appropriate, to a Disputed Claims Reserve in the amount of Disputed Claims, and to administer the Liquidating Trust with respect to the Disputed Claims Reserve and the holders of Disputed Claims in accordance with applicable Treasury Regulations.

2.  Tax Reporting.

a.  The Liquidating Trustee shall file tax returns (including U.S. federal returns) for the Liquidating Trust treating the Liquidating Trust (other than with respect to any Liquidating Trust Assets allocable to the Disputed Claims Reserve) as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) and in accordance with this Article VII. The Liquidating Trustee shall otherwise make available to each holder of a Liquidating Trust Beneficial Interest a statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their U.S. federal income tax returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their U.S. federal income tax returns. The Liquidating Trustee shall cause to be filed any other statements, returns or disclosures relating to the Liquidating Trust as required by any governmental unit.

b.  As soon as practicable following the Effective Date, the Liquidating Trustee will in good faith value Liquidating Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including, without limitation, the Liquidating Trustee and Liquidating Trust Beneficiaries) for all United States federal income tax purposes.

c.  Allocations of the Liquidating Trust's tax items shall be in accordance with each holder's Pro-Rata share of the Liquidating Trust determined in good faith by the Liquidating Trustee.

d.  Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee shall (A) timely elect to treat any Liquidating Trust Assets allocable to the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Liquidating Trustee and the Liquidating Trust Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

e.  The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust, including the Disputed Claims Reserve.

3.     Tax Payment.  The Liquidating Trustee shall be responsible for the payment, out of the Liquidating Trust Assets, of any taxes imposed on the Liquidating Trust or its assets, including the Disputed Claims Reserve.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay any portion of such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims (including any income that may arise upon the distribution of the assets of the Disputed Claims Reserve), such taxes shall be (a) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims or (b) to the extent such Disputed Claims subsequently have been resolved, deducted from any amounts distributable by the Liquidating Trustee as a result of the resolutions of such Disputed Claims

**ARTICLE VIII**
**LIMITATION OF LIABILITY AND INDEMNIFICATION**

1.     Limitation of Liability. The Liquidating Trust Parties  will not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Liquidating Trust Agreement under any circumstances.

2.     Indemnification.

a.     The Liquidating Trust shall indemnify and hold harmless the Liquidating Trustee Parties and their employees and agents so that they shall not be liable for actions taken or omitted in their capacity as the Liquidating Trustee Parties or in fulfillment of their duties with respect to the Liquidating Trust except those acts that are determined by Final Order to have arisen out of their own gross negligence, fraud or reckless or willful misconduct, and each shall be entitled to be indemnified, held harmless, and reimbursed by the Liquidating Trust for fees and expenses including, without limitation, reasonable attorneys' fees, which such persons and entities may incur or may become subject to or in connection with any action, suit, proceeding or investigation that is brought or threatened against such persons or entities regarding the implementation or administration of the Liquidating Trust Agreement or the discharge of their respective duties hereunder or thereunder or in respect thereof, except for any actions or inactions that have arisen out of their own gross negligence, fraud, recklessness or willful misconduct.

b.     Any claim of the Liquidating Trustee Parties to be indemnified, held harmless, or reimbursed shall be satisfied solely from the Liquidating Trust Assets, or any applicable insurance that the Liquidating Trust has purchased, as provided in Section 6 of Article I.

c.     The Liquidating Trustee shall not be liable for acts or omissions of an officer, employee or agent of the Liquidating Trust, unless the Liquidating Trustee acted with gross negligence, fraud or reckless or willful misconduct in the selection, retention or supervision of that officer, employee or agent of the Liquidating Trust.

d.     If the Liquidating Trustee becomes involved in any action, proceeding or investigation in connection with any matter arising out of or in connection with the Plan, this Liquidating Trust Agreement or the affairs of the Liquidating Trust, the Liquidating Trust shall promptly advance to or reimburse the Liquidating Trustee on demand for all of his or her

15

reasonable expenses up to the amount of $50,000.00 (including, without limitation, attorneys' fees, disbursements and related expenses) incurred in connection therewith; provided, however, that the Liquidating Trustee shall be required promptly to repay to the Liquidating Trust the amount of any advanced or reimbursed expenses paid to him or her under this Section 2(d) to the extent that it shall be ultimately determined by Final Order of a court of competent jurisdiction that the Liquidating Trustee engaged in gross negligence, fraud or reckless or willful misconduct in connection with the affairs of the Liquidating Trust. The provisions of this Section 2 shall remain available to and be binding upon any former Liquidating Trustee or the estate of any deceased Liquidating Trustee whether or not the former Liquidating Trustee resigned or was removed.

