Carolyn J. Johnsen
Texas Bar No. 19844600
William L. Novotny (admitted pro hac vice)
Arizona Bar. No. 4239
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, Arizona  85004
Telephone:   (602) 285-5000
Facsimile:     (844) 670-6009
cjjohnsen@dickinsonwright.com
wnovotny@dickinsonwright.com

*Counsel for the Official Committee
of Unsecured Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

In re:

| | | |
|---|---|---|
| FRESH ACQUISITIONS, LLC, *et al.*,[1] | § | Case No. 21-30721 (SGJ) |
| | § | Chapter 11 |
| Debtors. | § | (Jointly Administered) |

_____

**DECLARATION OF DAVID GONZALES IN SUPPORT OF CONFIRMATION OF THE COMMITTEE'S FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION**

I, David Gonzales, hereby declare under penalty of perjury of law that the following statements are true and correct to the best of my knowledge, information, and belief[2]:

---

[1] The Debtors in these Chapter 11 cases ("Debtors") and the last four digits of each Debtor's Taxpayer Identification Number are as follows: Alamo Fresh Payroll, LLC (1590); Fresh Acquisitions, LLC (2795); Alamo Ovation, LLC (9002); Buffets LLC (2294); Hometown Buffet, Inc. (3002); Tahoe Joe's Inc. (7129); OCB Restaurant Company, LLC (7607); OCB Purchasing, Co. (7610); Ryan's Restaurant Group, LLC (7895); Fire Mountain Restaurants, LLC (8003); Food Management Partners, Inc. (7374); FMP SA Management Group, LLC (3031); FMP-Fresh Payroll, LLC (8962); FMP-Ovation Payroll, LLC (1728); and Alamo Buffets Payroll, LLC (0998). The Debtors' principal offices are located at: 2338 N. Loop 1604 W., Suite 350, San Antonio TX, 78248, United States.

[2] Capitalized terms not otherwise defined herein are those set forth in the Plan.

**BACKGROUND**

1. I am the Manager and principal of Caliber-Advisors, LLC and was retained by the Official Committee of Unsecured Creditors (the "**Committee**") to serve as its financial advisor in the above-captioned cases. My retention was approved by the Court by Order dated June 25, 2021 as modified on October 22, 2021 [Doc Nos.267,486].

2. I am over the age of 18, and I am authorized to submit this declaration on behalf of the Committee. I submit this Declaration in support of confirmation of the *Official Committee of Unsecured Creditors' First Amended Joint Chapter 11 Plan of Liquidation* (the "**Plan**") filed on October 30, 2021 [Doc No. 498] and final approval of the *First Amended Disclosure Statement in Support of the Official Committee of Unsecured Creditors' First Amended Joint Chapter 11 Plan of Liquidation* [Doc No. 499, corrected at 502] (the "**Disclosure Statement**").

3. References to the Bankruptcy Code, the Chapter 11 process, and related legal matters are based on my understanding of such as explained to me by Committee counsel. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4. I have over 40 years of experience in banking, finance and restructuring as a banker, debtor and creditor advisor. I have served as a Chief Restructuring Officer ("**CRO**") and Chief Executive Officer ("**CEO**") of multiple Chapter 11 debtors.

5. I hold a Series 79 FINRA Investment Banking license, a Series 24 supervisory license and a Series 63 General Security license.

6. Significant bankruptcy representations have included *In re Surgical Specialty Hospital*, No. 13-20029 (Bankr. D. Az) (financial advisor to the Debtor and eventual CRO—confirmed Debtor plan); *In re Pet Resorts*, No. 12-13494 (Bankr. D. Az) (financial advisor to the Committee-confirmed Committee Plan); *In re Arctic Catering*, No.18-13118 (Bankr. D. Az) (CEO); *In re Roomstores*, No.15-15898 (Bankr. D. Az) (financial advisor to the Debtor and subsequent Liquidating Trustee-confirmed Debtor Plan).

7. I have considerable experience with the Chapter 11 plan confirmation process and a broad working knowledge and understanding of the Bankruptcy Code requirements for confirmation.

