DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

Carolyn J. Johnsen
Texas Bar No. 19844600
Amanda E. Newman (admitted in N.D. Tex.)
Arizona Bar No. 032462
Gabriel A. Blumberg (admitted pro hac vice)
Nevada Bar No. 12332
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Telephone: (602) 285-5000
Facsimile: (844) 670-6009
cjjohnsen@dickinsonwright.com
anewman@dickinsonwright.com
gblumberg@dickinsonwright.com
*Counsel for the Plaintiff Trustee of the Fresh Acquisitions Liquidating Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>FRESH ACQUISITIONS, LLC, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 21-30721 (SGJ)<br>(Jointly Administered) |
| DAVID GONZALES, TRUSTEE OF THE FRESH ACQUISITIONS LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>MARTIN CORTES, a single man, and NATHAN CALVERT, a single man;<br>Defendants. | **Adv. No. ________**<br><br>**VERIFIED SECOND AMENDED COMPLAINT** |

Plaintiff David Gonzales, Liquidating Trustee (the "Plaintiff" or the "Trustee") on behalf of the Fresh Acquisitions Liquidating Trust (the "Trust"), by its undersigned attorneys, alleges as follows for his Verified Complaint against Defendants Martin Cortes ("Cortes") and Nathan Calvert ("Calvert") (together, "Defendants"):

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

## PREFATORY STATEMENT

1. For years, the Debtors in this case were misused by their majority owners, Defendants Allen Jackie Jones ("Jones"), Jason Richard Kemp ("Kemp"), and Lawrence Farrell "Larry" Harris Jr. ("Harris") (collectively, the "Owners"). The Owners used the Debtors as their personal piggybanks. The Owners drained the Debtors of their assets. The Owners used the Debtors for fraud and improper purposes, including the misuse of millions of dollars in COVID-19 relief funds that were required to be used for payroll and lease payments, but were instead were used to personally enrich the Owners.

2. Even while the Debtors (and the buffet restaurant industry) were eroding financially and it was clear that the Debtors, which ran chains of buffet restaurants, were insolvent, the Owners continued to take large salaries and distributions and unreasonably delayed filing for bankruptcy, creating a deepening insolvency for the Debtors. In governing the Debtors, the Owners favored themselves and ignored the best interests of the Debtors and creditors.

3. Employees, landlords, vendors, multiple taxing authorities, and the federal government all went unpaid while the Owners lined their pockets and misrepresented the Debtors' financial situation.

4. The Owners sometimes acted directly, sometimes acted through their personal entities, and sometimes acted through other entities they controlled, which they appointed as "managers" of the Debtors. Cortes and Calvert worked for those managers and were instrumental in the misuse of the Debtors.

5. The Owners' disregard for the Debtors' corporate forms was evident. The Owners were making large transfers from the Debtors to themselves. But, at the same time, the Owners (and the entities they controlled) failed to maintain separate records for the Debtors. The Owners (and the entities they controlled) failed to file tax returns for the Debtors for years, resulting in massive claims

by the Internal Revenue Service and state taxing authorities. The Owners (and the entities they controlled) moved the Debtors' assets around, without consideration, like chess pieces. The Owners caused the Debtors to pay exorbitant purported management fees — far more than the management contracts provided for — to Defendants TXFMP Management, LLC ("TXFMP") and VitaNova Brands, LLC ("VitaNova"), both of which were also controlled by the Owners for the Owners' benefit.

6. Cortes and Calvert — who worked for the Debtors' management companies — participated in controlling the Debtors, misusing them, and causing the malfeasance alleged herein.

7. The misconduct continued even after the Debtors filed their bankruptcy petitions in this action. VitaNova (controlled by the Owners, and acting through Defendants) continued to receive management fees but did not provide management services. VitaNova (controlled by the Owners, and acting through Defendants) failed and refused to provide the financial information necessary for the Debtors to comply with bankruptcy rules and procedures. VitaNova (controlled by the Owners, and acting through Defendants) attempted a sham purchase of the Debtors' assets. VitaNova (controlled by the Owners, and acting through Defendants) submitted materially false information in Schedules and Monthly Operating Reports, to conceal the Owners' fraud and misuse of the Debtors. VitaNova (controlled by the Owners, and acting through Defendants) withheld relevant information from the Court and creditors. VitaNova (controlled by the Owners, and acting through Defendants) commingled Debtor documents with those of non-Debtor entities and withheld those documents for months, in violation of their contractual and Plan-based duties.

8. In an episode that highlighted their lack of respect for the Debtors' assets, the interests of creditors, and their own duties, the Owners — both shortly before and during the bankruptcy — caused the Debtors to improperly use Paycheck Protection Program ("PPP") funding to pay a $1.85 million payment for the benefit of the Owners — and then they concealed or omitted those payments

from the Debtors' bankruptcy Schedules. Similarly, the Owners diverted more than $3 million in Debtor PPP funding to themselves, seemingly to pay their personal loans and line their pockets. Cortes and Calvert were complicit in these.

9. This lawsuit addresses Cortes's and Calvert's participation in the egregious misconduct by the Owners, their personal entities (Defendants All Jones, LLC, Dayspring Operating Company, LLC, and Larrac Inv., LLC), and other entities they control (including TXFMP and VitaNova). The Defendants are liable for their misconduct, which caused substantial damages to the Debtors, the Estate, and creditors.

## PARTIES, JURISDICTION, AND VENUE

10. This Court has subject matter jurisdiction over this adversary proceeding, which arises under Title 11 of the United States Code (the "Bankruptcy Code") and arises in and relates to a case under the Bankruptcy Code pending in the United States Bankruptcy Court for the Northern District of Texas, Case No. 21-30721 (SGJ), under 28 U.S.C. §§ 157(b)(2) & 1334.

11. This is a core proceeding under 28 U.S.C. § 157(b). Plaintiff consents to entry of a final judgment by this Court with respect to the allegations and matters presented herein.

12. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 & 1409(a).

13. This adversary proceeding is commenced pursuant to Rule 7001(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Section 105(a) of Bankruptcy Code.

14. Pursuant to the Plan and Confirmation Order (each as defined below), this Court retained jurisdiction after the Effective Date (as defined below): (a) as to all proceedings and other matters arising in or relating to this Bankruptcy Case, including any adversary proceedings commenced after the Effective Date, and (b) in order to hear and determine any rights held by or accruing to the Trust pursuant to the Plan, this Bankruptcy Case, or any federal or state statute or legal theory.

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

15. Debtor Alamo Fresh Payroll, LLC ("Alamo Fresh Payroll") is a Texas limited liability company ("LLC"). At relevant times, its members and directors were Jones, Kemp, and Harris. Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

16. Debtor Fresh Acquisitions, LLC ("Fresh") is a Delaware LLC. Jones, Kemp, and Harris held various positions of control over the entity (as shareholders, managers, officers, and/or directors), directly or indirectly, at various relevant times.

17. Debtor Alamo Ovation, LLC ("Alamo Ovation") is a Texas limited liability company ("LLC"). At relevant times, its members and directors were Jones, Kemp, and Harris. Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

18. Debtor Buffets, LLC ("Buffets") is a Minnesota LLC. At relevant times, Kemp was a manager of Buffets. On information and belief (including based on review of corporate filings, public records, and the Debtors' records), Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

19. Debtor HomeTown Buffet, Inc. ("HomeTown Buffet") is a Minnesota corporation. At relevant times, Kemp was CEO of Hometown Buffet. Jones, Kemp, and Harris held various positions of control over the entity (as shareholders, managers, officers, and/or directors), directly or indirectly, at various relevant times.

20. Debtor Tahoe Joe's Inc. ("Tahoe Joe's") is a Minnesota corporation. At relevant times, Kemp was CEO of Tahoe Joe's. Jones, Kemp, and Harris held various positions of control over the entity (as shareholders, managers, officers, and/or directors), directly or indirectly, at various relevant times.

21. Debtor OCB Restaurant Company, LLC ("OCB Restaurant") is a Minnesota LLC. At relevant times, Jones was its president, Kemp was its treasurer and manager, and Harris was its chairman. Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

22. Debtor OCB Purchasing, Co. ("OCB Purchasing") is a Minnesota corporation. At relevant times, Kemp was its CEO. Jones, Kemp, and Harris held various positions of control over the entity (as shareholders, managers, officers, and/or directors), directly or indirectly, at various relevant times.

23. Debtor Ryan's Restaurant Group, LLC ("Ryan's Restaurant") is a South Carolina LLC. Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

24. Debtor Fire Mountain Restaurants, LLC ("Fire Mountain") is an Ohio LLC. At relevant times, its directors and officers were Jones (president), Kemp (treasurer), and Harris (chairman). Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

25. Debtor Food Management Partners, Inc. ("Food Management Partners") is a Texas corporation. At relevant times, its members and directors were Jones, Kemp, and Harris. Jones, Kemp, and Harris held various positions of control over the entity (as shareholders, managers, officers, and/or directors), directly or indirectly, at various relevant times.

