

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed June 18, 2025

_____
United States Bankruptcy Judge
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **In re:** <br><br> **FRESH ACQUISITIONS, LLC,** *et al.* <br><br> Post-Confirmation/Liquidating Debtors. | Chapter 11 <br><br> Case No. 21-30721-sgj-11 <br> (Jointly Administered) |
| **DAVID GONZALES, TRUSTEE OF THE FRESH ACQUISITIONS LIQUIDATING TRUST** <br><br>     Plaintiff. <br> v. <br><br> **ALLEN JACKIE JONES, et al.,** <br><br>     Defendants. | Adv. No. 22-3087-sgj <br><br><br> Civ. Act. No. 3:22-cv-2659-M |

**<u>MEMORANDUM OPINION AND ORDER REQUIRING LIQUIDATING TRUSTEE TO: (A) FILE LITIGATION FUNDING AGREEMENT, UNSEALED AND UNREDACTED, ON MAIN BANKRUPTCY CASE DOCKET; AND (B) APPEAR AND SHOW CAUSE REGARDING HIS AUTHORITY (OR LACK THEREOF) TO UNILATERALLY ENTER INTO SUCH AGREEMENT</u>**

1

I.  **INTRODUCTION**

This order arises in a post-confirmation Chapter 11 context. It arises against the backdrop of seven post-confirmation adversary proceedings that are being prosecuted by a liquidating plan trustee, as plaintiff (the "Liquidating Trustee" or sometimes the "LT"). The adversary proceedings have now gone on quite long, at great expense, with no end in sight (and, thus far, with no distribution to unsecured creditors).

The court learned somewhat inadvertently at a recent status conference that the Liquidating Trustee entered into a ***litigation funding agreement***—several months after his tenure began as a post-confirmation trustee, and unbeknownst to the court. According to certain defendants being sued by him, this agreement is hampering the prospect of settlement in the various post-confirmation adversary proceedings. This court was surprised to hear about a litigation funding agreement. The court never heard about it or approved it. The court has gone back and scoured the bankruptcy court docket, the Disclosure Statement that the court approved, the Plan that the court confirmed, the form of Liquidating Trust Agreement, and the Confirmation Order. Nothing. Apparently, the Liquidating Trustee believes this is irrelevant, since the litigation funding agreement was entered into ***post-confirmation*** and, he says, he controls all litigation decisions.

II.  **THE RELEVANT TIMELINE**

The timeline here bears emphasizing.

On **April 20, 2021**, Fresh Acquisitions, LLC and fourteen related entities (collectively, the "Debtors") filed Chapter 11 bankruptcy cases. The Debtors were in the restaurant business, mostly operating under the names "Furr's," "Ryan's," "Old Country Buffet," and "Tahoe Joe's."

On **December 20, 2021**, after approving a section 363 sale of the very few still-open restaurants of the Debtors, the bankruptcy court confirmed a *First Amended Joint Chapter 11 Plan*

2

*of Liquidation* (the "Plan"), DE # 498, that was proposed by an Official Committee of Unsecured Creditors ("UCC"). *See Findings of Fact, Conclusions of Law, and Order (I) Approving Disclosure Statement on a Final Basis and (II) Confirming the Official Committee of Unsecured Creditors' First Amended Joint Chapter 11 Plan of Liquidation* (the "Confirmation Order"). DE # 586. The Plan was a typical liquidating "pot plan" that we see so often in Chapter 11 cases, pursuant to which a trust (the "Liquidating Trust" or "Trust") was created, and an individual named David Gonzales of Caliber Advisors, LLC in Scottsdale, Arizona, was appointed as the Liquidating Trustee. Mr. Gonzales was a financial advisor to the UCC pre-petition, and apparently the UCC wanted him to serve as the LT because he was already somewhat familiar with issues that would be litigated post-confirmation. In accordance with the terms of the Plan, the Confirmation Order, and the Fresh Acquisitions Liquidating Trust Agreement (the "Trust Agreement"), all of the Debtors' assets, as defined in section 541 of the Bankruptcy Code, including "Causes of Action," were transferred to and vested in the Liquidating Trust. The Liquidating Trustee was granted standing to prosecute the Causes of Action. On the effective date of the Plan, the holders of general unsecured claims against the substantively consolidated Debtors received a pro-rata beneficial interest in the Liquidating Trust "in full and final satisfaction" of their claims. The Liquidating Trust received a sum of cash ($250,000) to seed the trust. In reviewing the Trust Agreement [DE # 499-1, Ex. C], the court now observes, with regret, that there was no "Oversight Committee" of trust beneficiaries, as we typically see, so as to provide a type of "corporate governance" to the Liquidating Trustee. The court is not sure why. The Liquidating Trustee makes decisions for the Trust beneficiaries (the holders of administrative, priority, and unsecured claims) and 75% of that group can vote to remove or replace the LT.