**ARTICLE IX**
**TERMINATION OF LIQUIDATING TRUST**

1.      Duration.  The Liquidating Trustee and the Liquidating Trust shall be discharged or dissolved, as the case may be, upon the earlier to occur of (i) all of the Liquidating Trust Assets have been distributed pursuant to the Liquidating Trust Agreement, (ii) the Liquidating Trustee determines that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit.  If at any time the Liquidating Trustee determines, in reliance upon the Liquidating Trust Professionals as the Liquidating Trustee may retain, that the expense of administering the Liquidating Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Liquidating Trust, the Liquidating Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Liquidating Trust, and (ii) dissolve the Liquidating Trust.  If the duration of the Liquidating  Trust will, in the determination of the Liquidating Trustee, extend for more than seven years from the Effective Date, the Creditor Trustee shall seek the approval and obtain an order of the Bankruptcy Court extending the duration of the Liquidating Trust.

2.      Post-Termination.  After the termination of the Liquidating Trust and solely for the purpose of liquidating and winding up the affairs of the Liquidating Trust, the Liquidating Trustee shall continue to act as such until his/her duties have been fully performed.  Upon distribution of all the Liquidating Trust Assets, the Liquidating Trustee shall retain all books and records pertaining to the Debtors or the Liquidating Trust that have been delivered to or created by the Liquidating Trustee, subject to the provisions of Section 3 of this Article IX.

3.      Destruction of Books and Records. At the Liquidating Trustee's discretion, all books and records pertaining to the Debtors or the Liquidating Trust that have been delivered to or created by the Liquidating Trustee may be destroyed at any time following the date that is one (1) year after the final distribution of Liquidating Trust Assets unless such records and documents are necessary to fulfill the Liquidating Trustee's remaining obligations.

4.      Discharge.  Except as otherwise specifically provided herein, upon the final distribution of Liquidating Trust Assets, the Liquidating Trustee shall be deemed discharged and have no further duties or obligations hereunder, the Liquidating Trust Beneficial Interests shall be cancelled and the Liquidating Trust will be deemed to have been dissolved.

16

## ARTICLE X
## <u>MISCELLANEOUS PROVISIONS</u>

1.      <u>Governing Law</u>.  This Trust Agreement shall be governed by and construed in accordance with the laws of the State of Arizona (without reference to conflicts of law).

2.      <u>Jurisdiction</u>.  Subject to the proviso below, the parties agree that the Bankruptcy Court shall have exclusive jurisdiction over the Liquidating Trust and the Liquidating Trustee, including, without limitation, the administration and activities of the Liquidating Trust and the Liquidating Trustee, <u>provided</u>, <u>however</u>, that notwithstanding the foregoing or anything to the contrary set forth herein, the Liquidating Trustee shall have power and authority to bring any action in any court of competent jurisdiction to prosecute any Cause of Action or Disputed Claim that is vested or assigned to the Liquidating Trust.

3.      <u>Severability</u>.  In the event that any provision of this Liquidating Trust Agreement or the application thereof to any person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Liquidating Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Liquidating Trust Agreement shall be valid and enforceable to the fullest extent permitted by law.

4.      <u>Notices</u>.  Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally or by telex, facsimile or other telegraphic means, sent by nationally recognized overnight delivery service, or mailed by first-class mail:

>    (i)      if to the Liquidating  Trustee, to:
>
>    David Gonzales
>    Caliber Advisors, LLC
>    7373 E. Doubletree Ranch Road
>    Suite 210
>    Scottsdale, Arizona 85258
>    dave@caliber-advisors.com
>
>    (ii)     if to any Liquidating Trust Beneficiary, to the last know address of such Liquidating Trust Beneficiary according to the Liquidating Trustee's records.

5.      <u>Headings</u>.  The headings contained in this Liquidating Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Liquidating Trust Agreement or of any term or provision hereof.

6.      Plan.      Nothing contained herein shall modify the terms of the Plan or the order confirming the Plan; instead, the terms of this Liquidating Trust Agreement are intended to supplement them. If there is any inconsistency among the documents, the Plan and the Confirmation Order shall supersede all other documents, including this Liquidating Trust Agreement.