8. Except as otherwise indicated, all facts in this Declaration are based upon my personal knowledge; my discussions with Mark Shapiro, the Debtors' CRO and other members of his firm B.Riley; my review of relevant documents and information concerning the Debtors' operations and financial affairs; or my opinions based upon my experience and knowledge.

9. Over the course of the last several months, I have reviewed extensively the Debtors' financial information that the Committee was able to obtain principally from Arizona Bank & Trust ("**ABT**") which maintained nearly all of the Debtors' bank accounts. I examined over

25,000 pages of documents including checks for disbursement accounts from 2019 to 2021, applications regarding Paycheck Protection Payment ("**PPP**") funds, numerous financial reports for both Debtors and non-debtor affiliates, current valuation appraisals for non-debtor Affiliates; and personal financial statements for certain of Debtors' Insiders. I compiled information from 275 checking statements for over 20 Debtor or Debtor-related business accounts covering the past 12 months

10. I also reviewed in detail the Debtors' Schedules and Monthly Operating Reports ("**MOR's**"), information provided by the Debtors in their so-called "data room" created to solicit bids for the sale of the Debtors' operating restaurants in the early part of the Cases, and a substantial number of the Proofs of Claim ("**POC's**") filed by Creditors in the Cases.

11. I assisted with the preparation of and am familiar with the terms of the Plan and Disclosure Statement.

12. The Plan is the product of considerable analysis and consideration of alternatives to maximize recovery for Creditors in these cases. In my opinion, it represents the best path available to expeditiously conclude these chapter 11 cases and maximize creditor recoveries. Accordingly, the Plan should be confirmed.

**OVERVIEW OF THE PLAN**

13. The Plan provides for the orderly liquidation of the Debtors' Assets which consist principally of Cash in the approximate amount of $1,587,037 and anticipated litigation claims totaling approximately $19,500,000. The Plan provides for the creation of a Liquidating Trust and the appointment of a Liquidating Trustee on the Effective Date of the Plan which is anticipated to be January 1, 2022. On the Effective Date, all of the Assets will be transferred to the Liquidating Trust. The Plan will be funded by the Cash and by the proceeds of the litigation ("**Litigation Recovery**") that will be distributed to creditors according to the priorities established by the Bankruptcy Code. I will serve as the Liquidating Trustee and intend to retain current Committee counsel Dickinson Wright, PLLC to prosecute the litigation.

14. The Plan provides that Administrative Claims and Priority Tax Claims are treated separately as unclassified Claims and further designates four (4) Classes of Claims and Interests.

15. Unless previously approved and paid, Allowed Administrative Claims will be paid, in full satisfaction of the Claim: (a) one cash payment in the Allowed amount of the Claim on the Effective Date or as soon thereafter as possible or after the claim is Allowed if subject to Court approval; (b) in the ordinary course of business as the Claim matures; or (c) upon other less favorable terms as may be agreed upon by the Holder of the Claim, or as ordered by the Bankruptcy Court.

16. The Plan provides that required applications for Administrative Claims must be filed within 30 days of the Effective Date and so that number is unknown. In addition, Committee

counsel and I have agreed to defer payment of our fees incurred in the Cases for September through December until such time as the Liquidating Trust has sufficient funds and it is prudent to pay them. In addition, Debtors' counsel Gray Reed has agreed to defer $25,000 of its fees for six months. Thus, based on information provided by B.Riley regarding payables, Debtors' counsel, and the United States Trustee ("**UST**"), I believe the total remaining cash after required payments will be approximately $345,000.

17.     Unless otherwise agreed, each Holder of an Allowed Priority Tax Claims will be paid in equal annual installments for four years with a balloon payment on or before April 20, 2026, the fifth anniversary of the Petition Date. Interest will accrue on each Allowed Priority Tax Claim at the statutory rate applicable in the Holder's jurisdiction. If there is no applicable statutory rate, then the rate will be established at six percent (6%) per annum.