26. Debtor FMP SA Management Group, LLC ("FMPSA") is a Texas LLC. At relevant times, its managers were Jones, Kemp, and Harris. Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

27. Debtor FMP-Fresh Payroll, LLC ("FMP-Fresh Payroll") is a Texas LLC. At relevant

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

times, its managers were Jones, Kemp, and Harris. Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

28. Debtor FMP-Ovation Payroll, LLC ("FMP-Ovation Payroll") is a Texas LLC. At relevant times, its managers and directors were Jones, Kemp, and Harris. Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

29. Debtor Alamo Buffets Payroll, LLC ("Alamo Buffets Payroll") is a Texas LLC. At relevant times, its directors and managers were Jones, Kemp, and Harris. Jones, Kemp, and Harris held various positions of control over the entity (as members, managers, officers, and/or directors), directly or indirectly, at various relevant times.

30. Alamo Fresh Payroll, Fresh, Alamo Ovation, Buffets, HomeTown Buffet, Tahoe Joe's, OCB Restaurant, OCB Purchasing, Ryan's Restaurant, Fire Mountain, Food Management Partners, FMPSA, FMP-Fresh Payroll, FMP-Ovation Payroll, and Alamo Buffets Payroll are all debtors in these consolidated cases and are collectively referred to herein as the "Debtors."

31. On April 20, 2021 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code; those proceedings remain pending.

32. The Trust was formed as of January 3, 2022, which was the "Effective Date" of *The Official Committee of Unsecured Creditors' First Amended Joint Chapter 11 Plan of Liquidation* filed on October 30, 2021 (the "Plan"), [Administrative Docket No. 498], which was confirmed pursuant to the *Findings of Fact, Conclusions of Law, and Order (I) Approving Disclosure Statement on a Final Basis and (II) Confirming The Official Committee of Unsecured Creditors' First Amended Joint Chapter 11 Plan of Liquidation* entered on December 20, 2021 (the "Confirmation Order") [Administrative Docket No. 587].

33. In accordance with the terms of the Plan and the Confirmation Order, on the Effective Date, the Trustee was granted the rights and powers of a debtor in possession under Bankruptcy Code Section 1107 and such other powers, rights, and duties to effectuate the provisions of the Plan.

34. In addition, in accordance with the terms of the Plan, the Confirmation Order, and the Fresh Acquisition Liquidating Trust Agreement (the "Trust Agreement") [Administrative Docket No. 499], on the Effective Date, (a) all Causes of Action[1] of the Debtors were vested in the Trust, and the Trustee was conferred with standing to bring and prosecute the Causes of Action vested and transferred to the Trust on behalf of the Trust; and (b) all of the Debtors' assets as provided in Section 541of the Bankruptcy Code were transferred to and vested in the Trust.

35. Defendant Martin Cortes ("Cortes") is, on information and belief, a single man, who, on information and belief (based on review of Debtor records and public records), is a resident of Texas and does business in Texas. As described herein, Cortes held various positions of control over the Debtors, including, at relevant times, acting as Chief Financial Officer of VitaNova, as well as of Food Management Partners and the other Debtors.

36. Defendant Nathan Calvert ("Calvert") is, on information and belief, a single man, who, on information and belief (based on review of Debtor records and public records), is a resident of Texas and does business in Texas. As described herein, Calvert held various positions of control over the Debtors and VitaNova, including, at relevant times, acting as Vice President - Controller of VitaNova as well as of Food Management Partners and the other Debtors.

## GENERAL ALLEGATIONS

37. The Debtors are related companies that historically owned and operated various chains of buffet restaurants, such as those operating under the Furr's Fresh Buffet™, Country Buffet™, Old Country Buffet™, HomeTown Buffet™, Tahoe Joe's™, Ryan's™, and Fire

Mountain™ brands.

38. Those companies have struggled financially for years. The Debtors (in various iterations) previously filed for Chapter 11 bankruptcy in 2008, 2012, and 2016.

39. On information and belief, including based on review of the Debtors' records and their bankruptcy filings (both in the current bankruptcy and in those prior bankruptcies, incorporated herein by reference), as well as based on the creditors' claims in this case (the claims register is also incorporated herein by reference), the Debtors have been insolvent consistently or nearly consistently since at least 2015. Specifically, the Debtors were insolvent no later than August 2015 because they had liabilities that exceeded their assets and never had a positive cash flow. Independently, the Debtors were also insolvent no later than March 2020, when they ceased operating and had virtually no cash flow, despite growing liabilities. Independently, the Debtors were also insolvent no later than April 17, 2020, when they began receiving PPP loans that created massive liabilities and that were siphoned for the benefit of the Owners and other Insiders, rather than being used to reduce the Debtors' growing liabilities to landlords and employees.

40. The ultimate ownership group at the time of the instant bankruptcy — the Owners and, to a lesser extent, Brian Padilla ("Padilla") — acquired ownership interests in the Debtors in or around 2015. Specifically, the Debtors were insolvent at all relevant times after the Owners and Padilla acquired them; they had liabilities that exceeded their assets.

41. Saddled with excessive management fees, mismanagement, and ownership that used the Debtors as their personal piggybanks, the Debtors were not successful under the Owners' control.

42. Indeed, on information and belief (based on review of the Debtors' records and interviews with former Debtor personnel), during the Owners' ownership of the Debtors, the Debtors never had positive cash flow.

---

[1] This phrase uses the definition in the Plan.

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

43. The Owners caused various of the Debtors to file for bankruptcy in March 2016. After shedding more than $100 million in creditor claims through a plan of reorganization, the Owners repurchased those Debtors' assets in mid-2017 for the modest sum of $6.5 million and continued to abuse the entities for their benefit. Specifically, the Debtors were insolvent no later than the moment of the repurchased assets because they had liabilities that exceeded their assets and never had a positive cash flow. The Debtors remained insolvent at all relevant times until bankruptcy was again filed in March 2021.

44. However, the Debtors continued to fail. By 2019 (if not earlier), the Owners were again discussing the need to file bankruptcy.

45. The COVID-19 pandemic, which started to impact businesses in the United States in 2020, was the final straw for the already-failing Debtors. With disruptions to restaurant operations and a particular consumer reticence toward buffet-style dining during the pandemic, the Debtors were unable to continue.

46. The Debtors ceased restaurant operations in March 2020. Although a few restaurants briefly reopened later that year, they were short-lived and an insignificant portion of the Debtors' business. It was clear the Debtors were insolvent and a bankruptcy filing was needed at all relevant times after March 2020.

47. But the obvious reality of the Debtors' insolvency did not lead to a timely bankruptcy filing. Instead, the Owners and other Insiders waited and used the time to drain the Debtors of their assets, including draining them of funds that were owed to employees, landlords, and other creditors. It was only after the Debtors' assets were transferred to the Owners and other Insiders, and there was nothing left for employees, landlords, and creditors, that bankruptcy was filed.

48. The Owners (acting at times through VitaNova) finally decided in 2021 that it was time for another bankruptcy, and they attempted to use this proceeding as they did the one in 2016:

rid the Debtors of creditor claims and then repurchase their assets on the cheap and keep operating as before. In short, exploit the bankruptcy system to enrich themselves while creditors went unpaid.

49. Unfortunately for the Owners and their Affiliates (including VitaNova and TXFMP), their improper serial bankruptcy strategy failed. The Debtors were liquidated instead of reorganized, and the malfeasance of the Owners and other Debtor Insiders and Affiliates — including Cortes and Calvert — came to light.

## A. Structure, Consolidated Operations, and Treatment of the Relevant Companies

50. The Debtors were part of a complicated web of business entities created and/or maintained to benefit their ultimate owners — primarily, Jones, Kemp, and Harris.

51. Relevant portions of the Debtors' organizational structure, at certain (but perhaps not all) relevant times, included the following (Debtors are outlined in **bold**):




Dayspring Operating Company, LLC (33.33%)
All Jones, LLC (33.33%)
Larrac Inv., LLC (33.34%)
FMP-Ovation Payroll, LLC
FMP-Fresh Payroll, LLC


Larry Harris (33.34%)
Allen Jones (33.33%)
Jason Kemp (33.33%)
Food Management Partners, Inc.
Larry Harris (21%)
Allen Jones (21%)
Jason Kemp (21%)
Brian Padilla (21%)
FMP Rewards, LLC (16%)
Alamo Ovation, LLC (100%)
Buffets Restaurants Holdings, Inc. (100%)
Buffets Holdings, LLC

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D







52. The business empire that included the Debtors and their Affiliates consisted of <u>more than 250</u> separate business entities registered in various states throughout the country, but all operating out of the same address in San Antonio, Texas.

53. The Owners (as well as their entities, including without limitation TXFMP and VitaNova) used this excessively complicated web of entities to avoid personal liability, conceal their business activities, and perpetrate fraud and fraudulent transfers.