On **September 12, 2022**, the above-referenced Adversary Proceeding ("Original Adversary Proceeding") was filed. The original complaint was 71-pages long, plus eight exhibits,

3

and it named 22 defendants (plus additional "John and Jane Does" and other unknown, fictitious entities) and set forth 27 causes of action. These 27 causes of action ranged from alleged fraudulent transfers, to mismanagement, to breach of fiduciary duties, to misappropriation of government PPP funds, and numerous other torts and remedies. The court soon ordered severance—in other words, a carving up of the Original Adversary Proceeding into seven different adversary proceedings (the "Seven Adversary Proceedings"),[1] after numerous defendants argued that the complaint filed in the Original Adversary Proceeding contained improper "group pleading" (in other words, there were broad allegations against the general group of defendants in the Original Adversary Proceeding without giving clear notice regarding which allegations and claims were being asserted against whom).

On or around **July 6, 2023**, the Liquidating Trustee filed separate "amended" complaints in each of the Seven Adversary Proceedings. During the course of this litigation, the court has seen: (a) motions to withdraw the reference and jury demands (and joinders) filed by certain of the 22 defendants (which were granted, since the defendants clearly had jury trial rights, although the bankruptcy court was designated to handle pre-trial matters); (b) Rule 12(b)(6) motions to dismiss from virtually every single defendant (none were granted); (c) numerous discovery disputes (instigated with motions to compel and motions for protective order); (d) *Daubert* motions; and (e) 15 separate motions and cross-motions for summary judgment (each of which included 3,000+ pages of aggregate appendices). The six motions for summary judgment that the court has ruled upon thus far (in three of the Seven Adversary Proceedings) have been denied, meaning that at least three of the Seven Adversary Proceedings will go to jury trial. It seems likely that all Seven

---

[1] The six new adversary proceedings created were Adversary Proceeding Nos. 23-03054, 23-03055, 23-03056, 23-03057, 23-03058, and 23-03059.

4

Adversary Proceedings will go to trial. Meanwhile, the District Judge who is assigned to preside over the ultimate jury trials is retiring this summer.

**On May 3, 2023**, during the midst of this litigation blitzkrieg, and unbeknownst to the court, the Liquidating Trustee entered into a **"Master Prepaid Forward Purchase Agreement by and Between Litchfield Ventures, LLC and Fresh Acquisitions Liquidating Trust (the "Litigation Funding Agreement")** which was then amended on **October 9, 2024** (the "Funding Amendment") (sometimes, collectively, the "LFA").  The court is naturally curious why the title "Master Prepaid Forward Purchase Agreement" was used for the LFA. The court can easily imagine different motivations, but the court would merely be speculating. Nothing was filed on the docket to disclose this.  The court was only presented with the LFA *in camera* on June 16, 2025, and it is described generally below.

   III.    THE STATUS CONFERENCE

How did the court learn about the LFA?  The court had *sua sponte* set a status conference on **June 5, 2025,** for the simple reason of exploring what might be done to hurry the Liquidating Trustee's Seven Adversary Proceedings along—including a discussion of possibly ordering another attempt at mediation (it was attempted unsuccessfully once before).  As noted earlier, the court learned, to its surprise, that *the Liquidating Trustee* had entered into the LFA post-confirmation and that the agreement—according to some defendants—was hampering the prospect of a settlement.

This court wondered how this could have happened without its knowledge?  Without the creditors' knowledge? Presumably without the U.S. Trustee's knowledge (the court notes that there is nothing it could find in the regular Post-Confirmation Reports filed with the U.S. Trustee that might clue anyone into there being post-confirmation litigation funding).  The court acknowledges

5

that there is less monitoring and limited bankruptcy subject matter jurisdiction in a post-confirmation Chapter 11 context. Apparently, the Liquidating Trustee (whose compensation, by the way, is a flat $10,000 per month) believes that he has no obligation to disclose the Litigation Funding Agreement; that it is irrelevant to any discussions of settlement, since it was entered into ***post-confirmation;*** and he says he has full control over all litigation/settlement decisions (and he understands he is a fiduciary). He thinks the agreement is confidential work product and that it might give an advantage to the defendants in the Seven Adversary Proceedings if they learn of its terms. But this is bankruptcy—where there is generally supposed to be transparency and a right on the part of ***creditors*** to take positions. Shouldn't the possibility of litigation funding have at least been disclosed to the creditors before they voted on the Plan and assessed whether it was better than Chapter 7 or other alternatives?