7.      Cooperation.  The Debtors shall reasonably cooperate with the Liquidating Trustee in carrying out his/her duties hereunder.

8.      Entire Agreement.  This Liquidating Trust Agreement and the Exhibits attached hereto contain the entire agreement between the parties and supersede all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

9.      Named Party.  In pursuing any Cause of Action, objecting to any Disputed Claim, or in disposing of any Liquidating Trust Assets, or otherwise administering the Liquidating Trust or any Liquidating Trust Assets, including, without limitation, the execution of documents, such as releases, and agreements, the Liquidating Trustee may pursue such matters and/or execute any such documents in the name of "Liquidating Trust" and/or in her own name as Liquidating Trustee or in such other names or such representative capacities as necessary or appropriate in the Liquidating Trustee's discretion.

10.     Amendment.  This Liquidating Trust Agreement may not be amended, modified, or supplemented without the prior written consent of the Liquidating Trustee, or by Bankruptcy Court approval.      Notwithstanding this Section no amendments to this Liquidating Trust Agreement shall be inconsistent with the purpose and intention of the Liquidating Trust to liquidate in an orderly manner the Liquidating Trust Assets (which will maximize the value of such assets) in accordance with Treasury Regulations Section 301.7701-4(d) or, in the alternative, as allowed under Arizona law applicable to limited liability companies or limited liability partnerships.  In the event that the Liquidating Trust shall fail or cease to qualify as a liquidating trust in accordance with Treasury Regulations Section 301.7701-4(d), this Liquidating Trust Agreement may be amended by the Liquidating Trustee to the extent necessary for the Liquidating Trustee to take such action as it shall deem appropriate to have the Liquidating Trust classified as a partnership for federal tax purposes under Treasury Regulations Section 301.7701-3 (but not a publicly traded partnership under section 7704 of the Tax Code, including, if necessary, creating or converting it into an Arizona limited liability partnership or limited liability company that is so classified.

Counterparts.  This Liquidating Trust Agreement may be executed in any number of counterparts, each of which shall be deemed original, but such counterparts shall together constitute one and the same instrument.  A facsimile or portable document file (PDF) signature of any party shall be considered to have the same binding legal effect as an original signature.

**IN WITNESS WHEREOF**, the parties hereto have executed this Liquidating Trust Agreement or caused this Liquidating Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

Liquidating Trustee

By:_____

    Name: David Gonzales, solely in his capacity as Liquidating Trustee

The following Debtor parties:

By:_____

    Name: _____

    Title: _____

# EXHIBIT A

## PARTIES

(Signature lines to be added)

# EXHIBIT B

## DEFINITIONS

(Plan Definitions Article II to be Added)

4864-4526-1824 v1 [53406-11]

# Exhibit D

PROJECTED CASH AVAILABLE FOR DISTRIBUTION TO CREDITORS
(Based on Effective Date of January 1, 2022)[1]

| | | Year end 1 | | Year end 2 | | Year end 3 | | Year end 4 | | Year end 5 | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | | $ | 250,000 | $ | 601,000 | $ | 543,000 | $ | 787,400 | $ | 217,400 | | |
| Litigation proceeds | | $ | 1,750,000 | $ | 4,000,000 | $ | 4,000,000 | $ | 5,000,000 | $ | 5,000,000 | $ 19,750,000 |
| Total | | | | | | | | | | | | |
| **Distributions** | | | | | | | | | | | | |
| Administrative | | $ | 400,000 | | | | | | | | | |
| Priority Taxes | | $ | 500,000 | | | | | | | | | |
| Wages | | $ | 75,000 | | | | | | | | | |
| | **Total** | $ | 1,025,000 | $ | 4,601,000 | $ | 4,543,000 | $ | 5,787,400 | $ | 5,217,400 | | |
| Trustee Costs | | $ | 120,000 | $ | 120,000 | $ | 120,000 | $ | 120,000 | $ | 120,000 | $ 600,000 |
| Accounting and other | | $ | 100,000 | $ | 60,000 | $ | 60,000 | $ | 60,000 | $ | 60,000 | $ 340,000 |
| UST Fees | | $ | 4,000 | $ | 28,000 | $ | 25,600 | $ | 40,000 | $ | 37,202 | $ 134,802 |
| Litigation Costs | | $ | 150,000 | $ | 350,000 | $ | 350,000 | $ | 350,000 | $ | 350,000 | $ 1,550,000 |
| | | | | | | | | | | | | $ - |
| | **Total** | $ | 374,000 | $ | 558,000 | $ | 555,600 | $ | 570,000 | $ | 567,202 | $ 2,624,802 |
| Net Cash | | $ | 601,000 | $ | 4,043,000 | $ | 3,987,400 | $ | 5,217,400 | $ | 4,650,198 | | |
| Payments to Prioroty | | | | $ | 3,500,000 | $ | 2,700,000 | | | | | $ 6,700,000 |
| Payments to Unsecured | | | | | | $ | 500,000.0 | $ | 5,000,000 | $ | 4,650,198 | $ 9,650,198 |
| % of Admin Paid | | | | | | | | | | | | 100% |
| % of Priority Paid | | | | | | | | | | | | 100% |
| % of Unsecured Paid | | | | | | | | | | | | 13% |