18.     The annual payment to each Holder of an Allowed Priority Tax Claim will consist of its Pro-Rata share of $500,000 to be paid each year on December 1, 2022, December 1, 2023, December 1, 2024, and December 1, 2025.  All remaining principal and accrued interest for each Tax Claimant will be paid on or before April 20, 2026.

19.     I have reviewed the Debtors' Schedules that estimate the total amount of Priority Tax Claims at approximately $6,700,000.  I have reviewed generally the proofs of claim filed by Priority Tax Claimants that total well over $175,000,000.  However, I have confirmed that an overwhelming number of Claims are based on estimates because the Debtors have failed to file many of their tax returns since 2015.

20.     Immediately after the Effective Date, as Liquidating Trustee I will employ tax professionals to assist with the preparation of the delinquent tax returns.  I have researched several potential firms that may be willing undertake this engagement.

21.     Based on my review and current knowledge of the Debtors' corporate structure and probable losses, I believe the Priority Tax Claims will be in the range of $6,700,000 to $7,500,000.

22.     Class 1 consists of the Allowed Claims for wages, salaries, or commissions earned within 180 days prior to the Petition Date or the date that the respective Debtors' business closed, whichever occurred first, and capped at $13,650.

23.     Based on my review of the Schedules and the POC's, I do not believe there are any Claims in this Class.  If there are Claims, they are minimal and each Holder of an Allowed Claim in this Class will be paid the foregoing capped amount in full and in cash on the Effective Date or as soon thereafter as reasonably possible.

24.     Class 2 consists of the Allowed Claims of general unsecured creditors, except those classified in Class 3. Based on my review of the Schedules and the POC's, I estimate the Claims in this Class will be approximately 169 million, including $91 million of IRS claims for missing tax returns. I expect to have these returns completed and based on what I know, I

do not believe any amounts will be due.  The Holder of an Allowed Claim in this Class will be paid its Pro-Rata share of the Liquidating Trust Fund in accordance with the Liquidating Trust Agreement and the Plan after full payment of Allowed Administrative Claims, Allowed Priority Tax Claims, and the Holders of Claims in Class 1.

25.    Class 3 consists of the Allowed Unsecured Claims of Insiders and Affiliates of the Debtors. Based on my review of the Schedules and the Proofs of Claim, I estimate the Claims in this Class are approximately $7.5 million. The Claims in this Class will be deemed disallowed pending the resolution of any Cause of Action or Claim Objection filed against a Holder of a Claim in this Class. If such Claim is Allowed, in full and final satisfaction of such Claim, the Holder will be paid its Pro-Rata share of the Liquidating Trust Fund in accordance with the Liquidating Trust Agreement and the Final Order allowing such Claim (that may provide for the subordination of such Claim), after full payment of Allowed Administrative Claims and Priority Claims.

26.    Class 4 consists of the Equity Interests in each of the Debtors.  The Interests will be cancelled on the Effective Date.

27.    The classification of Claims and Interests and the treatment provided for each Class is based on valid legal and business reasons. The Claims and Interests placed in each particular Class are substantially similar. The nature of the Claims and Interest differ and therefore, are separately classified for that reason.  The classification was not implemented for any improper purpose and does not unfairly discriminate between or among Holders of such Claims and Interests.

28.    The Plan provides for a Liquidating Trust Agreement that along with the Plan will govern the duties and obligations of the Liquidating Trustee. I have reviewed the Liquidating Trust Agreement, believe it is reasonable and appropriate under the circumstances of these Cases, and I agree to its terms.  I have significant experience in serving as a liquidating trustee pursuant to similar trust agreements.  I am well-prepared to immediately implement and fulfill the requirements set forth in the Plan and the Liquidating Trust Agreement.

**SUBSTANTIVE CONSOLIDATION**

29.    Article VI of the Plan provides for the substantive consolidation of the Debtors' Estates into a single Estate for purposes of the Plan and the Distributions.