54. At relevant times, the Owners collectively held a controlling interest in each of the Debtors. Some of those interests were held through the Owners' respective personal entities, All Jones, Larrac, and Dayspring (collectively, the "Owner Personal Entities").

55. The Debtors' bankruptcy petitions identified the Owners as "Governing Persons" of the Debtors.

56. The Debtors were completely controlled by the same group of individuals. That group included the Owners and their entities, such as the Owner Personal Entities and two companies the Owners installed as managers for the Debtors, TXFMP Management, LLC ("TXFMP") and VitaNova Brands ("VitaNova"). It also included individuals such as Cortes and Calvert.

57. The Debtors acted through their management companies (at relevant times, TXFMP and VitaNova), who were, in turn, controlled by the Owners. All material actions by the Debtors were decided and controlled by the Owners (acting directly or through TXFMP, VitaNova, or their personal entities), assisted by others, such as Cortes and Calvert, who helped the Owners use the Debtors to accomplish their purposes.

58. Evidencing the lack of formalities recognized for the Debtors, as well as their alter ego characteristics, individuals who held positions within the empire — such as Cortes and Calvert — usually did so formally with Food Management Partners (as was reflected in their email signature blocks) but acted in the same position with respect to <u>all</u> of the Debtors.

59. For example, Cortes was Chief Financial Officer of Food Management Partners and all the other Debtors, as well as of VitaNova.

60. Calvert was formerly a financial analyst for the Debtors. In or around 2020, as the

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

Debtors' ship further deteriorated, he was abruptly elevated to be Vice President - Controller of Food Management Partners and all the other Debtors, as well as of VitaNova.

61. Cortes and Calvert also held those same positions with VitaNova: Cortes was VitaNova's Chief Financial Officer, and Calvert was VitaNova's Vice President - Controller.

62. At the Owners' direction, Cortes and Calvert personally authorized and caused the improper payments to the Owners during at least 2020 and 2021.

63. Cortes' and Calvert's parallel positions with all the Debtors and with VitaNova are another example of and are indicative of the joint and alter ego way in which the Owners operated the Debtors and their other companies — ultimately, this was a single business enterprise operated to enrich the Owners at the expense of creditors..

64. Those parallel positions also allowed Cortes and Calvert (and VitaNova and the Owners through them) to continue to mismanage the Debtors, and continue to do the Owners' bidding, even during the bankruptcy proceeding (*see* discussion below, about VitaNova's mismanagement of the Debtors during the bankruptcy).

65. The Owners and those who acted in concert with them (including, without limitation, the Owner Personal Entities, TXFMP, VitaNova, Cortes, and Calvert), did not use or respect the Debtors as separate entities. Rather, they treated the Debtors as parts of a mass of companies without separate or distinct characteristics, for the purpose of enriching the Owners at the expense of creditors.

66. The Debtors were substantively consolidated as per the Confirmation Order. [Administrative Docket No. 587, ¶ 14].

67. Specifically, the Court found:

> Substantive consolidation is warranted because it is clear that while the Debtors in form had separate operating entities, in substance they historically operated on a consolidated basis. All Debtors as well as many

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

> non-debtor Affiliates generally have the same officers, managers, and directors. Cash and other assets were regularly commingled between and among the Debtors and their non-debtor Affiliates. Additionally, the Debtors were managed by the same insider owned management companies, shared general accounting services, shared software systems and risk management services. Numerous Creditors filed duplicative claims in several of the Debtor entity cases thus indicating they viewed the Debtors as a single entity. It appears that unsecured creditors viewed the Debtors as a single entity when extending credit terms, as such negotiations and agreements customarily provided for services to be rendered to multiple restaurant brands and locations owned by various Debtors, and the Debtors capitalized upon the scale and operations of the entirety of the Debtors' business operations to negotiate such agreements and maximize value. Further, all accounts payable functions were performed from one centralized location, by the same administrative staff working on behalf of all Debtors, and virtually all debts were centralized and paid by one of the Debtor entities.
>
> Determining the sources of the Debtors' pre-petition assets and liabilities on a per-entity basis would involve the nearly impossible task of reviewing and categorizing records of thousands of individual transactions to trace such transactions back to the proper entity.

[*Id.*].

## B. Management Agreements

68. The Debtors were day-to-day managed pursuant to a series of management agreements.

69. The management agreements were not the result of arm's-length negotiations, because the Owners caused the Debtors to hire Insiders and Affiliates as their managers, and the Owners controlled the decisions of these entities and their managers.

70. In effect, the Owners had their left arm (the Debtors) make an agreement with their right arm (other Owner-controlled entities) for these management agreements, which is no negotiation at all.

71. In 2015, FMPSA (indirectly owned and controlled by Jones, Kemp, and Harris) agreed to provide day-to-day management services to most of the Debtors.

72. Specifically, Buffets and FMPSA entered a Management Agreement dated August 9, 2015, for FMPSA to provide day-to-day management services to Buffets and its subsidiaries, for a weekly fee of 4% of Buffets' net consolidated revenues (the "2015 Buffets-FMPSA Management Agreement").

73. Fresh and FMPSA also entered an Amended and Restated Management Agreement dated August 18, 2015, for FMPSA to provide day-to-day management services to Fresh, for a fee of 2% of Fresh's net consolidated revenues, payable every two weeks (the "2015 Fresh-FMPSA Management Agreement").

74. In 2017, TXFMP assumed day-to-day management services for Buffets and its subsidiaries.

75. Specifically, Buffets and TXFMP entered a Management Agreement dated 2017 for TXFMP to provide day-to-day management services to Buffets and its subsidiaries, for a weekly fee of 4% of Buffets' net consolidated revenues (the "2017 TXFMP Management Agreement").

76. Later, VitaNova assumed day-to-day management services for both Fresh and Buffets and its subsidiaries.

77. First, VitaNova succeeded FMPSA as the manager of Fresh in 2020, via an Assignment and Assumption of Management Agreement and Consent by Company dated July 16, 2020 between FMPSA as Assignor and VitaNova as Assignee, with the consent of Fresh and Arizona Bank & Trust (the "2020 VitaNova Management Assignment"). Through this agreement, VitaNova took FMPSA's place as the manager under the 2015 Fresh-FMPSA Management Agreement.

78. Second, VitaNova succeeded TXFMP as the manager of Buffets and its subsidiaries in 2021, via a Management Agreement dated January 1, 2021 between Buffets and VitaNova, for VitaNova to provide day-to-day management services to Buffets and its subsidiaries, for a weekly

fee of 5% of Buffets' net consolidated revenues (the "2021 VitaNova Management Agreement").

**C. Malfeasance and Mismanagement of the Debtors**

79. The Debtors were mismanaged for years by those in control of their operations, including the Owners, the Owner Personal Entities, TXFMP, and VitaNova (through, inter alia, Cortes and Calvert).

80. The Owners, the Owner Personal Entities, TXFMP, and VitaNova caused the Debtors to pay excessive management fees to TXFMP and VitaNova — in other words, to themselves.

81. For example, from January 2020 to March 2021, Buffets, Fresh, and Tahoe Joe's paid a total of $7,654,906.71 in management fees, on aggregate revenues of $68,166,044; Buffets alone paid $5,087,053.21 in management fees on aggregate revenues of $360,016.17. This amount is unfeasible by any measure, and far exceeds the already-excessive contractual amount. These figures show that these Defendants caused the Debtors to pay exorbitant management fees that greatly exceeded the contractual rates.

82. The Owners, the Owner Personal Entities, TXFMP, and VitaNova caused the Debtors to <u>overpay</u> more than $6.9 million in purported management fees during the period of January 2020 to March 2021 — these are just the fees that exceed the already excessive contracted amounts.

83. Indeed, on information and belief (based on review of Debtor records, including documents produced by the Debtors' bankruptcy counsel), management fees were not invoiced, and the amounts transferred for management fees were not supported by written calculations based on the formulas in the management agreements. They are, as a result, all excessive.

84. Cortes and Calvert both participated in causing these overpayments to be made.

85. Furthermore, on information and belief (based on review of Debtor records and the record from the bankruptcy proceeding), it appears that Buffets and Fresh continued to pay high management fees even after all restaurants (other than Tahoe Joe's) had been closed, leaving little (if

any) need for management, and a period where the Debtors had no net revenues on which to pay management fees.

86. On information and belief (based on review of Debtor records, and based on the Insiders' course of dealing and regular operations of the Debtors), the Owners, the Owner Personal Entities, TXFMP, and VitaNova caused the Debtors to pay similarly excessive and non-contractual management fees before 2020, as well.