The LT has cited authority from the non-bankruptcy world suggesting that litigation funding agreements can be shielded from production in litigation because of lack of relevance or work product privilege. *Fleet Connect Sols LLC v. Waste Connections US, Inc.,* No. 2:21-CV-00365-JRG, 2022 U.S. Dist. LEXIS 1292167, at *7 (E.D. Tex. June 29, 2022). He does not cite any authority from the bankruptcy courts. Indeed, it is commonplace for litigation funding agreements to be provided and presented for approval on notice to the creditors in bankruptcy cases. *E.g., Dean v. Seidel,* 2021 WL 1541550, at *2 (N.D. Tex. 2021) (litigation funding agreement approved when presented in connection with trustee's motion to employ special litigation counsel; appeal to Fifth Circuit was dismissed for appellant's lack of standing); *In re DesignLine Corp.*, 565 B.R. 341, 344 (Bankr. W.D. N.C. 2017) (describing the trustee's ongoing efforts to seal information relating to litigation funding arrangement and the court's ultimate ruling that permitted shielding only of the proposed litigation ***budget***); *In re Superior Nat. Ins. Gr.*, 2014 WL 51128, at *4 (Bankr. C.D. Cal. 2014) (requiring disclosure of litigation financing arrangement, but permitting the trustee to seal

6

terms relating to the amount of financing and how the money is to be used); *Motion of the Official Committee of Unsecured Creditors for Entry of an Order . . . Authorizing Entry by the Debtors' Estates Into The Litigation Funding Arrangement with Benchmark 21p, L.P.*, para 44, [DE # 10407] in *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Apr. 21, 2022) (noting that the Liquidating Trustee Agreement approved under the chapter 11 plan authorized the Liquating Trust Board created thereunder to incur additional financing to pursue litigation). *See generally* KARA BRUCE, THE PROMISE AND PERIL OF THIRD-PARTY LITIGATION FINANCE IN BANKRUPTCY, 44 No. 4 Bankr. Law Letter NL 1 (Apr. 2024) (for an extensive discussion of these issues). *See also* ND TX LR 3.1(c) (local District Court Rule requiring a "Certificate of Interested Persons" to be filed with a civil complaint, which includes "legal entities that are financially interested in the outcome of the case").

This court can find nothing in the Disclosure Statement, the Plan, the Confirmation Order, or the Trust Agreement that hinted at the possibility of a Litigation Funding Agreement or gave the LT authority to enter into one post-confirmation. There are well over a dozen provisions in these collective documents that might be considered pertinent. The court considers the most pertinent the Exhibit D attached to the Disclosure Statement that showed "Projected Cash Available for Distribution." It showed projected "Litigation Costs" ranging from $150,000 to $350,000 per year over five years (along with Trustee's monthly fee amounting to $120,000 per year). While the Liquidating Trustee has authority to hire lawyers and consultants and other professionals, **the court can find no references to post-confirmation borrowing by the Trust to fund litigation**. As shown below, these projections for professional fees have been exceeded greatly, and the litigation funding (if allowed to stand, per the LFA) is going to greatly impair any possible creditor recovery: it will result in another huge obligation that presumably will have to be paid before prepetition creditors ever see a dime of recovery.

7

At the June 5, 2025 status conference, the court orally ordered the Liquidating Trustee to file the Litigation Funding Agreement with the court. He resisted. The court indicated it was ordering global mediation and *might* require the Litigation Funder to attend (given the complaints of some of the defendants). Again, the LT resisted the notion of the Litigation Funder being included in mediation. The LT has now filed his "Motion for Entry of an Order Authorizing the Trustee to File Agreement *Under Seal*" (the "Sealing Motion") [DE #402]. He filed it only in the above-referenced adversary proceeding (i.e., the Original Adversary Proceeding) not the main bankruptcy case; thus, it is unlikely the U.S. Trustee or any prepetition creditors monitoring the case saw it. Among other things, the LT argues he actually did notify the court and beneficiaries of the Trust (i.e., prepetition creditors) that the LT had entered into the LFA in a "Notice of Trustee's Status Report to Beneficiaries" he filed on August 22, 2024 (Status Report") [DE # 1097]. However, it is certainly not clear at all that the Trust Agreement gives him authority to do this. Moreover, this Status Report was filed almost a year and a half after the Litigation Funding Agreement was executed. The Status Report is extremely dense with information and legal advocacy regarding his causes of actions against numerous defendants. It contains extensive detail about the LT's different claims and strategies and his "stunning discovery finds,"[2] and the zealous resistance from the numerous defendants he is suing. Buried in the Status Report (which is 15 pages, plus 7 pages of rather sensational email attachments), there is one sentence that generically references the fact that the LT had obtained litigation funding. Specifically, after noting that the Debtors' "Owners" were and are "covered by a $2 million D&O policy paying all of their legal fees," the Status Report stated: "The Trustee countered this strategy by securing litigation financing that he believes will be ample to

---

[2] Without a doubt, some of what was disclosed is stunning. Among other things, it appears that millions of dollars of PPP funds may have been grossly misused by prior owners of the Debtors for their own personal benefit. Nothing in this Order should be construed as casting doubt upon the LT's claims.