[1] All projections subject to change.

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UST Fees | | $ | 4,000 | $ | 28,000 | $ | 25,600 | $ | 40,000 | $ | 37,202 | $ 134,802 |

# Exhibit E

# DAVID GONZALES

**PARADISE VALLEY, ARIZONA**                                                          **602 571 9588**

**EXECUTIVE SUMMARY**                                          **www.dave@caliber-advisors.com**

A Senior Financial Executive and Business Owner with more than 35 years of business experience. Gonzales has extensive experience in strategy development, risk analysis, feasibility assessment, business turnaround, bankruptcy navigation, marketing, team building, and company under duress operating management. Gonzales has led real estate and commercial workouts from both creditor and equity perspectives, utilizing operating business, banking and investment banking skill sets to maximize the stakeholder outcome.  Gonzales has an extensive experience inventory and uses this knowledge to develop unique entrepreneurial solutions to operating businesses and real estate projects.

PROFESSIONAL EXPERIENCE

**Caliber-Advisors, LLC,** Phoenix, Arizona                                        5/06 – Present
**President    www.caliber-advisors.com**
The company provides hands on advisory services to resolve business model and financing issues. Caliber works to evaluate and renegotiate credit facilities that more appropriately fit the current operating capabilities of business operations.
These situations are commonly referred to as "workouts". Gonzales takes an active role with clients, in many cases assuming the role of Chief Restructuring Officer. Because of this operating bias and an orientation to repair versus liquidate, Gonzales' work is focused on owners or companies.
Gonzales has acted in the role as an advisor to secured and unsecured creditors and as a Liquidating Trustee in several matters. These trustee roles included significant dollar and number of litigation assets and required a focused approach, management of multiple issues in different jurisdictions and success turned on the appropriate selection of counsel and working with counsel to maximum the cost benefit of issues and tactics.

**Carolina Financial Securities, LLC**                                            8/19 – 8/20
**Managing Director    www.carofin.com**
Gonzales provided structured financing by accessing private placement capital for targeted middle market companies. This role included providing advisory services to middle market companies requiring a formal or informal capital restructuring. Gonzales holds a Series 79 FINRA investment Banking license, a Series 24 Supervisory license, and a Series 63 General Security license.

**Arctic Catering, Inc.**   Phoenix, Arizona and Anchorage Alaska                8/15 – 6/19
**CEO/President    www.arcticcatering.com**
Arctic catering provides remote site support services to energy companies primarily in Alaska and in the southeast US. Gonzales was brought in as an interim CEO with the prior CEO terminated for cause.
Gonzales led the restructure as the Alaskan energy industry collapsed with company revenue subsequently decreasing by 50%. Vendor relationships were recalibrated, the business model was adjusted, and new financing was acquired as the company survived the reginal energy recession. More importantly, during this period Gonzales delivered seasoned leadership to a team that was rudderless and anxious.
All company processes, team and business model were completely re-engineered "on the fly" eliminating $5 million in costs in a volatile business environment. The market has most recently rebounded, and the business has returned to profitability. Gonzales filed a Chapter 11 to protect the business from a lender and as a bridge to the desired sale strategy. The company sold 6/19 via a 363 transaction.