30.    In my review of the ABT documents, the filings in the Cases including the Debtors' Cash Management Motion [Doc No. 8], the Declaration of Mark Shapiro [Doc No. 20], and various POC's, I concur with the Shapiro Declaration and found it is clear that while the Debtors in form had separate operating entities, in substance they historically operated on a consolidated basis. All Debtors as well as many non-debtor Affiliates generally have the same officers, managers, and directors. Cash and other assets were regularly commingled between and among the Debtors and their non-debtor Affiliates. Additionally, the Debtors

were managed by the same insider owned management companies, shared general accounting services, shared software systems and risk management services.

31. Numerous Creditors filed duplicative claims in several of the Debtor entities thus indicating they viewed the Debtors as a single entity. It appears that entities provided services to various sets of restaurants and the agreements customarily provided for services to be rendered to multiple restaurant brands and locations owned by various Debtors, and the Debtors capitalized upon the scale and operations of the entirety of the Debtors' business operations to negotiate such agreements and maximize value.

32. Further, all accounts payable functions were performed from one centralized location, by the same administrative staff working on behalf of all Debtors, and virtually all debts were centralized and paid by one of the Debtor entities.

33. It is my opinion that determining the sources of the Debtors' pre-petition assets and liabilities on a per-entity basis would involve the nearly impossible task of reviewing and categorizing records of thousands of individual transactions to trace such transactions back to the proper entity.

34. Given the amount and nature of the remaining Assets held by various of the Debtors, and the expense of generating separate plans of reorganization for each of the Debtors, the overall effect of substantive consolidation will be more beneficial than harmful to Creditors and will allow for greater efficiencies and simplification in administering the Plan.

35. I do not believe that substantive consolidation of the Debtors' Estates under the terms of the Plan will adversely impact the treatment of any of the Creditors, but rather will reduce administrative expenses by automatically eliminating duplicative claims asserted against more than one of the Debtors, decreasing the administrative difficulties and costs related to the administration of separate Debtors' estates separately, as well as eliminating the need to determine professional fees on a case-by-case basis and streamlining the administration of the Plan.

36. Therefore, substantive consolidation is warranted.

**DISCLOSURE STATEMENT**

37. The Disclosure Statement was prepared based on the limited information the Committee was able to obtain from the Debtors and the documents provided by ABT. The facts and information set forth in the Disclosure Statement are true and correct to the best of my knowledge.

38. Based on my experience in formulating plans and disclosure statements in large commercial Chapter 11 cases and my understanding and discussions with counsel as to what constitutes adequate information under section 1125 of the Bankruptcy Code and the legal standard for approving a disclosure statement, I believe that the Disclosure Statement

provided adequate information to allow Creditors to determine whether to accept or reject the Plan.

39. Therefore, the Disclosure Statement should be approved on a final basis.

**SOLICITATION AND VOTING**

40. The Plan provides for four (4) classes of Claims and Interests. The Plan designated whether each class was Impaired. Class 1 is not Impaired, is deemed to have accepted the Plan, and was not solicited for voting. Classes 2 and 3 are Impaired and were solicited for voting. Class 4 is Impaired, but is deemed to have rejected the Plan and was not solicited for voting.

41. On November 2, 2021, the Bankruptcy Court entered its Order Approving Disclosure Statement and Scheduling Confirmation Hearing and Related Deadlines (the "**Disclosure Order**") [Doc No. 503] that provided for BMC Group, Inc. ("**BMC**"), the service agent in these Cases to transmit a copy of the Disclosure Order, the Plan, the Disclosure Statement and a ballot to Creditors as appropriate under the Bankruptcy Rules. The Disclosure Order provided that ballots were to be returned to and received by Committee counsel no later than December 6, 2021 at 5:00 p.m. Central Time (the "**Voting Deadline**").