87. Again, Cortes and Calvert both participated in causing these overpayments to be made.

88. The Debtors were structured so that there were specific Debtor entities responsible for paying payroll. However, on information and belief (based on review of Debtor records), the Owners, the Owner Personal Entities, TXFMP, and VitaNova caused the Debtors to transfer to the "payroll entities" much more than was required (or actually paid) for payroll. Each transfer that exceeded the actual payroll was an improper transfer. For example, Fresh transferred $3.2 million to Alamo Fresh Payroll for a time period when Alamo Fresh Payroll only transferred to Paycor Inc. (which handled actually paying employees) $398,349.

89. Similarly, the Debtors nearly always made payroll payments to Owner-affiliated entities <u>in round numbers</u>, which are inherently questionable and indicative of fraud.

90. On information and belief, the Owners, the Owner Personal Entities, TXFMP, and VitaNova also caused the Debtors to overpay Alamo Dynamic, LLC d/b/a Dynamic Foods ("Alamo Dynamic"), an Insider and Affiliate of the Debtors, for food products.

91. Alamo Dynamic operated a food production facility in Lubbock, Texas, that sold food products to the Debtors. In the year before the Petition Date, Alamo Dynamic received $804,405 from Fresh, $55,000 from Buffets, and $175,000 from Alamo Fresh Payroll — purportedly most or all for food products. In the year before that, Alamo Dynamic received $3.9 million from Fresh, $1.5

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

million from Buffets, and $95,000 from FMPSA.

92. Nearly all of the transfers to Alamo Dynamic that make up those amounts were transfers of round, even figures — which are inherently questionable, and indicative of fraud and likely indicative that the amounts were not supported by actual food products received by the Debtors.

93. The Owners, the Owner Personal Entities, TXFMP, and VitaNova also caused the Debtors to incur exorbitant amounts of credit card charges. For example, in the year prior to the Petition Date, the Debtors incurred more than $8 million in credit card debt. Those excessive amounts are inherently questionable and, on information and belief (based on review of Debtor records, including credit card statements), included large amounts spent to personally benefit the Defendants — for example, for the personal medical expenses of the Owners — rather than to pay the Debtors' proper business expenses.

94. On information and belief, Cortes and Calvert facilitated these charges and/or payments.

95. The Owners, the Owner Personal Entities, TXFMP, and VitaNova caused the Debtors to incur debts beyond their ability to pay.

96. The Owners, the Owner Personal Entities, TXFMP, and VitaNova drained the Debtors' profits for their own use (and the use of their other entities), while the Debtors' creditors went unpaid.

97. The Owners, the Owner Personal Entities, TXFMP, and VitaNova failed to cause the Debtors to file tax returns since 2015, leading to $150 million in claims filed by the Internal Revenue Service ("IRS") in this bankruptcy case, as well as large state liabilities, and otherwise causing harm to the Debtors.

98. VitaNova's failure to perform its obligations as manager for the Debtors caused or

contributed to the occurrence of massive unpaid vendor and tax liabilities for the Debtors, which the Trust has now inherited.

99. Additionally, in managing the Debtors, VitaNova failed to keep separate, segregated records for them. For example, as discussed above, when VitaNova finally turned over Debtor files to the Trustee in mid-2022, as required under the Plan and Confirmation Order, it produced an enormous amount of data including millions of files belonging to the Debtors and various non-Debtor related entities. VitaNova was unable to extract from that morass the records specifically relating to the Debtors, because VitaNova had completely failed to properly maintain those records so that they could be separately extracted.

100. The foregoing are nonexclusive examples of the mismanagement suffered by the Debtors; they are not intended to be an all-encompassing list.

101. Indeed, that mismanagement permeated the Owners', the Owner Personal Entities', TXFMP's, and VitaNova's interactions with and transactions involving the Debtors, many of which were improper or fraudulent, as further described below.

**D. Misuse of PPP Funds**

102. The Debtors received various federal loans through the Paycheck Protection Program ("PPP"), a program implemented by the Small Business Administration ("SBA") that provided small businesses with loans so they could maintain employee payroll during the COVID-19 pandemic, hire back employees who had been laid off, and cover applicable overhead, including mortgages, rent, and utilities.

103. The Owners (directly and through the Owner Personal Entities), TXFMP, VitaNova, Cortes, and Calvert caused the Debtors to misuse PPP funding that the Debtors received.

104. Debtor Fresh received approximately $2,996,600 in PPP funds on April 17, 2020.

105. Debtor Buffets received approximately $10 million in PPP funds on April 20, 2020.

106. Notwithstanding receiving substantial PPP funding that was specifically designated for items such as payroll and rent, the Debtors (through their managers and other control persons) failed to direct most of their PPP funds to those permitted expenses.

107. Instead, the Owners caused the PPP funding to be transferred to enrich Insiders and Affiliates, including the Owners, the Owner Personal Entities, and TXFMP.

108. For example, on April 20, 2020, the Owners caused $10 million in PPP funds (the "Buffets PPP Loan") to be deposited in an account ending in 2555, owned by Debtor Buffets (the "Buffets Account").

109. That same day, the Owners caused the entire $10 million from the Buffets PPP Loan to be transferred from the Buffets Account to an account ending in 6118, owned by Debtor Alamo Buffets Payroll (the "Alamo Account"). The Alamo Account had held a balance of $0.00 before the entire Buffets PPP Loan was transferred into it.

110. The very next day, April 21, 2020, $4,050,000 — the Owners caused nearly half of the Buffets PPP Loan — to be transferred from the Alamo Account to an account ending in 2986, owned by non-Debtor TXFMP (the "TXFMP Account").

111. From the TXFMP Account, the PPP funds were immediately drained by Insiders and transferred to themselves. On April 21, 2020, just one day after Buffets received its $10 million PPP loan, the Owners caused $1 million each to be wired from the TXFMP Account to All Jones, Dayspring, and Larrac — all non-Debtors, and the personal entities of Jones, Kemp, and Harris/Rachel Harris.

112. At an August 24, 2021 hearing, Calvert and Mark Shapiro of B. Riley (the chief restructuring officer) both acknowledged that $4,050,000 of the Buffets PPP Loan was transferred to non-Debtor TXFMP, testifying that it was "loan repayment." [Sale Hearing Tr., relevant excerpts attached as Exhibit 2 hereto, at 53-54, 96].

113. Loan repayment is not a permitted use of PPP funding.

114. On information and belief (based on review of Debtor records), the nearly $3 million in PPP funding received by Debtor Fresh (the "Fresh PPP Loan") was similarly misappropriated by the Owners to be used for their personal benefit; it was transferred to the Owners and Insiders at the direction of the Owners, and it was not used for lawful purposes.

115. For example, on information and belief (based, inter alia, on review of Debtor records, including bank statements), the Owners caused $1.85 million of the Fresh PPP Loan to be ultimately transferred to non-Debtor River North Furr's, LLC ("River North") to settle a lawsuit brought by River North against the Owners and Padilla and to redeem (for the Owners' benefit) an interest in a Debtor Affiliate entity, as further described below. This was not a permitted use of PPP funding.

116. Peter Donbavand ("Donbavand"), who was Vice President - Real Estate & Business Development for Food Management Partners and the other Debtors until April 20, 2020, testified at a deposition on March 5, 2021 that Jones "told me that they used [the PPP funds] to settle that fraud lawsuit with Steve Madlinger and the River North Group and said they were continuing to pay their very large salaries and other things," including remodeling stores. [*Arthur N. Rupe Foundation v. Fresh Acquisitions, LLC*, N.D. Tex. Case No. 5:20-cv-00130-H, Remote Videotaped Dep. of Peter Donbavand (Mar. 5, 2021), relevant excerpts attached as Exhibit 1 hereto, at 112-13, 117].

117. Furthermore, on April 17, 2020, the day the Fresh PPP Loan was received, the Owners caused $1 million of those funds to be transferred to the TXFMP Account, which transferred $300,000 to each of the Owners (as well as $100,000 to Padilla) that same day.

118. On information and belief (based on review of Debtor records, including, inter alia, bank statements and email communications), the Owners, the Owner Personal Entities, VitaNova, TXFMP, Cortes, and Calvert were all complicit in the PPP malfeasance.

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

119. Indeed, Calvert later described himself as "the main person handling the cash including PPP funds, for the year." [Exhibit 3 hereto, at p. 3].

120. Furthermore, based on review of the Debtors' records, it appears that Calvert signed at least portions of the PPP applications, including certifications.

121. Notably, the Debtors were, for the most part, not operating during this time period.

122. On information and belief, based on review of the Debtors' records, all of the Debtors' restaurants other than those under Tahoe Joe's closed in March 2020, and all of the Debtors (other than Tahoe Joe's) ceased operating. During that time, they had minimal or no payroll. A few Debtors briefly reopened a handful of restaurants in summer/fall 2020 — after the misspending of PPP funds alleged herein — but they reclosed soon afterward.

123. On information and belief, Buffets and HomeTown Buffet never reopened after March 2020; Ryan's Restaurant closed its single reopened restaurant in October 2020; Fire Mountain and OCB Restaurant closed their few reopened restaurants in November 2020; and Fresh closed its last restaurants in March 2021.