8

withstand a full trial if necessary." DE # 1097, p. 5 (middle of paragraph 8). That's it. In any event, the LT also argues that only the court's eyes should see the LFA because it would "expose his case strategies" and "impair his ability to obtain further access to financing," and will "impact his ability to settle with the Defendants." DE # 402 at p. 2.

### IV.     THE LITIGATION FUNDING AGREEMENT

The court has reviewed, *in camera,* the LFA, which was supplied by the LT on June 16, 2025, after filing his Sealing Motion. To be sure, not all litigation funding agreements are the same. Presumably, sometimes law firms simply enter into them directly with funders, and the funding might not be that remarkable (for example, the litigation funder might share in a law firm's contingency fee). It might be pricey generally, because of risks and the typically nonrecourse nature of it if litigation is not successful. But this LFA seems rather amazing. As noted earlier, the court notes that the term "Forward Purchaser" is used, rather than Funder, and the Liquidating Trustee is referred to as "Forward Seller." The document is marked "Confidential." It indicates that it is governed by Delaware law. It also provides that any disputes under it shall be decided by arbitration. ***There is no mention of the bankruptcy court or case number***. The LFA does at least indicate that the Liquidating Trustee has the sole and exclusive right to settle any claim. But the LT has to provide all details about a settlement to the Litigation Funder in writing within two business days (details include such things as offers, demands, proposals, and substance of discussions).

The pricing for the funding is not crystal clear. But it appears that there is a guaranteed funding commitment of $2,325,000 (with a substantial amount funded up front). It also appears that the promised "return" to the Funder is **three multiplied by whatever the Funder funds, plus a 12% return** (increased in the Funding Amendment from the original 8%). If there is a default, the "Default Rate" of interest to be charged is **20% per annum compounded monthly**. The LT gave

9

the Funder a security interest in the litigation proceeds and the claims themselves. Wow. Is this reasonable? Are these market terms? The LT says yes. The court's simple computations suggest the following: assuming **$2,325,000** is funded (which this court assumes has been fully extended by now—as addressed in Section V below), then the Funder will receive the first **$6,975,000** of the any litigation proceeds (3 times $2,325,000) **plus** whatever interest is computed for the 12% return (or 20% if the LFA is in default). That's like several hundred thousand dollars more.

Other random observations: (1) it appears that a broker named Fincorp Associates, LLC (individual name Les Baer) obtained a $75,000 broker fee for arranging the litigation funding (this was not disclosed anywhere); (2) the LT must consult with the Funder regarding any new counsel brought in; and (3) there are indemnities provided by LT to Funder.

V.    **LIQUIDATING TRUSTEE'S PROFESSIONAL FEES AND COSTS POST-CONFIRMATION**

Interestingly, while the Liquidating Trustee's counsel was not required to file fee applications during this post-confirmation phase of the case (which is, of course, not unusual post-confirmation in Chapter 11), the court entered a "Sua Sponte Order Directing Fee Reporting by the Liquidating Trustee" on May 13, 2022 ("Sua Sponte Order"), after former Debtors' counsel raised concern about the LT's litigation tactics in a contested matter. The latest report filed by the LT shows the following pertinent information: (a) LT's counsel has been paid **$2,215,908.49** for post-confirmation fees and expenses (it has billed a total of $4,342,186.58); (b) the LT's financial advisory firm Caliber has been paid **$371,737.80** for post-confirmation fees and expenses (it has billed $380,212.80)—and this is in addition to LT's individual $10,000 flat monthly fee during the case, for which he has been paid **$330,000**; (c) other professionals (tax accountant and a firm handling a contract matter of some sort) have cumulatively been paid **$13,214**). DE # 1111.