**CKS Advisors, LLC /CKS Securities, LLC**  Phoenix, Arizona                                     10/10 – 8/19

<u>Managing Partner</u>

CKS provides services to businesses that face operating inflection points. CKS was a registered Broker Dealer. Gonzales provided unique and proven interim CEO/CRO services to a wide range of industries including extensive experience in hospital and healthcare related business models. Gonzales has acted as a CEO/CRO in companies ranging from heavy equipment rentals, retail hardware, real estate developments, and surgical/emergency hospitals.

**Interval Capital & Bridge Capital,** Phoenix, Arizona                                     9/99 – 5/06

<u>President and Founder</u>

Gonzales was one of two partners managing a private $70 million investment fund achieving IRRs in the mid 30% range. The fund was comprised of high-net-worth investors and an Arizona based life insurance company. In some situations, Gonzales would assume a more direct role in the business where management was found ineffective. The business would be adjusted and sold to realize returns.

**Wells Fargo Bank,** Phoenix, Arizona

<u>Executive Vice President/Division Manager</u>, Asset Based Lending                           1997 – 10/99

Restructured an operating business that had twelve months to turn around or be closed. The restructure required an assessment of the competition, assessment of the existing business and the formulation of new business strategies. Responsibilities for this operating unit included direct accountability for all profit and loss categories, product development, integrating these assets-based products into the affiliate distribution channels, strategy development, coaching the sales force, recruiting staff, budgeting, personnel management and providing leadership necessary for a division staff of more than 60 people and $2 billion in assets.

<u>Executive Vice President/Division Manager,</u> Southwest Commercial Banking                  1995-1997

Relocated to Phoenix, AZ to merge this five-state operation into the newly configured bank. Responsibilities included leadership for a division of more than 3000 employees and $5 Billion in assets.  Major functions included managing all wholesale banking operations for five states, including direct profit and loss accountability, community outreach, financial forecasting, personnel administration, and other related executive duties. Managed significant employee retention issues, financial accounting concerns, asset quality questions, culture transfer issues, customer satisfaction challenges surrounding this merger.

***Regional Executive Vice President,*** *Los Angeles Commercial Banking*                         *1991 - 1995*

Restructured an anemic operating business in the company's largest commercial middle-market location and in 18 months moved the operating business into the company's growth and relative profit leader.

The business restructure included the redesign of the marketing process and the development of clear business strategies emphasizing internal strengths and competitor weaknesses. Responsibilities included leadership for a staff of 40 employees, recruiting a team to implement the new strategies, managing a loan portfolio of $1.2 billion, sales force management, direct management of all profit and loss components, designed and directed a focused marketing plan, planned, and managed an annual budget of $15 million, community outreach, and other related executive duties.

<u>Senior Vice President - Deputy Manager</u> Loan Adjustment Group                             1981 - 1991

Responsibilities included management of $1.7 billion in workout commercial and corporate loans while managing a staff of nearly 35 employees.  Formulated corporate and commercial restructuring plans for public and private companies experiencing operating leverage or marketing related challenges.  The management of this portfolio also required accessing the capital markets or using the bankruptcy process as part of the resolution.

<u>Other Experience</u>                                                                       1977-1981

Security Pacific National Bank & Bank of America- workout, City National Bank - lending and United States Treasury, Comptroller of the Currency - regulator.  University of Southern California, BBA 1977. Multiple trainings and University of Washington - Banking School.

2

# Exhibit F

# EXHIBIT F

**Potential Defendants in Causes of Action to be pursued by the Liquidating Trustee (See
Article IX of the Plan and Sections XI and XIII of the Disclosure Statement)**

**Note:  This Exhibit F is subject to change and may be modified by the
Committee any time prior to the Confirmation Date.**

Alamo Dynamic, LLC
Alamo Furr's II, LLC
Alamo Furr's, LLC
Allen Jones
Arizona Bank & Trust
Bob Amaro
Brian Padilla
Brothers Produce of Dallas
California Franchise Tax Board
Catalina Restaurant Group
City of Garland Utilities
Dynamic Foods
Elavon
E Risk Services
Gerardo Fortino Solis Serrato
Great West Trust
Jane Doe Jones
Jane Doe Padilla
Jason Kemp
Kane Russell Coleman Logan
Katten, Muchin, Rosenman
Larry Harris
Liberty Mutual Insurance
Minnesota Department of Revenue
Nathan Calvert
Nationwide Management Liability & Indemnity
Paycor Inc.
Peter Donbavand
Rachel Harris
River North Furr's, LLC
SAN15INNN LLC
SLO Promenade DE, LLC