42. I worked with Brad Daniel of BMC to ensure that ballots were sent to Creditors who did not receive them initially and to verify claim amounts when necessary. I assisted Committee counsel in reviewing and tabulating the ballots. The results are as follows:

  Total number of eligible votes = 1,000 (approximately 11% voted)

  Total number of dollar votes = $175,787,498 (approximately 22% voted)

  Class 1 – No Ballots received

  Class 2 -- 100 Ballots received by the Voting Deadline; 13 Ballots received after the

  Voting Deadline but postmarked several days prior.   Total Ballots received:  113

  Acceptances    106 (94%)    $ 39,231,043 (99%)

  Rejections     7 (6%)       $      8,213 (1%)

  Totals:        113 (100%)   $ 39,239,256 (100%)

  Class 3 --  No Ballots received

  Class 4 ---  No Ballots received

43.     The procedure by which ballots were solicited, received and tabulated was fair, properly conducted, and to my knowledge in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement, and the Disclosure Order.

**CAUSES OF ACTION AND FEASIBILITY**

44.     As noted above, Plan funding and payment to Creditors is based on the Litigation Recovery. As a key part of my role as financial advisor, I was asked to analyze the Debtors' proposed sale of its operating Assets to VitaNova Brands, LLC ("**VitaNova**"), an Insider and Affiliate of the Debtors.

45.     The proposed sale did not generate any cash for Unsecured Creditors and proposed to sell of all of the Causes of Action to VitaNova for no identifiable consideration. The Committee objected believing that the Causes of Action had value and could be pursued for the benefit of the Creditors.  Because many of the potential Causes of Action focused on Debtors' Insiders and Affiliates, the Committee sought discovery of the Debtors' financial records from an independent party ABT to perform such an analysis.

46.     My analysis of the ABT data, along with the Schedules, revealed numerous financial transactions that form a solid basis for pursuing various Causes of Action against Affiliates and Insiders as well as third parties.  The proceeds from the litigation of the Causes of Action could provide a significant recovery for Creditors.

47.     I testified about the Causes of Action in this Court's hearing on the proposed VitaNova sale.  In summary, the Causes of Action are based on the following analysis completed to date:

   a.   Potential misuse of PPP funds – transfers for improper purposes in the amount of $4,050,000
   b.   Excessive management fees both pre and post-petition to entities owned or controlled by the Debtors in the amount of $5,250,000
   c.   Unexplained transfers to Affiliates and Insiders that constitute preferences of fraudulent conveyances in the amount of $3,850,000
   d.   Preferential transfers to unrelated third parties in the amount of $350,000
   e.   Transfers of real property and diversion of funds to Affiliate Alamo Dynamic, LLC in the amount of $2,000,000
   f.   Unexplained credit card debt in the year prior to the Petition in the amount of $2,250,000
   g.   D&O Insurance policy in the amount of $2,000,000
        Total:  $19,750,000

48.     I am advised and understand that the analysis may support Causes of Action against the (1) Debtors' Affiliates, Insiders, and Interest Holders; (2) current and past officers, directors, members, shareholders, accountants, attorneys, advisors, lenders, employees, agents, and consultants of the Debtors, their Affiliates, Insiders and Interest Holders; and (3)

other parties identified in discovery and would include actions for breach of fiduciary duty, actual fraud, constructive fraud, misrepresentation, conversion, gross mismanagement, self-dealing, breaches and violations related to corporate governance and securities laws, negligence, gross negligence, willful and malicious injury, aiding and abetting, breach of contract, breach of covenant of good faith and fair dealing, alter ego and the Avoidance Actions.

49.    Each of the non-debtor entities that are targets of potential avoidance actions, are believed to be owned or controlled at least in part by the same individuals who own, directly or indirectly, the Debtors. Even if a non-debtor defendant does not have recoverable assets, I believe that all of the entities have been operated as a single enterprise and that the separateness will not ultimately protect the individuals from liability. In addition, the mismanagement and potential misconduct of the individuals may give rise to their liability for breaches of fiduciary duty and fraud.

50.    I have reviewed the current personal financial statements that the individuals who own or control the Debtors and its Affiliates provided to ABT. It appears that they have significant assets that would be collectible via litigation. Their combined net worth was disclosed to ABT to be $62,705,345, of which $31,562,386.00 was cash.