124. The Owners' and their Affiliates' misuse of the PPP program through the Debtors went beyond misappropriating the employee relief funding and transferring it for the Owners' benefit.

125. In mid-2020, the federal government gave companies the opportunity to apply for forgiveness of the COVID-19 relief loans, in whole or in part, if certain conditions had been met in the spending of the money.

126. On information and belief (based on review of Debtor records), while the Debtors likely had some permissible costs and expenses to support forgiveness of their PPP loans, the spending was not correctly designated, and it appears that the forgiveness applications filed by the Debtors contained material inaccuracies.

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

127. On information and belief, on or about June 16, 2020, the Owners, VitaNova, and TXFMP caused a Loan Forgiveness Application (the "Buffets Forgiveness Application") to be filed with the SBA for the PPP funds received by Buffets, seeking forgiveness of the Buffets PPP Loan in its entirety.

128. On information and belief (based on review of the Debtors' records, including email correspondence), Kemp, on behalf of Buffets, signed the Buffets Forgiveness Application. On information and belief, he was acting on behalf of all of the Owners.

129. The terms of the Buffets PPP Loan allowed for forgiveness of the entire loan amount so long as at least 60% of the funds received through the loan were spent on payroll-related costs.

130. In the Buffets Forgiveness Application, the Owners, VitaNova, and TXFMP falsely represented that Buffets spent \$6,363,536.34 on payroll costs, \$6,393,765.48 on business rent or lease payments, and \$2,147,729.90 on business utility payments.

131. Based on those representations, the Buffets PPP Loan was forgiven in its entirety.

132. On information and belief, as described herein, those representations in the Buffets Forgiveness Application were inaccurate and/or misleading.

133. Buffets' records reflect that only \$1,770,524.88 of the Buffets PPP Loan — less than 18% of the loan — was spent on payroll costs.

134. Indeed, on information and belief (based on review of the Debtors' records), the Owners, VitaNova, and TXFMP caused Buffets to spend at least \$2,900,000.00 of the Buffets PPP Loan on credit card payments, at least \$4,050,000.00 on management fees, and at least \$468,882.87 on "Operating Funds."

135. On information and belief, the Owners, VitaNova, and TXFMP caused a similarly inaccurate and/or misleading forgiveness application was filed on behalf of Fresh.

136. Fresh's records reflect that only \$366,368.95 of the Fresh PPP Loan — less than 13%

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

— was spent on payroll costs.

137. On information and belief (based on review of the Debtors' records), Fresh spent at least $99,000.00 of the Fresh PPP Loan on other loan payments, at least $100,000.00 on management fees, at least $242,000.00 on "Operating Funds," and at least $275,000.00 on credit card payments.

138. Cortes and Kemp were primarily responsible for the forgiveness application process/ filings, with (on information and belief, based on review of the Debtors' records, including emails) the knowledge and involvement of the other Owners, the Owner Personal Entities, VitaNova, and TXFMP.

139. On August 20, 2021, Calvert told the Debtors' bankruptcy counsel, Gray Reed, that — based on his knowledge of how the PPP funds were spent — he was "not comfortable . . . agreeing to the accuracy [of] any of the items on the PPP [forgiveness] application right now. I don't feel the company paid enough of those [permitted] expenses and they are still sitting as liabilities on the balance sheets." [Exhibit 3 hereto, p. 3].

140. Calvert noted, for example, that specific taxes and payroll that were recorded as paid on the forgiveness application were "still . . . unpaid" as of August 20, 2021. [*Id.* at p. 3].

**E. The River North Settlement Payments**

141. River North formerly was, with the Owners and Padilla, a member in Alamo Furr's, LLC ("Alamo Furr's").

142. In June 2019, River North sued FMPSA, the Owners, and Padilla in U.S. District Court for the Western District of Texas, Case No. 5:19-cv-757, alleging that River North was entitled to repayment of its capital contribution to Alamo Furr's and a preferred return (the "River North Litigation").

143. River North alleged that FMPSA had guaranteed the repayment, but in fact the purported guaranty was for no consideration and, thus, was not enforceable, as further set out in the

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

Trustee's operative pleading in *Gonzales v. River North Furr's, LLC*, adversary case No. 22-03098 (SGJ) before this Court, incorporated by this reference.

144. The Owners caused the River North Litigation to be settled on or about May 13, 2020 with an agreement that Alamo Furr's would redeem River North's 14% ownership interest for payment to River North of $1.85 million.

145. Notwithstanding the fact that non-Debtor Alamo Furr's was purportedly redeeming River North's ownership interest, and notwithstanding the fact that the redemption would inure primarily to the benefit of the Owners (whose respective ownership interests in Alamo Furr's would be correspondingly increased with the redemption), the $1.85 million redemption was paid by Debtor FMPSA — which gained nothing from the transaction.

146. The Owners caused FMPSA, via TXFMP, to make the following transfers to River North, totaling $1.85 million: a transfer of $500,000 on May 15, 2020 and transfers of $112,500 each on June 1, 2020, July 1, 2020, July 31, 2020, September 1, 2020, October 1, 2020, October 30, 2020, December 1, 2020, January 4, 2021, February 1, 2021, March 1, 2021, April 1, 2021, and April 30, 2021 (collectively, the "River North Transfers").

147. Cortes and Calvert participated in making those transfers. They each authorized Arizona Bank & Trust to make multiple of the River North Transfers.

148. On information and belief (based, inter alia, on review of the Debtors' records, including bank statements), the primary or sole source of the funds for the River North Transfers was the Fresh PPP Loan.

149. Again, Donbavand testified in March 2021 that Jones told him the Owners used PPP funds to settle the River North Litigation. [Exhibit 1, at 112-13, 117].

150. The River North Transfers were made for the benefit of the Owners and Padilla (which directly benefitted from resolution of the claims against them and indirectly benefitted from

the redemption of River North's interest), as well as Alamo Furr's (which directly benefitted from the redemption of River North's interest).

151. Debtor FMPSA did not receive reasonably equivalent value for the River North Transfers.

152. Indeed, Debtor FMPSA did not even receive the 14% interest in Alamo Furr's that Debtor FMPSA repurchased. On information and belief, the Owners and Padilla retained that benefit.

153. The River North Transfers were concealed from creditors and the Court. They were not disclosed in the Schedules — indeed, even the bank account to which they were transferred was omitted from disclosure.

154. On information and belief (based on their participation in preparing the Schedules), Cortes, Calvert, and VitaNova helped conceal the River North Transfers by omitting them from the Schedules.

155. And, when the Debtors' counsel questioned Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ("Ogletree") (which represented the defendants to the River North Litigation) about the source of the funds for the River North Transfers, Kemp told Ogletree to not respond "while our Atty gets it squashed." [Email attached (without attachments) as Exhibit 4 hereto]. This was a further attempt to conceal the transfers from creditors and the Court.

## F. Malfeasance and Continued Mismanagement During the Bankruptcy

156. The actions by the Owners, entities they control (VitaNova, TXFMP, and the Owner Personal Entities), and their accomplices (Cortes and Calvert) to undermine the Debtors and harm creditors and the Estate continued even during this bankruptcy proceeding.

157. During the bankruptcy case, VitaNova (directed by the Owners) caused the Debtors' professional services firms to act in ways that did not benefit the Debtors, and instead benefitted the Insiders.

158. Indeed, Joseph Pegnia of B. Riley Advisory Services ("B. Riley"), the Debtors' Chief Restructuring Officer, wrote in an October 7, 2021 email to Gray Reed (the Debtors' bankruptcy counsel): "I think it is wrong that we have continued to work this case for their [VitaNova's] benefit . . . ." [Exhibit 5 hereto, p. 1].

159. From the beginning, the bankruptcy was structured to benefit the Owners and other Insiders. For example, VitaNova caused the Debtors to incur a debtor-in-possession line of credit (the "DIP") that was not in the Debtors' best interests. Instead, it benefitted Insiders and Affiliates: VitaNova and, through it, the Owners.

160. Then, throughout the proceeding, VitaNova made improper threats to terminate the financing, to put undue pressure on the Debtors to act in a certain way and prevent discovery of the Owners' improper acts described herein.

161. This bankruptcy was atypical, in that, instead of the Chief Restructuring Officer, B. Riley, handling day-to-day operations, financial management, accounting, and similar responsibilities for the Debtors during the proceeding, all such tasks were handed off to Insider VitaNova — and then VitaNova failed to perform the work.

162. During the proceeding, VitaNova substantially failed to provide financial and other information, and provided inaccurate information on the occasions when it did provide information, resulting in inaccurate, deficient, and missing filings by the Debtors, and resulting in increased professional fees for the Debtors and the Committee.

163. The Schedules and the few filed Monthly Operating Reports ("MORs") were — due to VitaNova's failure to provide accurate and complete information — riddled with inaccuracies and could not be relied upon by the Court or creditors.