10

**Roughly $3 million**. While this fee payment information shows up in the LT's ten different "Reports of Professional Fees and Costs" filed with the court, pursuant to the court's Sua Sponte Order, the court notes that none of these disbursements show up on the regular Post-Confirmation Reports (13 of them altogether) filed with the U.S. Trustee (perhaps the LT thought it was not necessary since the disbursements were apparently made with Litigation Funding as opposed to assets liquidated from Causes of Action?). One can deduce that the fees and expenses must have been funded from the Litigation Funding since, as noted earlier, the Trust was seeded with only $250,000 cash, and the LT's August 22, 2024 Status Report indicated he has recovered only $375,000 from his post-confirmation settlements/litigation since his appointment in January 2022. DE # 402, para. 6.

## VI.    CONCLUSION

The court is mindful of the wise words from Judge Posner of the Seventh Circuit many years ago, in a slightly different context (involving a Chapter 7 trustee):

> The . . . trustee's case . . . invites consideration of ***the exercise of litigation judgment*** by a Chapter 7 trustee. The filing of lawsuits by a going concern is properly inhibited by concern for future relations with suppliers, customers, creditors, and other persons with whom the firm deals (including government) and by the cost of litigation. The trustee of a defunct enterprise does not have the same inhibitions. A related point is that while the management of a going concern has many other duties besides bringing lawsuits, the trustee of a defunct business has little to do besides filing claims that if resisted he may decide to sue to enforce. ***Judges must therefore be vigilant in policing the litigation judgment exercised by trustees in bankruptcy***, and in an appropriate case must give consideration to imposing sanctions for the filing of a frivolous suit. The Bankruptcy Code forbids reimbursing trustees for expenses incurred in actions not "reasonably likely to benefit the debtor's estate," 11 U.S.C. § 330(a)(4)(A)(ii)(I), and authorizes an "appropriate sanction" against parties who file such a claim. Bankruptcy Rule 9011(b)(2), (c)(1)(B); In re Bryson, 131 F.3d 601, 603–04 (7th Cir.1997); In re Cohoes Industrial Terminal, Inc., 931 F.2d 222, 227 (2d Cir.1991). Not "reasonably likely to benefit the debtor's estate" may well be a correct description of this suit.

*Maxwell v. KPMG, LLP,* 520 F.3d 713, 718 (7th Cir. 2008) (emphasis added). Here, the issue is different than in the *Maxwell* case (the court does not believe that the LT has brought frivolous claims), but the LT's litigation judgment is still implicated—and, perhaps it is worse than that, in that it appears that the LT's act in obtaining litigation funding was done ***without adequate disclosure to creditors and the court or authority***. And it is not just any litigation funding. It is litigation funding that this court cannot imagine approving in a context such as this. Maybe an expert witness would testify that it is not outrageously expensive. But it sure looks outrageous on the surface. ***We are in the world of bankruptcy where creditor recoveries are of paramount concern***. The creditors in this case were warned that ultimate recovery was uncertain. But they were advised in the Disclosure Statement that projected professional fees would run from $150,000 to $350,000 per year, and they were never told that the LT might pledge their recoveries in favor of pricey financing if things did not go according to plan. When the LT pivoted to the pricey Litigation Funding, it was done with little to no transparency. As the court indicated at the June 5, 2025 status conference, the court is having trouble seeing how "the juice will ever be worth the squeeze" here. It would appear that the unapproved Litigation Funding has ensured that.

For the reasons set forth above:

**IT IS ORDERED** that the Liquidating Trustee shall file on the docket in the main bankruptcy case, within 8 days, the Litigation Funding Agreement;

**IT IS FURTHER ORDERED** that the Liquidating Trustee shall appear on **July 30, 2025 at 1:30 pm** before the bankruptcy court and show cause ("Show Cause Hearing") as to whether his entry into the LFA was legally proper (presenting all arguments as to why—despite an apparent absence of authority in the Trust Agreement and lack of disclosure in the Disclosure Statement) and also whether the LFA was entered into in the exercise of reasonable business judgment. The

Liquidating Trustee shall be permitted to put on any testimony regarding whether it reflects reasonable market terms and whether (unbeknownst to the court) this is a standard practice of post-confirmation Chapter 11 trustees.[3]

**IT IS FURTHER ORDERED** that any party-in-interest besides the Liquidating Trustee who wishes to be heard must file a responsive pleading to this Order within 21 days and file a witness and exhibit list three days before the Show Cause Hearing, if it desires to put on evidence;

**IT IS FURTHER ORDERED** that the court will consider all remedies, potential sanctions, and potentially an order voiding the Litigation Funding Agreement, depending on the argument and evidence of the Liquidating Trustee.

###END OF ORDER###

---

[3] In other words, does the LT perceive it to be a standard practice to obtain post-confirmation litigation funding without any foreshadowing in a Disclosure Statement or any authorizing provisions in a Liquidating Trust Agreement?