Tara Kemp
Scottsdale Indemnity Company
Sushi Zushi

Texas Alamo Business Group
Texas Business Group
TXFMP Management LLC

VitaNova Brands, LLC
Waste Connections
Waste Management National
Westfield Bank
Zios Restaurant Company

Affiliates, Interest Holders, and Insiders of the Debtors
Officers, directors, members and shareholders of the Debtors from January 1, 2011 through the Petition Date

4828-1981-9263 v1 [97257-1]

Exhibit G

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS (DALLAS)

IN RE:                              . Case No. 21-30721-SGJ-11
                                    .
FRESH ACQUISITIONS, LLC,            . U.S. Bankruptcy Court
                                    . 1100 Commerce Street
                                    . Dallas, Texas 75242
                                    .
                  Debtor.           . Tuesday, August 24, 2021
. . . . . . . . . . . . . . . . . . 9:40 A.M.

TRANSCRIPT OF HEARING ON MOTION TO SELL PROPERTY FREE AND CLEAR
OF LIENS UNDER SECTION 363(f) DEBTORS' MOTION FOR (I) AN ORDER
 (A) APPROVING BIDDING PROCEDURES AND CERTAIN BID PROCEDURES,
(B) SCHEDULING BID DEADLINE, AUCTION DATE, AND SALE HEARING AND
APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (C) APPROVING
CURE PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF; AND
 (II) AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS
            FILED BY DEBTOR FRESH ACQUISITIONS, LLC
          BEFORE THE HONORABLE STACEY G. JERNIGAN
            UNITED STATES BANKRUPTCY COURT JUDGE


TELEPHONIC APPEARANCES:

For the Debtor:              Gray Reed & McGraw LLP
                             BY:  JASON S. BROOKNER, ESQ.
                                  AARON MICHAEL KAUFMAN, ESQ.
                                  AMBER MICHELLE CARSON, ESQ.
                             1601 Elm Street, Suite 4600
                             Dallas, Texas 75201

For VitaNova Brands          Carrington Coleman Sloman & Blumenthal
LLC:                         BY:  J. MICHAEL SUTHERLAND, ESQ.
                             901 Main Street, Suite 5500
                             Dallas, Texas 75202

For the Official             Dickinson Wright, PLLC
Committee of                 BY:  CAROLYN J. JOHNSEN, ESQ.
Unsecured Creditors:              WILLIAM L. NOVOTNY, ESQ.
                             1850 North Central Avenue, Ste 1400
                             Phoenix, Arizona 85004

ECRO:                        Mike F. Edmond

 Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail:  DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

2

**TELEPHONIC APPEARANCES (CONTINUED):**

For Arthur N. Rupe            Katten Muchin Rosenman LLP
Foundation:                   BY:  MICHAELA  C. CROCKER, ESQ.
                              2121 North Pearl Street, Suite 1100
                              Dallas, Texas 75201


For the United States         Office of the United States Trustee
Trustee:                      BY:  MEREDYTH KIPPES, ESQ.
                              1100 Commerce Street, Room 976
                              Dallas, Texas 75242


For Segura Investors          Ephron & Barenholtz
XII-XVI, LLC:                 BY:  BRETT BARENHOLTZ, ESQ.
                              1901 Avenue of the Stars, Suite 1030
                              Los Angeles, California 90067


For Paycor, Inc.:             Fishman Jackson
                              BY:  MARK H. RALSTON, ESQ.
                              13155 Noel Road, Suite 700
                              Dallas, Texas 75240


For Guarantors:               Robin Phelan Law
                              BY:  ROBIN ERIC PHELAN, ESQ.
                              4214 Woodfin Drive
                              Dallas, Texas 75220

207

THE COURT:  What?

MR. PHELAN:  A short piece of information.  My clients have instructed me to say, and I believe them.  They're not getting one more dime in this case.  And I just want the Court to take that into consideration.

THE COURT:  Okay, fine.  All right.  Well, it pains me to do this in a lot of ways since I suspect conversion is likely going to result from this ruling.  But I am denying the motion.  I cannot possibly approve this sale as proposed.  The standard under a 363 sale motion has been articulated many times as requiring the bankruptcy court to look at is there a sound business justification for the proposed transaction.  Also, is it a reflection of reasonable business judgment.