51.    I note that my analysis is based solely on the documents provided by ABT and the Debtors' Schedules. The documents covered an extremely limited time period and many documents were not provided. Post confirmation, I will have access to all of the Debtor, Insider, and Affiliate documents as per the requirements of the Plan and can further embark on full discovery. It is likely that additional claims may be uncovered.

52.    Based on the limited information, the Committee has been able to obtain to date, I have identified multiple potential defendants listed on Exhibit F to the Disclosure Statement, amended in the Plan Supplement [Doc No. 566] and submitted to the Court as evidence in support of this Declaration.

53.    I estimate that the liquidation of the Causes of Action will occur over five years and accordingly, I have prepared projections for expenses and distributions over this period of time. These projections are attached as Exhibit D to the Disclosure Statement and are submitted to the Court as evidence in support of my Declaration (the "**Projection**s").

54.    The projections are based on my extensive experience in many Chapter 11 cases and litigating or settling numerous claims similar to the Causes of Action identified above. The Projections represent my best mid-range estimates based on the information I currently have.

55.    As indicated above in paragraph 13, I anticipate the Trust will receive approximately $1,587,037 in Cash, and after reserving for immediate payment of Administrative Claims will have a balance of approximately $345,000. This amount will be sufficient for payment of accounting fees for the filing of tax returns, for initial discovery and litigation expenses.

56. The Projections describe the anticipated litigation proceeds, expenses of litigation and anticipated payments to creditors.  I anticipate a net recovery of $9 million with payment of priority taxes in full at the end of by the end of the third year and an approximate 10-13% recovery to Unsecured Creditors.

57. Based on my experience and the analysis performed to date, I believe the Projections are reasonable and credible and that the Plan is feasible within the meaning of Section 1129(a)(11) of the Bankruptcy Code.

**LIQUIDATION ANALYSIS AND BEST INTERESTS OF CREDITORS**

58. I understand that Bankruptcy Code Section 1129(a)(7) requires that each creditor either accept the Plan or receive from the Debtors' Estates as much under the Plan as each creditor would receive in a Chapter 7 liquidation of the Debtors.

59. Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical Chapter 7 is substantially similar to the Chapter 11 liquidation contemplated by the Plan. I believe that the orderly liquidation proposed under the Plan is likely to generate greater distributions to creditors than would occur in a Chapter 7 liquidation.

60. As set forth previously, I have prepared a comprehensive analysis of the Causes of Action that would provide a recovery for Creditors. As a result, I have gained momentum in developing a necessary strategy for pursuing litigation.  This will save inordinate cost and delay in having a new trustee and new counsel enter into the case and virtually start over. Creditors have already paid for the analysis and should not have to pay for it again.  Only the potential defendants in the Causes of Action will benefit from the delay.

61. I have estimated that the costs of litigation will be a total of approximately $600,000 over the five-year term of the Plan. Payments to a Chapter 7 trustee calculated under Section 326 of the Bankruptcy Code would be a higher amount at about $625,000.

62. Certainly, Creditors will receive Distributions under the Plan of at least as much as they would receive in a Chapter 7 liquidation and thus, the Plan meets the best interests of creditors test.

**FURTHER REQUIREMENTS OF SECTION 1129**

63. I am aware of and have discussed with counsel the confirmation requirements of Section 1129 of the Bankruptcy Code. I believe the Plan meets all these requirements and should be confirmed.

64. The Plan complies with all applicable provisions of the Bankruptcy Code thereby satisfying Section 1129(a)(1). Specifically Creditors and Interest Holders have been properly classified, designated and treated without discrimination thereby satisfying  Sections 1122 and 1123(a)(1)(2)(3) and (4). The Plan provides for adequate and proper means for

implementing the Plan, including the creation of the Liquidating Trust, the appointment of the Liquidating Trustee, and the vesting of the Assets, including the Causes of Action, in the Liquidating Trust. The Liquidating Trustee will be authorized to pursue any and all Causes of Action. Therefore, Bankruptcy Code Section 1123(a)(5) and (a)(7) have been satisfied. The Plan's provisions are appropriate and are not inconsistent with the applicable provisions of the Bankruptcy Code in accordance with Section 1123(b).