164. The Debtors used a software accounting package that, while commonly used in complex businesses, is a specialized tool and requires specialized operating staff.

165. Before or shortly after the Petition Date, the Owners caused VitaNova to terminate all employees who knew how to use this accounting software. This meant that, during the bankruptcy, the Committee (and, subsequently, the Trustee) had no way to read or understand the data from the software; VitaNova and the Owners failed to provide the Committee with the necessary information (or access to the former employees with the knowledge). This was done by the Owners to conceal the financial information.

166. During the bankruptcy case, VitaNova continued to take management fees from the bankruptcy Estate until September 2021. Notably, the relevant management agreements were never subject to approval by the Court, and thus creditors were not given the opportunity to challenge them.

167. Despite receiving those continuing fees, VitaNova — and, specifically, Cortes and Calvert — substantially failed to perform management services for the Debtors during this time period. For example, without limitation, VitaNova failed to cause the Debtors to file tax returns, failed to provide the information necessary for MORs to be filed for the Debtors (as required by 28 C.F.R § 58.8) for most months of the bankruptcy, and provided the Debtors' professionals with inaccurate financial information that rendered financial filings for the Debtors (including the two months of MORs that were filed, one of which was late and did not cover all of the Debtors) unreliable and inaccurate.

168. During the bankruptcy case, VitaNova caused or permitted the Debtors to be shut out of their offices, and caused or permitted the Debtors' data servers — including important Debtor financial information — to be transferred from a server owned by Debtor FMPSA to the cloud, where it was beyond the control of the Debtors and the Estate. No one — neither the Owners, VitaNova, Cortes, nor Calvert — notified the Court or creditors about these prejudicial changes to the Debtors' circumstances and property during the bankruptcy.

169. Perhaps the most visible example of the Owners' attempts to (through VitaNova) control the bankruptcy proceeding to benefit themselves (instead of the Estate and creditors) was VitaNova's attempt to conduct a sham purchase of the Debtors' remaining lucrative assets.

170. During the bankruptcy case, VitaNova advocated for, and caused the Debtors to propose that, the Debtors' assets (including their only still-operating business, Tahoe Joe's) be sold to VitaNova as the stalking horse bidder. That proposed transaction (the "Failed Sale") would have provided for the repayment of the DIP to VitaNova but would have produced no cash to the Debtors and would have caused a full release of millions of dollars of potential Debtor Causes of Action, including without limitation those asserted herein.

171. The Failed Sale was designed by the Owners and VitaNova to benefit Insiders and Affiliates, particularly VitaNova. The proposal was for VitaNova to purchase the Tahoe Joe's restaurants (the only still-operating portion of the Debtors' business), all of the Debtors' intellectual property, and all Causes of Action belonging to the Debtors (including those brought in this adversary proceeding) for a credit bid of $3.5 million and the assumption of about $10.8 million in liabilities that were, in large part, wholly unrelated to the on-going Tahoe Joe's business proposed to be transferred to VitaNova. Thus, the total alleged purchase price was $14,358,000 — a price that would have produced no cash for the Estate but, by including the purported assumption of massive liabilities, was an artificially high number that chilled the market.

172. The circumstances around the Failed Sale highlighted the fact that the Owners, through VitaNova, were continuing to manipulate the Debtors for their personal benefit.

173. Indeed, when the Trustee asked B. Riley whether the Debtors' Causes of Action had been analyzed and valued for the proposed sale to VitaNova, Mark Shapiro of B. Riley told the Trustee there was no need to spend the time because it was VitaNova's company and VitaNova would own everything anyway.

174. Gray Reed, the Debtors' counsel in the bankruptcy proceeding, relied on VitaNova (as the Debtors' manager and as the proponent of the Failed Sale) to provide exhibits for an August 24, 2021 hearing on the Failed Sale. VitaNova provided what Gray Reed described as "PPP exhibits [that] are materially inaccurate such that they cannot be used," and management fee exhibits and intercompany loan exhibits that did "not appear to line up with the data that [the Debtors had] disclosed to the Court in the SOFAs." [Exhibit 6 hereto, p. 1].

175. Then, as discussed above, Calvert told Gray Reed that he did not believe the PPP forgiveness application was accurate and that he was "not comfortable testifying that PPP money out was used/spent on forgivable expenses." [Exhibit 3, p. 2].

176. VitaNova's, Cortes's, and Calvert's failures to support the sale VitaNova had advocated for were critical. As Gray Reed described it: Calvert provided exhibits "very late," Cortes provided exhibits "so useless" that they could not be used, Calvert informed Gray Reed that the PPP information provided by Cortes was inaccurate, and "VitaNova/Larry [Harris]" refused to let Gray Reed seek a continuance for the hearing, which would have allowed more time to prepare. [Exhibit 7 hereto, p. 1].

177. After considerable expense to the Debtors, the Estate, the Committee, and creditors, the Court ultimately denied the Failed Sale, in part because the Owners and VitaNova — after creating and advocating for the proposal — failed and refused to support the proposal in the sale hearing, including through Cortes and Calvert.

## G. The Challenged Transfers

178. During the 10 years before the Petition Date (the "Lookback Period"), one or more Debtors made fraudulent transfers of various property/assets to or for the benefit of the Defendants or other Insiders or Affiliates of the Debtors, as initial or subsequent transferees. All such transfers are collectively referred to herein as the "Challenged Transfers."

179. For example, the Challenged Transfers include all transfers from any Debtor to or for the benefit of any Defendant or other Debtor Insider or Affiliate, including without limitation all distributions, during the Lookback Period, that were not made for equivalent value.

180. The Challenged Transfers include all transfers of PPP funding to or for the benefit of any Defendants or other Debtor Insider or Affiliate.

181. The Challenged Transfers include all transfers from any Debtor to or for the benefit of VitaNova or TXFMP, for purported management fees, during the Lookback Period (again, it is estimated there were more than $6.9 million in overpayments of purported management fees during the period of January 2020 to March 2021 alone; likely, there were also overpayments in prior years). For amounts paid beyond the required fees under the management contracts, no consideration was given.

182. The Challenged Transfers also include all transfers from any Debtor to or for the benefit of VitaNova, for purported management fees, after the Petition Date. Again, VitaNova did not provide the management services for which those payments were allegedly made, and thus reasonably equivalent consideration was not provided. These include, without limitation: $27,870.00 transferred in or about the week of May 28, 2021; $22,123.00 transferred in or about the week of June 4, 2021; $22,565.00 transferred in or about the week of June 18, 2021; $114,109.00 transferred in or about the week of June 25, 2021; $25,437.00 transferred in or about the week of July 2, 2021; $37,823.00 transferred in or about the week of July 9, 2021; $44,450.00 transferred in or about the week of July 23, 2021; $62,952.92 transferred in or about the week of August 20, 2021; and $59,211.00 transferred in or about the week of September 3, 2021 — a total of $416,540.93.

183. The Challenged Transfers include, without limitation, the following specific transfers:

a. All transfers of PPP funding to TXFMP, including the $4,050,000 from the Buffets PPP Loan that was transferred to TXFMP on April 21, 2020 and the

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

$1 million from the Fresh PPP Loan that was transferred to TXFMP on April 17, 2020.

b. The subsequent transfers of $1 million each to All Jones, Dayspring, and Larrac, from the TXFMP Account, on April 21, 2020 (the Buffets PPP funding), for which the Debtors' records reflect no consideration given (and which were for the benefit of Jones, Kemp, and Harris and Rachel Harris, respectively).

c. The subsequent transfers of $300,000 each to Jones, Kemp, and Harris, from the TXFMP Account, on April 17, 2020 (the Fresh PPP funding), for which the Debtors' records reflect no consideration given.

d. Transfers to TXFMP of $66,000 from Food Management Partners, $265,000 from Fresh, $1,303,811 from Alamo Buffet Payroll, $1,520,000 from Tahoe Joe's, and $190,000 from Buffets, reported on the SOFAs.

e. Transfers to VitaNova of $15,000 from Fresh and $470,000 from Tahoe Joe's, reported on the SOFAs.

f. All transfers listed on Exhibit 8 hereto, which reflects transfers of the Debtors' assets to non-Debtor Affiliates within two years before the Petition Date that have been identified as of the filing of this Second Amended Verified Complaint.[2] Those transfers total about $53.5 million, including, inter alia: $29.4 million to TXFMP, $6.6 million to Alamo Dynamic (two accounts), and more than $535,000 to VitaNova

184. The foregoing are merely examples of the Challenged Transfers. The Challenged

[2] The Challenged Transactions are not limited to the two-year period preceding the Petition Date. This chart merely reflects, as exemplars, certain transfers that have been identified as of the filing of this Second Amended Verified

Transfers encompass all transfers from any Debtor to or for the benefit of any Defendant or Insider or Affiliate (either as an initial or subsequent transferee), since 2015, that were not for equivalent value or that were intended to pay Defendants, or Insiders, or Affiliates instead of creditors.