I do not have the evidence to find that.  I, for one thing, worry greatly that the marking process was not sufficiently fair and fulsome because I am of the belief, based on Mr. Gonzales's comments, that bidders may have thought, oh, we have a $13 million bid here to beat or even $11 million and I'm not going to read any further.  I'm not interested.  And I do not believe this should be treated as an $11 or $13 million bid.

I cannot find that the purchase price is a fair value.  I have no evidence, no evidence -- remember follow the facts.  I have no evidence that the buyer is ready, willing, and able to close or pay the whole list of assumed liabilities

that I guess were in Schedule 2.3 in full or when.  I have no evidence to determine that these purchasers are good faith purchasers for value.

They didn't testify and again, I am baffled at the notion that they wouldn't fund these assumed liabilities so that there could be the role of the Court and creditors to look at what the filed claims are and look at are any of them objectionable and make sure the pot of money only pays those which should be paid.  I had evidence that some of these taxes that would be assumed are left over from a prior bankruptcy and were never paid.  So again, I had no evidence that the buyer is ready, willing, and able to close and pay these assumed liabilities in full or when.

I agree that this does not feel like a straight 363 sale of assets.  Whether Braniff prohibits its approval or not, I think that we have a compromise of estate claims embodied in it that was not sufficiently noticed and I cannot find under AWECO standards that the compromise is fair and equitable in the best interest of the estate when considering all the risks and rewards of further litigation.

I just don't have enough solid evidence at this point as far as what's being compromised, the bona fides of the claims, the merits of the claims, the collectability.  So I understand the creditors here and I'm supposed to consider the paramount interest of the creditors.  We have creditors who

209

don't like this transaction.  They vehemently objected and they're ready to roll the dice.  I mean and they're getting zero, the unsecured creditors under this transaction, so they're willing to roll the dice on the prospect that maybe they would get more than zero if I don't approve this.

So I guess I would just add I haven't been convinced by the evidence that this going concern purchase price exceeds the value of the parts.  I just haven't been.  So painful.  This is I guess the fourth attempt at Chapter 11 and maybe a going concern emergence isn't possible at this point.  That pains me.  It bothers me greatly, but I just don't feel like the evidence supports a finding that there's a sound business justification for this transaction.

So that's the ruling of the Court.

(Proceedings concluded at 3:51 p.m.)

\* \* \* \* \*

210

**C E R T I F I C A T I O N**

I, DIPTI PATEL, COURTNEY MONTGOMERY, and KAREN WATSON, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Dipti Patel

DIPTI PATEL

/s/ Courtney Montgomery

COURTNEY MONTGOMERY

/s/ Karen Watson

KAREN WATSON

LIBERTY TRANSCRIPTS                    DATE: August 26, 2021

211

**INDEX**

**PAGE**

COMMENCEMENT OF PROCEEDINGS                              3

OPENING STATEMENTS

 By:  Mr. Brookner                                       10

 By:  Ms. Carson                                         13

 By:  Ms. Johnsen                                        29

 By:  Mr. Phelan                                         33

 By:  Ms. Kippes                                         37

 By:  Mr. Sutherland                                     39


CLOSING STATEMENTS

 By:  Mr. Kaufman                                        185

 By:  Mr. Sutherland                                     192

 By:  Mr. Phelan                                         196

 By:  Ms. Johnsen                                        200

 By:  Mr. Novotny                                        201

 By:  Ms. Kippes                                         204

 By:  Ms. Crocker                                        206


RULING BY THE COURT                                      207

END OF PROCEEDINGS                                       209

INDEX                                                    211/212

212

INDEX

WITNESSES:

FOR THE DEBTOR:

NATHAN CALVERT

Direct Examination by Mr. Kaufman                    42

Cross-Examination by Ms. Johnsen                    69

MARK SHAPIRO

Direct Examination by Mr. Kaufman                    75

Cross-Examination by Ms. Johnsen                   114

Questions by the Court                             124

Redirect Examination by Mr. Kaufman                127


FOR THE COMMITTEE:

DAVID GONZALES

Direct Examination by Ms/ Johnsen                  132

Cross-Examination by Mr. Kaufman                   167

Redirect Examination by Ms. Johnsen                181


| EXHIBITS: | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| 1 through 49 | 44 | 45 |
| 50 | 44 | 131 |
| FOR THE COMMITTEE: | | |
| 1 through 37 | 137 | 137 |