65. The Committee as Plan Proponent has complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code Section 1129(a)(2).

66. The Committee has proposed the Plan in good faith with the legitimate and honest purpose of liquidating the Debtors' Assets and pursuing the Causes of Action in a manner to maximize the recovery to Creditors and Interest Holders in accordance with the priorities set forth in the Bankruptcy Code. Therefore, Bankruptcy Code Section 1129(a)(3) has been satisfied.

67. Any payments to be made for services or for costs and expenses in connection with the Cases have been approved by, or are subject to the approval of the Court as reasonable, thereby satisfying Bankruptcy Code Section 1129(a)(4).

68. The Plan, Disclosure Statement, and Liquidating Trust Agreement describe the appointment of the Liquidating Trustee. The Plan does not propose the retention or employment of an insider of the Debtors. Therefore, Bankruptcy Code Section 1129(a)(5) has been satisfied.

69. The Plan does not provide for any rate changes subject to the jurisdiction of any governmental regulatory commission, and therefore, Bankruptcy Code Section 1129(a)(6) is inapplicable.

70. My testimony above in paragraphs 58-62 demonstrates that the "best interest" test embodied in Bankruptcy Code Section 1129(a)(7) has been satisfied.

71. My testimony regarding the Plan provisions as set forth above in paragraphs 15-19 demonstrates that Section 1129(a)(9)(a)(b) and (c) have been satisfied.

72. Class 2 is Impaired and has accepted the Plan, thereby satisfying Bankruptcy Code Section 1129(a)(10).

73. My testimony above in paragraphs 44-57 demonstrates that the Plan is feasible and therefore Bankruptcy Code Section 1129(a)(11) has been satisfied.

74. Substantially all fees payable under 28 U.S.C. § 1930 have been paid, and the Plan provides for the payment of any unpaid fees as they become due. Therefore, Bankruptcy Code Section 1129(a)(12) has been satisfied.

75. Bankruptcy Code Sections 1129(a)(13),(14),(15),and(16) regarding respectively retiree benefits, domestic support obligations, individuals, and nonprofit corporations are not applicable.

76. Class 3 did not vote and Class 4 is deemed to have rejected the Plan. Nevertheless, the Plan may be confirmed pursuant to Bankruptcy Code Section 1129(b)(1) because (i) Class 2 voted to accept the Plan; (ii) the Plan does not discriminate unfairly and is fair and equitable with respect the Claims and Interests in the rejecting Classes; (iii) the Plan has been proposed in good faith and is reasonable; and (iv) no Holder of any Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest and (v) no Holder of a Claim or Interest in a Class senior to such Class is receiving more than 100 percent on account of its Claims. Therefore, Bankruptcy Code Section 1129(b) has been satisfied.

77. The Plan is the only plan filed in the Cases, and therefore, Bankruptcy Code Section 1129(c) has been satisfied.

78. The principal purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act. Therefore, Bankruptcy Code Section 1129(d) has been satisfied.

79. I understand that the UST has objected to the Plan in part because the Debtors have failed to file their MOR's for August, September and October 2021. I contacted the CRO and his colleagues on numerous occasions to try to persuade them to correct the MOR's that had been filed and to file the delinquent ones. I was told that the Debtors did not have the information from their management company VitaNova.

80. I am willing to provide any necessary information to the UST post-confirmation. A conversion to a Chapter 7 or dismissal of the case on this ground would not be in the best interest of Creditors who then likely would receive minimal if any recovery.

81. I believe the Committee and the Plan satisfy the requirements of confirmation as set forth in Bankruptcy Code Section 1129 and that confirmation is in the best interest of the Creditors, Interest Holders and other parties in interest.

Dated: December 9, 2021.

                                            */s/ David Gonzales*
                                            David Gonzales
                                            Financial Advisor for the Unsecured Creditors' Committee

4884-0440-8324 v2 [97257-1]