185. Due to the Owners', VitaNova's, and TXFMP's failures to keep accurate and sufficient records for the Debtors, as well as their failures to cause financial statements and other accounting documents to be prepared for the Debtors at relevant times, the Trustee has not been able to fully trace all transfers of the Debtors' assets during the relevant time period.

186. Although Cortes and Calvert are not alleged to have received any Challenged Transfers (there are no claims against them for fraudulent transfer), they are alleged to have participated in causing them and to have conspired for them, and the Challenged Transfers underlie the claims against them for breach of fiduciary duties and conspiracy to commit fraudulent transfers.

## H. Claims and Principal Creditors in the Bankruptcy

187. More than 500 proofs of claim were filed against the Debtors in these consolidated bankruptcy proceedings, totaling more than $700 million in claims. The Trust has resolved objections to claims resulting in substantial reductions to those figures, and the Trustee anticipates that the number and amount of claims will be further reduced as additional objections are resolved. However, millions of dollars will remain, as a result of the failures by the Owners and their Affiliates to adequately manage the Debtors and pay the Debtors' liabilities.

188. The proofs of claim in this case include claims filed by former employees for unpaid wages, claims filed by service providers and suppliers, claims filed by landlords for unpaid rents, and claims from taxing entities, including claims for unpaid trust fund taxes, among other things.

189. For example, the IRS has filed 14 proofs of claim for $245,238,433.26 in unpaid

Complaint. The chart is not believed to be a complete listing of all transfers that took place in the period covered by the chart.

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

taxes.

190. Employees have filed claims that, as of the filing of the Verified Second Amended Complaint, exceed $1.3 million for unpaid wages and other employment-related claims.

191. Landlords have filed claims estimated to exceed $24 million for unpaid rent.

192. The United States Department of Justice (the "DOJ") filed claims of approximately $9 million against Fresh and approximately $30 million against Buffets, for violations of the federal False Claims Act, based on the apparent PPP malfeasance alleged herein.[3]

193. The Debtors' liabilities, as represented by the claims on the claims registry, far exceed their assets.

## I. The Debtors' Records and the Trustee's Review

194. The Trustee has possession of certain Debtor records, including: documents turned over by VitaNova pursuant to the Plan, documents turned over by Debtor professionals (such as B. Riley, Gray Reed, and Ogletree) pursuant to the Plan (including Gray Reed's analysis of legal causes of action), and documents obtained by third-parties (such as Arizona Bank and Trust) pursuant to Rule 2004 requests — a universe of millions of documents. The Trustee has reviewed significant portions of those records.[4]

195. The Trustee has reviewed public records related to the Debtors, including property records related to real property owned or formerly owned by the Debtors.

196. The Trustee has reviewed filings and materials from other lawsuits filed against Debtors or their Insiders.

197. The Trustee has reviewed the record in the bankruptcy proceeding, including without limitation all filings and hearing transcripts (all of which are incorporated herein by reference).

---

[3] As of the filing of this Verified Second Amended Complaint, there is a pending motion to approve a settlement reducing those amounts to approximately $13 million.

[4] As alleged above, documents turned over by VitaNova were not in a state permitting thorough or adequate review.

198. The Trustee has reviewed the record in the prior bankruptcy proceedings.

199. The Trustee has interviewed certain Debtor Insiders and former Debtor employees.

200. The Trustee's review of the foregoing documents and information formed a basis for the allegations in this lawsuit, including those alleged "on information and belief."

201. Many of the events, actions, and omissions alleged herein were discovered as part of the Trustee's review of these materials during the bankruptcy proceeding or since the Effective Date of the Plan. Those reasonably could not have been discovered by creditors sooner because most relevant information was possessed/controlled by the Debtors and their Insiders, and because of the poor state of the Debtors' records. Additionally, the Debtors were dominated and controlled by the wrongdoers until at least the bankruptcy was filed, and, more likely, until the Effective Date of the Plan.

## CAUSE ONE

### Breach of Fiduciary Duties

202. Plaintiff incorporates by this reference the preceding paragraphs of this Verified Second Amended Complaint as if fully set forth herein.

203. Under the internal affairs doctrine, the claims for breaches of fiduciary duties, as to each Debtor, are governed by the law of the state where that Debtor was formed or incorporated. *See, e.g., In re Soporex, Inc.*, 463 B.R. 344, 405 (Bankr. N.D. Tex. 2011).

204. As direct or indirect officers (and employees of managers) of one or more of the Debtors, Cortes and Calvert owed each of those Debtors fiduciary duties.

205. Those fiduciary duties included duties of loyalty, care, good faith, and/or obedience.

206. Defendants also owed fiduciary duties to creditors of the Debtors, once the Debtors entered the zone of insolvency and/or became insolvent.

207. Defendants breached their fiduciary duties of loyalty, care, good faith and fair

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

dealing, and/or obedience, including through the actions and inactions alleged herein.

208. For example, without limitation, Defendants breached their fiduciary duties through:

a. Engaging in actions and omissions that were not in the best interests of the Debtors, and that instead were in the interests of Defendants.

b. Engaging in actions and omissions that were not in the best interests of the Debtors, after the Debtors entered the zone of insolvency.

c. Failing to use the care that a reasonable person in their position would use.

d. Authorizing, causing, receiving, and/or benefitting from transfers of the Debtors' assets (including many of the Challenged Transfers, as well as the River North Transfers) that were not for value and/or did not benefit the Debtors, but instead benefitted Defendants.

e. Authorizing, causing, receiving, and/or benefitting from transfers of the Debtors' assets (including without limitation through distributions and purported management fees), while the Debtors were insolvent or in the zone of insolvency, that allowed Defendants to receive payments in preference to the Debtors' creditors.

f. Causing the Debtors to pay purported management fees that were undue and exceeded the contractual amounts.

g. Using the Debtors for improper and potentially fraudulent purposes, including, without limitation, misuse of PPP funds.

h. Failing to apply PPP funds for their intended purposes of payroll and rent, resulting in claims against the Debtors in this bankruptcy by unpaid employees and landlords.

i. Failing to act in the best interests of the Estate and creditors during the

bankruptcy proceeding.

j. Permitting the acts and omissions alleged herein.

209. Defendants' breaches of fiduciary duties were not in the best interests of the Debtors.

210. Defendants' breaches of fiduciary duties were done in bad faith and were willful and wanton.

211. Defendants acted with deliberate intent to injure the Debtors, or with reckless disregard for the Debtors' best interests.

212. Defendants' breaches of fiduciary duties rendered the Debtors unable to meet their legal obligations.

213. The Debtors and the Trust were injured by Defendants' breaches of fiduciary duties in an amount to be proven at trial.

## CAUSE TWO

### Aiding and Abetting Breach of Fiduciary Duties, or Knowing Participation in Fiduciary Breach

214. Plaintiff incorporates by this reference the preceding paragraphs of this Verified Second Amended Complaint as if fully set forth herein.

215. In the alternative to Cause One, above, to the extent either Cortes or Calvert are found not to owe the relevant fiduciary duties, then, on information and belief (based on review of the Debtors' records and also based on each Defendant's involvement in the breaches, as described above), such Defendants knowingly participated in, aided, and abetted the fiduciary breaches set forth in Cause One.

216. Additionally, Cortes and Calvert knowingly participated in, aided, and abetted the fiduciary breaches of the Owners, All Jones, Larrac, Dayspring, VitaNova, and TXFMP that are alleged in the adversary cases against those parties (including the one from which this case was

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

severed).

217. Cortes and Calvert knew of the fiduciary relationships alleged in Cause One, above, and alleged in the adversary cases against the Owners, All Jones, Larrac, Dayspring, VitaNova, and TXFMP.

218. Cortes and Calvert participated in actions that caused breaches of those relationships, and they did so knowingly, through the conduct alleged herein.

219. The Debtors were injured by the fiduciary breaches, in which Cortes and Calvert knowingly participated, in an amount to be proven at trial.

## CAUSE THREE

### Conspiracy to Commit Fraudulent Transfers

220. Plaintiff incorporates by this reference the preceding paragraphs of this Verified Second Amended Complaint as if fully set forth herein.

221. The Owners, All Jones, Larrac, Dayspring, VitaNova, TXFMP, Cortes, and Calvert, reached agreement(s) and had meeting(s) of the minds about accomplishing one or more of the Challenged Transfers, as well as the River North Transfers. This is evidenced by, inter alia, those parties' joint participation in causing those transfers. The timing of transfers (with multiple often occurring at once, and occurring, e.g., right after receipt of PPP funds) further indicates agreements and meetings of the minds, as does the overall scheme of fraud and fraudulent transfers.

222. Specifically, there was a conspiracy to commit fraudulent transfers involving the PPP funds. And there was a conspiracy to commit other fraudulent transfers of the Debtors' assets for the benefit of Insiders, particularly the Owners.

223. Cortes and Calvert caused and/or participated in fraudulent transfers, as alleged above.

224. Cortes and Calvert also caused and/or participated in the River North Transfers,

which constituted fraudulent transfers within the meaning of 11 U.S.C. §§ 544(a), 544(b), and 548, as well as applicable non-bankruptcy fraudulent transfer law, including without limitation the UFTA. The conspirators reached an agreement and had a meeting of the minds as to those transfers, as evidenced by, inter alia, the timing of those transfers in comparison to this bankruptcy proceeding, and the effort to conceal those transfers, as well as the overall scheme of fraud and fraudulent transfers.

225. The Debtors, the creditors of the Estate, and the Trust were damaged as a result.

226. Cortes and Calvert are liable, in an amount to be proven at trial, for conspiracy to commit the fraudulent transfers alleged herein.

## CAUSE FOUR

### Tortious Interference with Contract

227. Plaintiff incorporates by this reference the preceding paragraphs of this Verified Second Amended Complaint as if fully set forth herein.

228. The 2017 TXFMP Management Agreement was a contract between TXFMP and Buffets, with Buffets' subsidiaries as third-party beneficiaries.

229. The 2015 Fresh-FMPSA Management Agreement, as assigned via the 2020 VitaNova Management Assignment, was a contract between Fresh and VitaNova.

230. The 2021 VitaNova Management Agreement was a contract between VitaNova and Buffets, with Buffets' subsidiaries as third-party beneficiaries.

231. Cortes and Calvert willfully and intentionally inferred with the 2017 TXFMP Management Agreement, the 2015 Fresh-FMPSA Management Agreement, and the 2021 VitaNova Management Agreement, including by causing the breaches of those contracts alleged above.

232. That interference proximately caused damages, including the damages caused by the breaches of those contracts alleged above.

233. Cortes and Calvert acted solely in their own interests with respect to the contractual interference.

234. Cortes and Calvert did not take these acts in good faith and believing them to be in the best interests of the corporations.

235. The Debtors were actually damaged in an amount to be proven at trial.

**CAUSE FIVE**

**Violations of RICO, 18 U.S.C. § 1961 *et seq.***

236. Plaintiff incorporates by this reference the preceding paragraphs of this Verified Second Amended Complaint as if fully set forth herein.

237. The federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, provides a civil right of action based on certain concerted criminal activities.

238. Defendants engaged in two or more "predicate acts" under RICO, including wire fraud (under 18 U.S.C. § 1343), bank fraud (under 18 U.S.C. § 1344), and loan application fraud (under 18 U.S.C. § 1014), through, inter alia, electronically submitting the inaccurate or misleading PPP loan and forgiveness applications, engaging in the improper transfers and improper use of the PPP loan funds, engaging in the other fraudulent Challenged Transfers, and engaging in the fraudulent River North Transfers.

239. For example, the PPP loan and forgiveness applications, which were processed through banks, constituted bank fraud and loan application fraud. The PPP loan and forgiveness applications were submitted over the internet and constituted wire fraud. The PPP disbursements and improper transfers of PPP funds were made through wires and constituted wire fraud. All Challenged Transfers that were made through wires constituted wire fraud.

240. In engaging in those acts, Defendants acted with intent to deceive or defraud the federal government, and with intent to defraud the Debtors, their employees, and their creditors.

241. Defendants engaged in this pattern of racketeering activity in connection with their conduct and control of various business enterprises. The primary enterprise was the overall restaurant business enterprise consisting of the Debtors and their Affiliates. Other involved enterprises included: (a) individual enterprises (entities) within that empire, (b) association-in fact enterprises among the Defendants, and (c) association-in-fact enterprises between the individual Defendants and their respective entities/holding companies.

242. Defendants violated 18 U.S.C. § 1962(a) by, inter alia, using the PPP funds in the operation of various of their enterprises instead of properly using the PPP funds for the benefit of the Debtors and their employees, and using the Challenged Transfers and the River North Transfers of the Debtors' funds in the operation of various of their enterprises.

243. Defendants violated 18 U.S.C. § 1962(c) by, inter alia, participating in the conduct of their enterprises through the inaccurate or misleading PPP loan and forgiveness applications, through the improper transfers and use of the PPP loan funds, and through the other fraudulent Challenged Transfers and the River North Transfers.

244. Defendants violated 18 U.S.C. § 1962(d) by conspiring to commit the foregoing acts, and by knowingly agreeing to the acts and the objectives thereof. As alleged throughout this pleading, each Defendant to this claim knowingly participated in some manner in the overall objective of the conspiracy.

245. Defendants' actions demonstrated continuity because there was a period of repeated conduct, consisting of several years before the Petition Date, in which they caused and participated in the fraudulent Challenged Transfers and the River North Transfers, used the Challenged Transfers and River North Transfers of funds belonging to the Debtors for their own benefit or their enterprises' benefit instead of for the Debtors' benefit, used the PPP funds for distributions and other improper uses, failed to use the PPP funds for the uses that they were intended for (such as paying

employees and landlords), and inaccurately or misleadingly filled out PPP loan forgiveness applications.

246. Defendants' actions also demonstrated continuity because there were two PPP loan applications, two PPP loan forgiveness applications, and many improper transfers of the PPP funds that were received.

247. Defendants' actions also pose a threat of continued criminal activity, including, without limitation, continued misuse of the PPP funds that were improperly transferred to them.

248. The Debtors and the Estate were damaged by this conduct, in an amount to be proven at trial.

249. The primary damages suffered by the Debtors and the Estate include: (a) all claims against the Estate by landlords and employees, who should have been paid with the PPP funds but were not, resulting in those claims; and (b) the full amount of the DOJ's claims against the Estate related to False Claims Act violations for the PPP fraud.

250. The Debtors and the Estate were also damaged through and in the amounts of the Challenged Transfers.

## CAUSE SIX

### Imposition of Constructive Trust — Against Cortes and Calvert

251. Plaintiff incorporates by this reference the preceding paragraphs of this Verified Second Amended Complaint as if fully set forth herein.

252. As alleged above, Cortes and Calvert breached fiduciary duties and/or committed fraud with respect to the Debtors.

253. The conduct on which a constructive trust is sought includes the breaches of fiduciary duties alleged in Cause One, incorporated by this reference, including without limitation specifically the conduct described at paragraph 208.

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

254. The conduct on which a constructive trust is sought also includes the fraud alleged throughout this complaint and incorporated by this reference, specifically: (1) the fraudulent transfers (and conspiracy to commit fraudulent transfers) alleged in detail throughout this pleading, including in paragraphs 102-155 and 179-185; and (2) the PPP fraud alleged in detail throughout this pleading (including without limitation the acts and omissions on which the DOJ's False Claims Act claims are based), including in paragraphs 102-155.

255. Defendants were unjustly enriched through transfers of the Debtors' assets that they each received.

256. Those transfers of assets form an identifiable res in the possession of each Defendant.

257. The Court should impose the remedy of a constructive trust on all assets of each Defendant that can be traced to the Debtors' assets, as well as on any funds that Defendants subsequently transferred to others.

## JURY DEMAND

The Trustee demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, the Trustee respectfully requests that judgment be entered in favor of the Trust and against Defendants, as follows:

A. Awarding compensatory damages to the Trust and against Defendants, in amounts to be proven at trial, including treble damages for the RICO claim, pursuant to 18 U.S.C. § 1964;

B. Imposing a constructive trust on all assets of Defendants that can be traced to the Debtors' assets, as well as on any and all such funds that those Defendants subsequently transferred to others;

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

C. Awarding the Trust its costs and, on all claims where available, attorneys' fees incurred herein; and

D. Such other and further legal and/or equitable relief as the Court deems just and proper under the circumstances.

**RESPECTFULLY SUBMITTED** this 6th day of July, 2023.

**DICKINSON WRIGHT PLLC**

By: */s/ Amanda E. Newman*
Carolyn J. Johnsen
Amanda E. Newman
Gabriel A. Blumberg
1850 North Central Avenue, Suite 1400
Phoenix, AZ 85004
*Attorneys for the Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that Notice of this document was electronically filed and served to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District on July 6, 2023.

By: */s/ Amanda E. Newman*

DocuSign Envelope ID: 2DE92921-DF6C-45F6-98B8-287B678BF67D

## VERIFICATION

I, David Gonzales, declare under oath and penalty of perjury, that:

1. I am the Plaintiff in the foregoing Verified Second Amended Complaint ("SAC").

2. I have reviewed the SAC.

3. I know or believe that all allegations in the SAC that the Plaintiff has personal knowledge of to be true.

4. I believe the allegations in the SAC that the Plaintiff does not have personal knowledge of to be true based on specified information, documents, or both.

5. I have authorized the filing of the SAC.

**DATED:** 7/6/2023

DocuSigned by:
David Gonzales
4E56D64DE9E74A0...
David Gonzales

4887-2410-5282 v2 [74463-2]